```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON

 3                            - - -
        UNITED STATES OF AMERICA,      .  Case No. 5:17-CR-0118
 4                                     .
               Plaintiff,              .
 5                                     .  Lexington, Kentucky
               - v -                   .
 6                                     .  Thursday, February 27, 2020
        KATHARINE MATTHEWS, et al.,    .  9:13 a.m.
 7                                     .
               Defendants.             .        JURY TRIAL DAY 4
 8                            - - -

 9                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KAREN K. CALDWELL
10               UNITED STATES DISTRICT COURT JUDGE

11                            - - -
        For the United States:    ROGER WEST, ESQ.
12                                DMITRIY SLAVIN, ESQ.
                                  WILLIAM P. MOYNAHAN, ESQ.
13                                Assistant U.S. Attorneys
                                  United States Attorney's Office
14                                260 West Vine Street, Suite 300
                                  Lexington, Kentucky  40507
15
        For the Defendant         ANDREW M. STEPHENS, ESQ.
16      Katharine Matthews:       117 West Second Street
                                  Lexington, Kentucky  40507
17
        For the Defendant         CALEB E. MASON, ESQ.
18      Robert Chipperfield, Jr.: Werksman, Jackson and Quinn
                                  888 West Sixth Street, Fourth Floor
19                                Los Angeles, California  90017

20
        For the Defendant         RUSSELL JAMES BALDANI, ESQ..
21      Torrey Ward:              Baldani Law Group
                                  300 West Short Street
22                                Lexington, Kentucky  40507

23

24      Appearances continued on next page

25
```

Appearances continued on next page

1    APPEARANCES CONTINUED:

2

3    For the Defendant          RANDY SUE POLLOCK, ESQ.
     Nader Sarkosh:             286 Santa Clara Avenue
4                               Oakland, California  94610

5    Court Reporter:            LINDA S. MULLEN, RDR, CRR
                                Official Court Reporter
6                               101 Barr Street
                                Lexington, Kentucky  40507

7

8    Proceedings recorded by mechanical stenography, transcript
     produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4 - 3

CEDRIC FAJARDO - CROSS

```
 1        (Proceedings in open court, February 27, 2020, 9:13 a.m.)
 2        THE COURT:  Good morning.  The record will reflect that
 3   all members of the jury are present in the courtroom along with
 4   all parties and counsel.  The witness is seated on the stand,
 5   having been previously sworn.  I remind you, sir, you remain
 6   under oath.
 7        Mr. Mason.
 8        MR. MASON:  Thank you, Your Honor.
 9                          CEDRIC FAJARDO
10                        CROSS-EXAMINATION
11   BY MR. MASON:
12   Q.   Good morning, Mr. Fajardo.  Good morning.
13   A.   Oh, good morning.
14   Q.   I would like to start by going over some of your testimony
15   from yesterday about your relationship with Robert Carlson.
16        First of all, can you remind me, you had involvement with
17   Mr. Carlson from 2017, correct?
18   A.   Yes, I did.
19   Q.   That involvement in 2017 began in February, correct?
20   A.   Say right at the very end of February or the very
21   beginning of March.  It was more likely March 1st or later.
22   Q.   Well, you were exchanging text messages with him in early
23   February 2017?
24   A.   Oh, I was, okay.
25   Q.   Is that a yes?
```

CEDRIC FAJARDO - CROSS

1   A.   I can't recall exactly.  It's been three years.

2   Q.   In fact, in February 2017, you were exchanging text

3   messages with him about using the computer businesses as a

4   story, correct?

5   A.   I don't recall.

6   Q.   Would it refresh your recollection to see your text

7   messages from February 14th, 2017?

8   A.   Yes, definitely would.

9   Q.   Okay.

10       MR. MASON:  May I hand one to the --

11       THE COURT:  You may.

12  BY MR. MASON:

13  Q.   Sir, I've handed you your text messages with Mr. Carlson

14  from 2014.  If you turn to the page -- to the second page, so

15  we're looking at February 14th, 2017.

16       Message:  That guy called for a reference when I was

17  sleeping.  What is the story I stick to?

18       Do you see that message?

19  A.   Correct.  Yes.  I do see that message.

20  Q.   His response:  That we worked together before selling IT

21  basically.  If he asks why we don't anymore, maybe say that's

22  somewhat confidential.  I'm pretty much overqualified so I

23  would like to be in the driver's seat when they figure out I

24  can be sporadically unreliable.

25       That's what you wrote, isn't it, sir?

CEDRIC FAJARDO - CROSS

1   A.   Yes, it is.  I haven't seen these in a long time.  I

2   forgot that these were even made.  This is the first time I'm

3   seeing these in three years.

4   Q.   Remind me, sir.  Is that what you wrote or is that what

5   Robert Carlson wrote?

6   A.   That's what I wrote.

7   Q.   Okay.  So the next one then, the response, which says:

8   Maybe not disclose my propensity for substance abuse and

9   episodical mania.

10       Is that you or Robert Carlson?

11  A.   That's me.

12  Q.   You had a propensity for substance abuse?

13  A.   I did, yes, occasionally.  And then I -- I then would go

14  into periods of sobriety and then I would relapse and then --

15  Q.   So the question, sir, at the time you wrote this,

16  February 14, 2017, correct, you had a propensity for substance

17  abuse and episodical mania, correct?

18  A.   I had a propensity, and it's more of a joke, episodical

19  mania.  But yeah, I've had mental problems.  I'm not a

20  professional psychiatrist.

21  Q.   What do you mean by "episodical mania"?

22  A.   I go into periods of depression.  And that's probably an

23  overstatement, but I really don't have periods of mania where

24  that would be a reference to bipolar mania, where there would

25  be high ups and low lows, and I do have low lows.

CEDRIC FAJARDO - CROSS

1    Q.   All right.   You were corresponding with Robert Carlson in

2    the middle of February 2017, correct?

3    A.   Yes.

4    Q.   You were corresponding about working with him, correct?

5    A.   This particular conversation is I'm trying to -- I'm

6    getting a job with a company that's actually close to Santa Ana

7    that does computers, and they are hiring me to create a whole

8    new arm of their business dedicated to enterprise business

9    servers.   And I'm using Rob Carlson for a reference because

10   he's the only one I worked with.

11   Q.   Within a month of these text messages, you testified

12   yesterday you were back smuggling cocaine with Robert Carlson,

13   correct?

14   A.   Right.   Yeah.

15   Q.   Now, you testified that you began your involvement with

16   the cocaine smuggling venture that ended up with you smuggling

17   cocaine into Kentucky in March 2017, correct?

18   A.   Yes.

19   Q.   You testified that you had a period sometime before that

20   when you said you were not involved with smuggling drugs with

21   Robert Carlson, correct?

22   A.   A very large period, yes.

23   Q.   I want to know what that period was.   Was that period more

24   than one year?

25   A.   Every time before this --

CEDRIC FAJARDO - CROSS

1    Q.    Sir, it would be helpful for the record if you would let

2    me finish a question, and then the court reporter can get a

3    clear transcript.

4         Was that period more than one year?

5    A.    Yes.

6    Q.    So that your testimony is that from at least -- and then

7    we're going to try to narrow it down further -- from at least

8    March 2016 to March 2017 you had no involvement with

9    Mr. Carlson; is that your testimony?

10   A.    Correct.

11   Q.    Does that gap go even further back?  What about

12   February 2016, does it go back more than a year?

13   A.    February, I think we're still cleaning up loose ends with

14   the business.  We're still moving furniture out of the old --

15   the old lease.  I'm picking up any parts that are at his house.

16   Q.   I'm talking about drug smuggling.  You said that there was

17   a gap in time.  We've identified March 2017, right, as the end

18   of that gap, when you went into the smuggling business to bring

19   drugs into Kentucky.

20   A.   Beginning of the drug smuggling business was after this.

21   Q.   Sir, I need to be able to ask a question, and if you would

22   listen --

23        THE COURT:  Excuse me.  Maybe you should break the

24   questions down a little better, Mr. Mason.

25        Listen carefully to Mr. Mason and wait until he's finished

CEDRIC FAJARDO - CROSS

1  to answer a question.

2  BY MR. MASON:

3  Q.   What was the time that you stopped smuggling drugs in

4  2016?

5  A.   Are you implying I was smuggling drugs beforehand?

6  Q.   Were you never smuggling drugs with Mr. Carlson at all

7  until March 2017?

8  A.   Correct.

9  Q.   Okay.

10  A.   That's what I'm saying.

11  Q.   Prior to March 2017, you never had any agreement with

12  Mr. Carlson to smuggle drugs?

13  A.   No.

14  Q.   Prior to March 2017, you were never involved with

15  Mr. Carlson in any conspiracy to smuggle drugs?

16  A.   That one time when I booked the hotel room and I knew that

17  he was driving methamphetamine up to Seattle, I'm not sure, but

18  I'm sure that could be construed as part of a conspiracy.

19  Q.   So that's the one occasion, you booked a hotel room for

20  him when he was driving to Seattle --

21  A.   Yes.

22  Q.   -- on this one-time trip, correct?

23  A.   Yes, as far as I can recall.

24  Q.   You had no involvement other than booking that one hotel

25  room with Mr. Carlson in any venture to smuggle drugs until

CEDRIC FAJARDO - CROSS

1  March 2017, that's your testimony?

2  A.  Yes.

3  Q.  Now, let's talk about Mr. Carlson.  You testified that

4  Mr. Carlson lied to people repeatedly, correct?

5  A.  Yes.

6  Q.  You testified that Mr. Carlson used people repeatedly,

7  correct?

8  A.  In my opinion, yes.

9  Q.  You observed it directly, didn't you?

10  A.  Yeah.

11  Q.  Yes?

12  A.  Yes.

13  Q.  You testified that he used you, correct?

14  A.  Correct.

15  Q.  He lied to you, among other things, about whether or not

16  you would be paid, correct?

17  A.  Yes.

18  Q.  He lied to you about the nature of the jobs he wanted you

19  to do for him, didn't he?

20  A.  Yes.

21  Q.  He lied to other people about the nature of the business

22  that he was in, didn't he?

23  A.  Yes.

24  Q.  For example, he told people he was in strip clubs,

25  correct?

4 - 10

CEDRIC FAJARDO - CROSS

1    A.   Yes, that's one example.

2    Q.   He told people that he was a flashy, successful

3    entrepreneur, correct?

4    A.   Yes.

5    Q.   He presented a facade to the world of being a flashy,

6    successful entrepreneur, correct?

7    A.   Yes.

8    Q.   He persuaded a lot of people in his life that he was

9    something that he was not, correct?

10   A.   Yes.

11   Q.   Would it be fair to say Robert Carlson was a professional

12   con artist?

13   A.   At times, yes.

14   Q.   Now, you testified that Robert Carlson did in fact have a

15   computer business, correct?

16   A.   Yes.

17   Q.   In fact, he had multiple companies that he incorporated?

18   A.   Yes, he had a lot of legitimate enterprises that propped

19   up some of his -- some of his illegal or not truthful

20   businesses.

21   Q.   He had multiple legitimate enterprises, correct?

22   A.   Yes, he did.

23   Q.   These included Fly Malibu, Incorporated?

24   A.   Yes.

25   Q.   Fly Malibu Aviation, Incorporated?

4 - 11

CEDRIC FAJARDO - CROSS

1    A.    They are legitimate entities.  I'm not -- I don't know

2    exactly what they did.

3    Q.    Okay.  My question is just, are you aware of the companies

4    that Robert Carlson had incorporated?

5    A.    Yes, I am.

6    Q.    These included also Discount Servers, correct?

7    A.    Correct.

8    Q.    Discountserversdirect.com, correct?

9    A.    Correct.

10   Q.    Gordon Gekko Holdings, Incorporated, correct?

11   A.    Yes.

12   Q.    Big Blue Renew, Incorporated, correct?

13   A.    Yes.

14   Q.    One Percent Aviation?

15   A.    Yes.

16   Q.    Tablesoft, LLC?

17   A.    I have never heard of that one.

18   Q.    PCServices911?

19   A.    Yes.

20   Q.    Malibu Servers, Incorporated?

21   A.    Yes.

22   Q.    Server Marketplace, Incorporated?

23   A.    Yes.

24   Q.    And you and Robert Carlson, you testified, did real

25   computer-related work, correct?

CEDRIC FAJARDO - CROSS

1    A.    Yes.

2    Q.    For real clients, correct?

3    A.    Yes.

4    Q.    You really did buy servers in bulk, correct?

5    A.    Yes.

6    Q.    You really did refurbish them, correct?

7    A.    Yes.

8    Q.    You really did sell them to real customers, correct?

9    A.    Yes.

10   Q.    I would like to discuss your preparation for your

11   testimony.

12         You made a decision to cooperate with the government at a

13   certain point in time, correct?

14   A.    Yes.

15   Q.    That point in time was April 28, 2017, wasn't it?

16   A.    Officially, yes.

17   Q.    That's the date you first had the meeting with the

18   government when you first told these gentlemen that you were a

19   criminal.

20   A.    I decided when -- when they asked if I wanted to talk with

21   them when I first got arrested, I was willing to with an

22   attorney.  But I could not be assigned an attorney yet until

23   after the weekend, until I had been arraigned.

24   Q.    You were arraigned on April 27, 2017?

25   A.    Okay.  Yes.

CEDRIC FAJARDO - CROSS

1   Q.   And you were arraigned together with Robert Carlson,

2   weren't you?

3   A.   Yes, I was.

4   Q.   You were standing together in the same room, correct?

5   A.   Yes, this room.

6   Q.   And you were held in the marshal cell together that same

7   day, weren't you?

8   A.   Yes, we were.

9   Q.   And it was that very same day that both of you first went

10  down to talk to these gentlemen to tell them you wanted to

11  cooperate; isn't that true?

12  A.   I already agreed, even before we were in the cell

13  together, when I had met my attorney.

14  Q.   You had already made the decision when you met your

15  attorney that you were going to cooperate?

16  A.   And I told my attorney, and my attorney had notified the

17  government even before we were in the cell, or that I even knew

18  that Rob Carlson wanted to speak to the government as well.

19  Q.   And you made that decision when you found out that you

20  were looking at 20 years, didn't you?

21  A.   Before I even knew what the penalties were, I had decided.

22  Like I said, as soon as I got arrested, I was willing to talk.

23  I did not know the penalties or anything at that time.

24  Q.   But, in fact, you didn't talk until you found out that you

25  were facing 20 years; isn't that true, sir?

CEDRIC FAJARDO - CROSS

1   A.   No, I didn't talk until I had an attorney present to

2   protect my rights.

3   Q.   Okay.  Robert Carlson made the decision to talk to the

4   government on the same day as you did; isn't that true?

5   A.   I'm not sure when he made the decision.

6   Q.   You discussed it in the cell, didn't you?

7   A.   He said he's telling the truth.  I didn't discuss.  He

8   made a statement.

9   Q.   He told you he was cooperating, didn't he?

10  A.   Yes.  He said, yeah, it's just time to tell the truth.

11  Q.   At that point you knew that the only way you were going to

12  get a benefit for yourself was if you could implicate as many

13  other people as possible; isn't that correct?

14  A.   No.  Because at that point I had not yet spoken to the

15  government.  I didn't know what they wanted from me.  I didn't

16  know -- some people that are implicated today, I don't know

17  them.  I don't -- so there was nothing predetermined before

18  ever talking to them.

19  Q.   The government asked you to implicate other people, didn't

20  they?

21  A.   No, they did not.

22  Q.   Did the government ever ask you questions about other

23  people's involvement?

24  A.   Yes, they did.

25  Q.   Isn't it true, sir, that in a way you are responsible for

1    Robert Carlson getting into the drug business in the first

2    place because he asked you for connections in the drug

3    business?  That was your testimony yesterday, correct?

4    A.   That was a decision he made on his own.  Whether he tried

5    to scour my contacts or anyone else's contacts, that's his

6    decision.  He would have done that on his own.  I didn't force

7    him to do anything.  He was ready to go as soon as he started

8    running out of money.

9    Q.   And he asked you to recommend contacts in the drug

10   business.  That was your testimony yesterday, correct?

11   A.   Yes.

12   Q.   And you introduced him to people, didn't you?

13   A.   Yes, I did.

14   Q.   Now, you didn't mention names in your direct testimony.

15   A.   I didn't.

16   Q.   Who did you introduce him to, what names?

17   A.   One was a friend that I knew that had contacts, because I

18   don't have -- I personally don't have any contacts in a

19   larger -- the larger drug business.  I'm a street-level user.

20   Q.   Sir, my question was what names?

21   A.   Jimmy Kim was one of them.  And then also my mother.  And

22   that's actually the extent of it.

23   Q.   You introduced Carlson to your mother, correct?

24   A.   Yes.

25   Q.   Because your mother was in the drug trafficking business,

CEDRIC FAJARDO - CROSS

1    correct?

2    A.    No.   That came -- that came about from when the credit

3    card incident happened in 2012, so they already knew each

4    other.

5    Q.    You were arrested in 2014 for drug trafficking, weren't

6    you?

7    A.    No, I was not, for drug trafficking.

8    Q.    You were arrested in 2004 for drug trafficking, weren't

9    you?

10   A.    At that time it was charged as intent to distribute but

11   that's not what it was.   It ended up being charged as a simple

12   possession.

13   Q.    It was charged as intent to distribute initially, correct?

14   A.    Initially, yes.

15   Q.    What were the substances?

16   A.    Ecstasy, cocaine, GHB and steroids.

17   Q.    What is GHB?

18   A.    It's a central nervous system depressant, Gamma

19   Hydroxybutrol [sic].

20   Q.    It's colloquially known as a date rape drug, isn't it?

21   A.    No, not that I know of.   I've never referred to that as

22   that.   The date rape drug I know is -- heard in the news is

23   called Rohypnol, which they don't make anymore.

24   Q.    What is GHB used for?

25   A.    It's used as a club drug, people that dance.

1    Q.   So you had four different substances you were charged with

2    distributing, correct?

3    A.   Yes.

4    Q.   You were already in the drug business from 2004 then, sir?

5    A.   I was not in the drug business at the time.  That was for

6    personal use.  I had a home off base and we had -- basically my

7    whole unit partied there with me when we all got back from

8    Iraq, maybe 45 days beforehand.

9    Q.   You were arrested in 2014 in Los Angeles on drug charges,

10   weren't you?

11   A.   Yes, I was.

12   Q.   What was the substance there?

13   A.   Possession of about a gram of cocaine and maybe about a

14   gram of Ketamine.

15   Q.   Cocaine and Ketamine.  What's Ketamine used for?

16   A.   It's a tranquilizer that's used on both humans and

17   animals.  And it's used on the party scene.  It's a

18   dissociative, kind of like a hallucinogenic.

19   Q.   You were also caught with MDMA, weren't you?

20   A.   Yes, I was.

21   Q.   You were caught after you climbed a fence and entered

22   somebody's yard and were found in their back yard; isn't that

23   correct?

24   A.   Yes.

25   Q.   The resident called the police, right?

CEDRIC FAJARDO - CROSS

1   A.   Yes, they did.

2   Q.   They had to hold you there, didn't they?

3   A.   They didn't have to.  I was lost in the neighborhood and I

4   was trying to get out of that neighborhood.  Personally, I

5   think they attacked me.

6   Q.   Then you went to court on September 17th, 2014, correct?

7   A.   Yes.

8   Q.   Now, you said yesterday that you were not aware that you

9   ever had an obligation to appear in court.  That's not really

10  true, is it, sir?

11  A.   No, that's not how I stated that.

12  Q.   In fact, you appeared three times on that case with a

13  lawyer, didn't you?

14  A.   Well, the first time they did not charge me, they just

15  told me to go home, so there was no charge.

16  Q.   Sir, you appeared three times in court in Los Angeles with

17  a lawyer.

18       THE COURT:  Wait, there's an objection?

19       MR. WEST:  If Mr. Mason would allow the witness to answer

20  the question before beginning another one, please.

21       THE COURT:  All right.  Let the lawyer ask a question and

22  then listen to that question and answer that question.

23       Mr. Mason, try to break it down a little bit.

24       MR. MASON:  Thank you.  I'll ask again.

25  BY MR. MASON:

4 - 19

CEDRIC FAJARDO - CROSS

1   Q.   You appeared three times in Los Angeles Superior Court

2   with a lawyer, true?

3   A.   Yes.

4   Q.   We even know the lawyer's name, don't we?

5        MR. WEST:  Objection.  May we approach, please?

6        THE COURT:  Approach.

7        (Bench conference on the record.)

8        THE COURT:  Mr. West.

9        MR. WEST:  Yes, Your Honor.  I've let this go for a while,

10  but we're past the point of relevance in asking these

11  questions.  Whether or not he appeared three times, the name of

12  his lawyer and those things, whether he was in a back yard when

13  the resident called the police have nothing to do with

14  impeachment in this matter.

15       He can ask if he's been convicted of this offense.  Going

16  to the intimate details of each one is past the point of

17  relevancy.

18       MR. MASON:  Your Honor, if I may?

19       THE COURT:  You may.

20       MR. MASON:  He testified yesterday that he was not aware

21  that he had a case in Los Angeles until he had a traffic stop

22  three years later.  He specifically denied any awareness that

23  he was on a fugitive status or that he had an obligation to

24  appear.

25       Well, I have the docket sheet for that case and he

CEDRIC FAJARDO - CROSS

1    appeared three times with an attorney.  And he was advised of

2    his obligation to return.  And the minutes reflect that he

3    stood in front of the court and told her that he knew he had

4    that obligation and he had to return.  The whole issue in this

5    case is the truthfulness of this witness and his propensity to

6    lie to a court.  And he's done it before.

7         THE COURT:  I have a question.  I'm a little confused,

8    because I thought that yesterday he testified that he didn't

9    know there was a warrant for his failure to appear.

10        Am I correct?

11        MR. WEST:  Right.

12        MR. MASON:  Well, Your Honor, that's not how I heard the

13   testimony.  I think he said he was not aware that he had any

14   obligation to be in court, and he only found out when he was

15   pulled over in a traffic stop in 2017.

16        But I have three appearances where he stood in court and

17   told the judge, I will be back.  And then he didn't appear.

18        THE COURT:  Well, again, I think he said he didn't know of

19   a warrant that had been issued for his failure to appear

20   yesterday.  I mean, I've let him testify about charges that are

21   outside the ten-year mark.  You know the rule, 609.  I've let

22   you go into this.

23        I'm going to direct that you finish up on this line of

24   questioning.  We are not going to drill down into the essence

25   of these former convictions.

4 - 21

CEDRIC FAJARDO - CROSS

1      But why don't you ask him what his testimony was yesterday

2   so that we are all on the same page.

3      MR. MASON:  Thank you, Your Honor.

4      Just for clarification, there are multiple areas in which

5   this witness has lied or prevaricated to official bodies, and I

6   do want to explore those because that's what he's doing today.

7   The government has put him on as somebody that they believe is

8   trustworthy.

9      THE COURT:  I understand that.  But he offered absolutely

10  no evidence against your client, did he?  None.  Your client's

11  name was never mentioned, was it?

12     MR. MASON:  That is true.  And I'm only going to ask about

13  his general credibility because he is part of the government's

14  case about this general --

15     THE COURT:  Well, Mr. Stephens had him on the stand for

16  over three hours.  You've had him on the stand.  I've been very

17  liberal with this, but we talked about this before we began the

18  trial.

19     I understand that these witnesses need to be impeached.  I

20  understand that Mr. Carlson -- I let you have at him over

21  Mr. Carlson.  But what we're getting into here is well beyond

22  any interest your client may have.  I don't see how you are

23  prejudiced and that Mr. Chipperfield is prejudiced in any way

24  by putting an end to this inquiry.

25     MR. MASON:  I will put an end to it then.

4 - 22

CEDRIC FAJARDO - CROSS

1          THE COURT:  Thank you.

2          (Bench conference concluded.)

3          THE COURT:  You may proceed, Mr. Mason.

4          MR. MASON:  Thank you.

5     BY MR. MASON:

6     Q.    In yesterday's testimony, was it your testimony that you

7     were completely unaware of your obligation to return to court

8     in the 2014 Los Angeles case?

9     A.    Okay.  So I was arrested and I was given bail, and then I

10    had a court date.  I showed up at that court date.  And

11    where -- I did not have an attorney yet, but I was assigned a

12    court-appointed attorney.  But my name wasn't even on the

13    docket anymore because they hadn't charged it.  They had not

14    weighed the evidence, they had not looked at the evidence.  So

15    I was allowed to go home and the bail was released.

16          After that, they said that they had mailed me a -- like an

17    official package saying that I had a -- I had to show up in

18    court.  I did not get that because I moved so much.  And I did

19    not have a -- like a nailed-down address.  So I used my aunt's

20    address.  I didn't get that.

21          So by the time I knew I was supposed to go back in court,

22    then I was -- I had been pulled over and they said I had a

23    warrant.  I bailed out for that and then I went back.  I went

24    back there with an attorney.

25          MR. MASON:  Your Honor, would the Court like to see the

CEDRIC FAJARDO - CROSS

1    parties again?

2         THE COURT:  Excuse me?

3         MR. MASON:  Would the Court like to see the parties at the

4    bench again before I inquire?

5         THE COURT:  Approach, yes.

6         MR. MASON:  Thank you.

7         (Bench conference on the record.)

8         THE COURT:  Yes.

9         MR. MASON:  Thank you.  So that entire answer is

10   contradicted by his docket sleet.  He appeared three times with

11   a private retained counsel.

12        THE COURT:  You can approach on this.  You can ask him

13   about this.  He testified about it yesterday and he's

14   testified.  I just don't want you to go into these other

15   things.  It has nothing to do with his testimony yesterday.  If

16   you got some issues, you can redirect on this.

17        MR. MASON:  Thank you.  Just trying to be cautious, Your

18   Honor.

19        THE COURT:  Thank you.

20        (Bench conference concluded.)

21   BY MR. MASON:

22   Q.   Sir, on September 17th, 2014, you were appointed a public

23   defender, correct?

24   A.   Yes.

25   Q.   Then you hired a private lawyer, didn't you?

CEDRIC FAJARDO - CROSS

1    A.    Yes, I did.

2    Q.    You hired Freddy Sayegh, correct?

3    A.    Correct.

4    Q.    And you went back to court and appeared with Freddy

5    Sayegh, didn't you, on October 21st, 2014?

6    A.    Yes, I did.

7    Q.    And then you went back to court again and appeared with

8    your private attorney, Freddy Sayegh, on November 6, 2014?

9    A.    He sent somebody in place of him.

10   Q.    You were there, right?

11   A.    I was there.

12   Q.    With Freddy Sayegh's associate, correct?

13   A.    Correct.

14   Q.    That was your private lawyer that you hired?

15   A.    Yes.

16   Q.    You made two appearances in this case before the judge

17   with your private lawyer, didn't you?

18   A.    Yes, I did.

19   Q.    It was only after making those two appearances with your

20   private lawyer and the one appearance with your public defender

21   that you stopped going to court; isn't that true?

22   A.    Yes, I missed the next court date.

23   Q.    In each of those three appearances, when you stood in

24   front of a judge with the lawyer next to you, on each of those

25   appearances that judge told you the date that you had to come

CEDRIC FAJARDO - CROSS

1    back; isn't that true, sir?

2    A.    Yes.

3    Q.    And you stood there and you agreed that you would come

4    back, didn't you?

5    A.    Yes.

6    Q.    And then you broke that promise and you didn't come back;

7    isn't that true?

8    A.    I did.

9    Q.    You didn't show up for three years; isn't that true?

10   A.    Yes.

11   Q.    But when you told this jury just now and yesterday you had

12   no idea that you had an obligation to be in court, that wasn't

13   true, was it, sir?

14   A.    That was according to the first appearance, only in

15   reference to the first appearance.

16   Q.    You didn't tell this jury that you actually made three

17   appearances before that judge?

18   A.    I wasn't asked.

19   Q.    You didn't mention it, did you?

20   A.    Excuse me?

21   Q.    I'm asking you now, when you told the jury yesterday that

22   you did not know that you had an obligation to appear in court

23   on your 2014 case, until three years later when you were pulled

24   over in a traffic violation, that wasn't true, was it?

25   A.    That's in reference to one appearance, not into all three

4 - 26
CEDRIC FAJARDO - CROSS

1    appearances.  And I wasn't asked about all three appearances.

2    Q.   When you stopped going to court after your third

3    appearance with your private counsel, you knew that you had a

4    pending case, didn't you?

5    A.   Yes, I did.

6    Q.   And you chose not to show up, didn't you?

7    A.   Yes, I'm responsible for not showing up.

8    Q.   You chose not to show up, didn't you?

9    A.   Yes.

10   Q.   After telling the judge that you would, correct?

11   A.   Yes.

12       MR. MASON:  Your Honor, I'm going to be cognizant of the

13   time here, I'm going to turn this witness over to my colleague,

14   Mr. Baldani, for further questioning.

15       THE COURT:  Mr. Baldani.

16       MR. BALDANI:  Thank you, Your Honor.

17                           CROSS-EXAMINATION

18   BY MR. BALDANI:

19   Q.   Good morning, Mr. Fajardo.

20   A.   Good morning, sir.

21   Q.   My name is Russ Baldani.

22   A.   Nice to meet you.

23   Q.   I represent Torrey Ward.

24       So I'm also going to try to be cognizant of time.  My

25   colleagues have already asked you quite a few things that I was

4 - 27
CEDRIC FAJARDO - CROSS

 1  going to, so hopefully I can skip them over.  But there are a

 2  few areas I want to revisit, okay?

 3  A.    Okay.

 4  Q.    And the first area, I just want to make sure that I, and

 5  hopefully the jury, have a good idea of the time line of some

 6  of the developments or the history with Mr. Carlson.  Okay?

 7  A.    Yes.

 8  Q.    All right.  First of all, can you clarify for me

 9  approximately when you first met Carlson?

10  A.    I would say late summer of 2011.

11  Q.    2011?  Okay.

12  A.    Right.

13  Q.    And you seem like you are a pretty detail-oriented guy,

14  that you have a good memory, right?  Would you agree with that?

15  A.    Yes, attention to detail.

16  Q.    And you seem to be fairly educated.  How far did you go?

17  A.    Well, I have credit for two years of college, but I've

18  been to maybe six.

19  Q.    Okay.  Okay.  So 2011.  And basically you responded to a

20  Craigslist ad, right?

21  A.    Right.

22  Q.    And you were looking for a job?

23  A.    Yes.

24  Q.    And it seemed like something that could be a reasonable

25  thing to get into, right?

4 - 28

CEDRIC FAJARDO - CROSS

1    A.    I thought if -- even if I didn't get the job, at least me

2    and my girlfriend could take a ride out to Malibu.

3    Q.    Your girlfriend's name is?

4    A.    Lettie, Leticia Rodriguez.

5    Q.    So he did hire you, right?

6    A.    Yes.

7    Q.    And it was just a pretty meager hourly rate, right?

8    A.    Yes.  But we got along pretty good so it worked out.

9    Q.    Actually, it was a legit business and it developed for a

10   period of time, right?

11   A.    Yes, it did.

12   Q.    But he paid you cash all the time, right?

13   A.    Correct.

14   Q.    So I think -- correct me if I'm wrong.  I think you said

15   in 2014, I think it was your words, there was a shift; is that

16   right?

17   A.    Yes.

18   Q.    And the shift was essentially the business going downhill?

19   A.    Yes.  That's kind -- it was kind of a pattern, because

20   there was also that shift in late 2012 where it went downhill

21   and I completely severed ties with him.

22   Q.    So I didn't have your time line -- I didn't have the time

23   line right, so correct me, please.

24   A.    It's even in these text messages.  And he refers to it as

25   the Tick Tock days.  We had another business after the Malibu

4 - 29

CEDRIC FAJARDO - CROSS

1    office, which was after the Malibu garage, where we had the

2    place called Tick Tock Tech, which was in LA, where his

3    partners, the partners there weren't happy with him and that

4    business kind of blew up when I went there.

5    Q.   What I'm trying to get at is kind of like the time periods

6    that you separated from Carlson.

7    A.   2013, because of that, because of that end of 2012 and the

8    way it ended, from October 2012, I began a period of separation

9    that lasted at least 15 to 16 months.

10   Q.   Okay.

11   A.   And in 2014 --

12   Q.   Let's do them one at a time.

13   A.   Okay.

14   Q.   So that -- there was a period of separation, right?

15   A.   Yes.

16   Q.   And you walked away from Carlson?

17   A.   Yes.

18   Q.   And he still owed you money?

19   A.   Yes.

20   Q.   Approximately how much?

21   A.   Probably about 2 grand at the time.

22   Q.   Okay.  And 2 grand to Carlson, I mean, that's a couple of

23   days at the Huntley --

24   A.   Right.

25   Q.   -- but that's a substantial amount to you, right?

CEDRIC FAJARDO - CROSS

1    A.    Right.  It's to keep me on the hook.

2    Q.    I'm sorry?

3    A.    It was to keep me on the hook.

4    Q.    You mean he left you hanging to keep you on the hook?

5    A.    Yeah, so I would have to answer the phone calls, because

6    I'm kind of notorious for not answering.

7         But if there was something that he had to offer, he could

8    get me to answer the phone if he really needed me for

9    something.

10   Q.    And you testified about some of Carlson's, I don't know,

11   MO or the way he does business, right?

12   A.    Right.

13   Q.    And keeping people on the hook is something that he does?

14   A.    Yes.

15   Q.    Fair to say?

16   A.    It's very pragmatic for the way he operates.

17   Q.    And so you had this period of time where you kind of

18   walked away, he owed you money, although he tried to keep you

19   on the hook, and then he brought you back in, right?

20   A.    Right.  That's in 2014 and that's with the discount

21   servers business.  That was in Granada Hills or something

22   hills.

23   Q.    Just to be clear, you didn't seek him out in 2014 to get

24   back in to recoup your 2 grand, he reached out to you; fair to

25   say?

CEDRIC FAJARDO - CROSS

1    A.    Yes.

2    Q.    And that's another kind of way he operates, isn't it?

3    A.    Right.

4    Q.    All right.  And so 2014, you got back in with the man,

5    right?

6    A.    Yes.

7    Q.    And give me a little idea.  That was a legit business in

8    2014, right?

9    A.    Yes.

10   Q.    And just so the jury is clear, I mean, he did -- I mean,

11   it's been made clear he had a legit business, but there's

12   actually at times a storefront, employees, right?

13   A.    Yes.

14   Q.    Such that Joe Public would view it as a successful

15   operating business, right?

16   A.    Right.

17   Q.    So 2014, you're back in with him.  Is that about the time

18   he ripped off your mom?

19   A.    That was more 2012.

20   Q.    Okay.

21   A.    2014 is significant to me because I more associate with

22   the discount servers, that storefront, a big warehouse.  And

23   that business ended with that business being stolen from and he

24   got a big insurance check.  That was the end of that business.

25   And I was only involved for a couple of months in that

1   business, and then again another period of separation.

2   Q.   Since you mentioned the insurance check, I'm going to

3   digress from the time line for just a minute.  You testified

4   yesterday about like a $450,000 forged check, right?

5   A.   Yes.

6   Q.   Is that what you were just referring to?

7   A.   That was -- no, that's different.

8   Q.   That's separate?

9   A.   That is separate.

10   Q.   The 450 grand forged check, give me a time line on that.

11   A.   I want to say late 2014, yeah.

12   Q.   Just to be clear, that was something that your mother was

13   involved with with Carlson, right?

14   A.   Right.

15   Q.   And somehow or other, he was able to cash the 450 grand

16   check or gain access to those funds, right?

17   A.   Yes.

18   Q.   And without going into details of that, that was -- he

19   bought a plane with that money, didn't he?

20   A.   I believe so.

21   Q.   Do you know what kind of plane?

22   A.   I do not, no.  It's because that separation, we weren't

23   talking and I never saw it and I never saw the home that was

24   associated with that plane and what that plane did.

25   Q.   So I'm guessing if you don't know what kind of plane, you

CEDRIC FAJARDO - CROSS

1    probably don't know who he bought it from either, or do you?

2    A.    Yeah, no clue.

3    Q.    Okay.   I digressed.   Let me -- did you have something

4    else?

5    A.    Yeah.   Actually, he had mentioned in 2016, 2017, this is

6    just in the peripherals of his conversation, him just bouncing

7    things off me and me hearing on the telephone, that he had

8    bought a plane in Houston, then he was also involved with a

9    plane in Florida.   But I don't remember the names.   But that

10   might have been associated with him buying and selling planes.

11   Q.    Since we're discussing that, the truth is, he was always

12   wheeling and dealing, trying to buy a plane, saying he was

13   buying a plane, approaching people about buying planes --

14   A.    Yes.

15   Q.    -- whether it was actually happening or not, right?

16   A.    Right.

17   Q.    So really aside from the luxury cars, planes even, that

18   was even higher on his list than the luxury cars, right?

19   A.    Yes, definitely.

20   Q.    Tell us just two or three of the luxury cars that you knew

21   him to be involved in.

22   A.    Like a late -- like early '90s Ferrari.

23   Q.    Right.

24   A.    A couple Porsches.

25   Q.    Yeah.

CEDRIC FAJARDO - CROSS

1    A.   A Porsche Panamera, a Mercedes S550, a 755 BMW.

2    Q.   Without getting into details on those, in general, his MO

3    was to acquire a car through fraudulent means, basically

4    default on it, right?

5    A.   Some of them, yes.

6    Q.   All right.  So back to our time line.  You're back in with

7    him and there's a legit business, right?

8    A.   Yes.

9    Q.   And then if I understood correctly, maybe I didn't, but I

10   think I did, you had another break from him, correct?

11   A.   Right.

12   Q.   Give us a general time line of the second break.

13   A.   So that break was in the middle of -- so probably the rest

14   of 2014.

15   Q.   Okay.

16   A.   Let's say that check was at the end there, I still wasn't

17   talking to him.  He's talking to my mother.  My mother said,

18   hey, talk to him.  I don't want to talk to him.  Even if he's

19   inside her office and I'm nearby, I don't even want him in my

20   office.  Because I had an office at my mom's business.

21   Q.   So you're not happy with him at this point?

22   A.   No, I don't want anything to do with him.  My girlfriend

23   doesn't want me to have anything to do with him.

24   Q.   How much more money does he owe you at this point of the

25   second breakup?

4 - 35

CEDRIC FAJARDO - CROSS

1   A.   There's still the same, it's still $2,000.  It's -- yeah.

2   Q.   Okay.  For some reason, I thought that 8,000 or something

3   was mentioned.

4   A.   That was another break.

5   Q.   Okay.

6   A.   That was from the Santa Monica business.

7   Q.   I'm sorry, talking about -- okay.  Tell us a little bit

8   about break number two.

9   A.   So like 2014 and '15, I'm going -- I went back to college.

10  And that's it.  I'm not hearing from him besides -- besides

11  from mutual friends.  I'm doing a little bit of the computer

12  business on the side so we still have some of the same

13  contacts, some people that do wiring, installing, some

14  suppliers.  And it's kind of a small world if you're using the

15  same type of labor.

16  Q.   Okay.  So once again, though, he brings you back in,

17  correct?

18  A.   Yes.

19  Q.   And give us a time frame of that.

20  A.   That would be March 2016.

21  Q.   '16?

22  A.   Yeah, 2016.

23  Q.   All right.  And, again, it was him reaching out to you,

24  bringing you back in?

25  A.   Right.  I was minding my own business and he came and

4 - 36

CEDRIC FAJARDO - CROSS

1   found me through my mother.

2   Q.   Got you.

3   A.   And gave me the whole story, and --

4   Q.   Whole story as in I'm back up and legit again?

5   A.   As in he lost a contract to the cartel, that he was flying

6   marijuana and he was making a lot of money, and that he had

7   this big house in Malibu.

8   Q.   Did you ever go to the big house in Malibu?

9   A.   No, I didn't.  People told me how impressive it was, but

10  those kind of things --

11  Q.   Did you ever look it up or anything?

12  A.   Those kind of things are not impressive to me.  And I

13  don't -- didn't want to see it.  It's just not --

14  Q.   But you mentioned 25 grand a month, right?

15  A.   Right.

16  Q.   And a personal chef, right?

17  A.   Yes, and groundskeepers.  The house had an extra house.

18  The pool had a house.

19  Q.   You didn't want to see that place?

20  A.   No.

21  Q.   Okay.

22  A.   Those kind of things are not impressive to me.  It's

23  not -- you know.

24  Q.   But I was thinking you said yesterday part of getting back

25  with him is you and your girl could get out of west LA and go

CEDRIC FAJARDO - CROSS

1    kind of hang at a nice place.  Was I wrong about that?

2    A.    At the time when I first met him, I was 28 years old and I

3    didn't have much.  But you know, I am trying to do things

4    legitimately.  Those things are above and out of my lifestyle.

5    I'm trying to survive, eat, pay, you know, save for my

6    daughter's college.

7    Q.    Even at the point that you were admittedly involved in

8    drug dealing, the flash and the cars and the young girls on

9    your arm, that wasn't your thing?

10   A.    No, absolutely not.

11   Q.    Got you, okay.  All right.

12         So in any event, he brings you back in, right?

13   A.    Yes.

14   Q.    And you found out that -- I think you said Rosas was

15   working with you some and you didn't know he was still with

16   Carlson, right?

17   A.    Right.

18   Q.    You and Rosas were decent buddies, right?

19   A.    Yeah.

20   Q.    And so the fact that Rosas didn't tell you that he was

21   doing his thing with Carlson led you to believe Carlson didn't

22   want you to know, correct?

23   A.    Let me back up, because I just mixed up the time lines --

24   Q.    Okay.

25   A.    -- right there.  I meant March of 2015.

CEDRIC FAJARDO - CROSS

1   Q.   Is when you got back in the second time?

2   A.   When I got back in the second time.  It wasn't 2016.  I

3   mixed those two years up because a lot of stuff was going on

4   for me.

5   Q.   My question was, you testified yesterday you were doing

6   your thing with Rosas, Basilio Rosas we call him, right?

7   A.   Right.

8   Q.   Isaac Basilio Rosas.  And you later found out he was doing

9   something separate with Carlson, right?

10  A.   When I --

11  Q.   You didn't know it?

12  A.   When I separated from Carlson again in 2016 from that

13  Santa Monica business, Basilio went with me.  So for all of

14  2016, Basilio was supposed to be with me and two other partners

15  doing computer business.  But at that time I didn't know that

16  he was still involved with Carlson.

17  Q.   Right.

18  A.   And in hindsight, the times when he was gone, he would

19  most likely be on these plane trips with Robert Carlson.

20  Q.   That's what you told the jury yesterday.

21  A.   Right.

22  Q.   My question was geared to this.  You didn't know he was

23  still doing it.  You were friends with Rosas, so that would

24  lead you to conclude Carlson didn't want you to know he was

25  involved with Rosas, right?

4 - 39

CEDRIC FAJARDO - CROSS

1   A.    Right.

2   Q.    And that's another thing that Carlson does, he keeps

3   people compartmentalized and he kind of plays them against the

4   other and he keeps things separate, right?

5   A.    Yes.

6   Q.    That's what I was getting at.  I thought yesterday you

7   said he owed you 8 grand, which was a legitimate debt, not for

8   drug activities; am I right about that?

9   A.    Correct.

10  Q.    When, basically, was that?

11  A.    Those started accumulating probably in the summer of 2015,

12  after he had brought me back.  And that started when we were in

13  the garage --

14  Q.    Okay.

15  A.    -- there.  And then we moved into that space in Santa

16  Monica on 12th Street where those kept accumulating that debt.

17  That's where that 8 grand came from.  And then we closed that

18  business in January, February of 2016.

19  Q.    Third time he brought you back in, that was to get --

20  A.    Right.

21  Q.    -- into the drug biz.  And he owed you 8 grand

22  legitimately, right?

23  A.    Correct.

24  Q.    Part of your agreeing to get back in with Rob Carlson was

25  to recoup 8,000, right?

CEDRIC FAJARDO - CROSS

1    A.    Yes.

2    Q.    Because like we talked about before, before it was 2

3    grand, but 8 grand obviously is a substantial amount to you,

4    given what you told us?

5    A.    Especially to me at the moment, yes.

6    Q.    Despite owing you 8 grand, you testified about that first

7    trip in which you're on a plane with just literally millions of

8    dollars worth of drugs.  You're going to these rooms not

9    knowing who's going to be there and what they are going to do,

10   and at the end of that, the guy that owed you 8 grand gave you

11   $500 for that; is that correct?

12   A.    Not -- on the first trip, I didn't get anything.  I was

13   supposed to be given $500.  The $500 was part of -- it was

14   given -- I was supposed to take out of a bigger amount that was

15   given to me in cash that I was supposed to give to Bob Wallace.

16   That was part of an $18,000 cash payment to Bob Wallace, but

17   Bob Wallace said, I'll just take that as a tip.

18   Q.    Okay.  As you sit here today, do you even have a tally of

19   what he owed you for your legitimate and illegitimate stuff?

20   A.    He said the $2,000 that he gave me on the second trip, to

21   take off what he owes me, so I suppose he would owe me $6,000

22   for computer parts --

23   Q.    Okay.

24   A.    -- services rendered, expenses.

25   Q.    Okay, I'm going to shift away from that.  I appreciate

4 - 41

CEDRIC FAJARDO - CROSS

1    your answers.

2        Mr. Mason asked you about court appearances and being in

3    the courtroom with Carlson.   Just to be clear, he asked you,

4    you came to court with Carlson; you also came to court together

5    with Isaac Basilio Rosas, right?

6    A.    Yes.

7    Q.    And you guys were all in court for like your initial

8    appearance on the first indictment, right, on April 28th that

9    he asked you about, right?

10   A.    Yes.

11   Q.    And that's when -- were you all picked up at -- even if

12   you were at separate jails, were you all picked up by the

13   marshals and brought to court together?

14   A.    Yes.   The first time that we -- like after we got

15   arrested, we were all picked up together, yeah.

16   Q.    Were you at different jails, so they'd stop, pick one

17   up --

18   A.    Me and Rosas started at Woodford County.   And then that

19   same transport bus went to Frankfort or Franklin, where it

20   picked up Rob Carlson.

21   Q.    Okay.   So anyway, the three of you rode together to this

22   courthouse, right?

23   A.    Yes.

24   Q.    And then you were put together downstairs in the marshal's

25   office together, right?

CEDRIC FAJARDO - CROSS

1   A.   Yes.

2   Q.   And obviously you talked somewhat about your situation,

3   correct?

4   A.   Not too much.  We were very -- everyone was paranoid that

5   everyone was listening or being recorded.  So it was a lot of

6   whispering.  He's whispering a lot to Rosas, and Rosas is

7   telling me don't say anything, just -- he was very paranoid.

8   He's pointing at imaginary microphones.

9   Q.   So you're all downstairs in the marshal's office, right?

10  A.   Right.  That's not uncommon when people first get

11  arrested, that people think that everyone's listening.

12  Q.   Well, sure.  I mean, you're in the U.S. Marshal's Office

13  down on the first floor, right?

14  A.   Right, right.

15  Q.   There's cameras --

16  A.   Yes.

17  Q.   -- showing you guys in the cell?

18  A.   Yes.

19  Q.   Basically you're kind of in a room together and it's got

20  kind of like the old-fashioned crisscross --

21  A.   Right.

22  Q.   -- gate.  But you're clearly -- I mean, you're clearly

23  able to discuss whatever you want to discuss.  Maybe you

24  whisper, right?

25  A.   Right.

CEDRIC FAJARDO - CROSS

1  Q.   That's the first time.  And then shortly thereafter, a

2  second indictment was returned, correct?

3  A.   Yes.

4  Q.   So once the second indictment is returned, you got to come

5  back to court and basically plead not guilty all over again,

6  right?

7  A.   Yes.

8  Q.   Okay.  It's kind of the same thing, you're all picked up

9  by the marshal's transport, ride together, downstairs together

10  for a period of time.  True?

11  A.   I suppose.  But I don't really recall that second time.  I

12  know it happened.  It's just been so long ago.

13  Q.   Right.

14  A.   And there wasn't anything of note that I really remember.

15  Q.   There's not any reason for you to think it didn't happen

16  that way?

17  A.   Right, correct.

18  Q.   You mentioned you babysat for Carlson?

19  A.   Yes, in 2011, maybe November, December is when his second

20  daughter was born.

21  Q.   That would be?

22  A.   XXXXXX.

23  Q.   Is that the one you babysat for, or XXXXX?

24  A.   Yeah, when it was the baby.  And so sometimes when him and

25  his girlfriend wanted to go out and we were -- my girlfriend

CEDRIC FAJARDO - CROSS

1    sometimes came to the office with me, it would be easier just

2    to stay there in Malibu than drive all the way back to LA.   And

3    we would baby-sit for -- baby-sit for them, and that was the

4    infant daughter, yes.

5    Q.   I'm getting close to the end here, Mr. Fajardo.

6         Caleb Mason mentioned the word "facade" and you agreed

7    with that, right?

8    A.   Yes.  In reference to, say --

9    Q.   Carlson.  Not you, Carlson.

10   A.   Yeah, his dealings.

11   Q.   Let me just ask it this way.  He was good as what he did,

12   wasn't he?

13   A.   Yes.  He's very intelligent.  And he knows the way things

14   work.  He appeals -- and what makes a good con artist is they

15   appeal to other people's greed.

16   Q.   Exactly.  And that's what he did?

17   A.   Yes, he knew greed in and out.  And that's why people

18   would come into his -- his world.  They thought they were

19   smarter than him and that he was the dummy and that they could

20   use him.

21   Q.   And he could con even the most sophisticated person,

22   couldn't he?

23   A.   It depends how greedy they were, yeah.

24   Q.   You saw it with business people, with landlords, right?

25   A.   Yes.

4 - 45

CEDRIC FAJARDO - CROSS

1    Q.   Car dealers?

2    A.   Yes.

3    Q.   And you mentioned, without me asking, about his

4    intelligence.  I was actually going to ask you about that.  He

5    was always thinking one or two steps ahead, wasn't he?

6    A.   Yes.  He's very good at kind of gauging human responses to

7    what they are going to do and how to get them to think his way.

8    Q.   One or two steps ahead, he's thinking ahead, if scenario A

9    happens, I got -- like the democratic candidate, I forget which

10   one, I got a plan for that?

11       THE COURT:  Excuse me.  Mr. West.

12       MR. WEST:  Objection.  Calls for speculation.

13       THE COURT:  Mr. Baldani.

14       MR. BALDANI:  Okay, all right.  I think we've gone --

15   maybe I've run that into the ground.  I apologize, Your Honor.

16   BY MR. BALDANI:

17   Q.   Let me get back and I'm going to wrap up.

18       You talked about his daughters, correct?

19   A.   Yes.

20   Q.   And you talked about one daughter was on a flight with

21   you, correct?

22   A.   Correct.

23   Q.   That's XXXXX?

24   A.   Yes.

25   Q.   Right?  At that time she was about 15, right?

CEDRIC FAJARDO - CROSS

1    A.    Yes.

2    Q.    And she had a friend with her, right?

3    A.    Yes.

4    Q.    And her friend was about the same age, younger, older,

5    what?

6    A.    I think about the same age.

7    Q.    And which of the flights, if you can remind me, was XXXXX

8    on?

9    A.    The second flight.

10   Q.    So you were on just one single drug flight with his

11   daughter?

12   A.    Correct.

13   Q.    Right.  And if I recall correctly, you said you don't know

14   what XXXXX knew, right?

15   A.    I don't.

16   Q.    Okay.  I think you did say that he would basically bring

17   passengers onto his planes, onto his drug trips basically to

18   look legit and for show, right?

19   A.    Yes.

20   Q.    So if you didn't know whether XXXXX knew, there's two

21   possibilities, right?

22   A.    Right.

23   Q.    Possibility number one, his 15-year-old daughter did know,

24   right?

25        MR. WEST:  I'll object again.

4 - 47

CEDRIC FAJARDO - CROSS

1   A.    That is a possibility.

2         MR. WEST:  Calls for speculation.

3         THE COURT:  Approach.

4         (Bench conference on the record.)

5         THE COURT:  Mr. West, what is the nature of your

6   objection?

7         MR. WEST:  He said -- Mr. Baldani's question, there's two

8   possibilities, one of two.  It calls for speculation from this

9   witness.  That's the first objection I have.

10        I have another matter right after that to bring up.

11        THE COURT:  All right.  Mr. Baldani.

12        MR. BALDANI:  Number one, Your Honor, I didn't bring out

13  that XXXXX was on the plane, nor did I ask did she know.  That

14  was bought up yesterday, number one.

15        THE COURT:  By the defense, not -- asking about whether

16  she knew was brought up by the defense, not the prosecution.

17        MR. BALDANI:  Well, a key issue in this case is who knew

18  and who didn't know.  And so the objection is speculation.

19        My question is, there are two -- I'm not going to ask him

20  which one it was.  But there's two possibilities, either she

21  knew or she's used as a prop.  That's all I'm going to ask and

22  I'm done.  But it's not asking for speculation.  It's --

23        THE COURT:  The objection is overruled.

24        Come here.  Let me talk about this a little bit.

25        I've given the defense a lot of latitude here.  This

CEDRIC FAJARDO - CROSS

1   witness offered testimony against two of the defendants in this

2   case.   Two and two only -- well, aside from Robert Carlson, but

3   Katharine Matthews and Mr. Wallace.   Only Katharine Matthews is

4   on trial here today.

5        Now, the Court understands the need of all parties to

6   attack the credibility of Robert Carlson, who is the principal

7   witness against the other defendants in this case.   I've given

8   you great latitude in doing that.   And I think that's

9   appropriate.

10       But what is happening here is that counsel for witnesses

11  against whom this defendant has offered no testimony whatsoever

12  are getting a second and third and fourth bite at the apple.

13  You're retreading ground, the same subjects.   You're even

14  cross-examining on what other defendants examined about.

15       Mr. Stephens is the person who explored the issue about

16  whether the daughter, XXXXX, was a prop.   I'm going to let you

17  explore that.   I think it's a reasonable inference that could

18  be drawn.

19       Nevertheless, I'm going to direct you -- we're going to be

20  here and if the purpose is to stretch this case out, I'm going

21  to be watching that.   But you need to end this.

22       MR. BALDANI:   I understand.

23       THE COURT:   And I'm going to caution Ms. Pollock in --

24       MS. POLLOCK:   I wasn't even --

25       THE COURT:   No.   I'm just saying, you know, we've now

CEDRIC FAJARDO - CROSS

 1   spent about an hour replowing ground that doesn't have anything

 2   to do with the defendant that you represent.

 3        MR. BALDANI:  I appreciate the latitude.  I am not trying

 4   to run out the clock.  I have gone 15, 20 minutes.  I

 5   understand.

 6        THE COURT:  Again, I want you -- I understand where you

 7   need to go, but let's attack what needs to be attacked.

 8        You said that you had another objection, Mr. West.

 9        MR. WEST:  It's not an objection, Judge.  We're talking

10   about the names of juveniles in this matter.  I'm going to ask

11   they be stricken from the court record.

12        THE COURT:  We can handle that, we can handle that.  What

13   I'm going to do too -- I hadn't really thought of that.  Thank

14   you for bringing it to my attention.

15        Of course all of you as counsel know that will not be

16   taken outside the courtroom.  But I'll just instruct the jury

17   that they may hear the names of people who are under the age

18   of 18, and that they shouldn't discuss that outside this court.

19   They are not supposed to be discussing it anyway, but we're all

20   sensitive to it and that we trust them not to do that.

21        Is that acceptable?

22        MS. POLLOCK:  They shouldn't be talking.

23        THE COURT:  They shouldn't be talking, period.  But I'm

24   talking about after the case, they should never talk about

25   that.

1        MR. WEST:  Yes, ma'am.  Thank you.

2        MR. SLAVIN:  After this witness is completely done, can we

3   just have a slightly longer break?  I've just been having some

4   adjustment issues.

5        THE COURT:  I'm sorry to hear that.

6        MR. SLAVIN:  I think --

7        THE COURT:  I think we need a few minutes anyways, so

8   we'll take a break.

9        MR. SLAVIN:  Thank you, Your Honor.

10       THE COURT:  If you need to step out, and this applies to

11  any counsel, if you need to step out at any time, please feel

12  free to do so.

13       MR. SLAVIN:  I'll be okay.

14       (Bench conference concluded.)

15  BY MR. BALDANI:

16  Q.   Mr. Fajardo, I'm just about done.  I was asking you about

17  XXXXX and the fact that she was on one flight with her friend

18  who is about 15, right?

19  A.   Right.

20  Q.   And I was asking, essentially there were two -- there's

21  two possibilities regarding XXXXX?

22  A.   Yes.

23  Q.   Okay.  Number one, that she knew and that Carlson involved

24  her in his drug trafficking activities, correct?  I'm not

25  asking if that's true.  I'm asking you, is that one of the

4 - 51

CEDRIC FAJARDO - CROSS

1   possibilities?

2   A.   It is a possibility.

3   Q.   Okay.  And the second possibility is he used the

4   15-year-old girl as a prop?

5   A.   That's also a possibility.

6   Q.   One of them two?

7   A.   Yes.

8        MR. BALDANI:  That's all.

9        THE COURT:  Thank you.

10       Ms. Pollock?

11       MS. POLLOCK:  I have no questions, Your Honor.

12       THE COURT:  Thank you.

13       Members of the jury, we're going to take a break this

14   morning.  Please leave your notebooks in the jury box and we'll

15   see you back here in the courtroom in about 15, 20 minutes.

16       (Jury left courtroom at 10:17 a.m.)

17       THE COURT:  Be seated.

18       Counsel, I just want to mention something to you.  I

19   believe that one of you, maybe Ms. Pollock, had asked if we

20   could put a table and computer monitor next to the podium.  I

21   inquired of our IT folks, we can.  The problem is there's going

22   to be a cable stretching across to the table beside the podium.

23       Now, I'm happy to do it, but all of you are going to have

24   to be mindful that there is a cable on the floor.  We will tape

25   it down, but you're going to have to be very careful of it.  So

4 - 52

CEDRIC FAJARDO - REDIRECT

1    I'm willing to do it, but I want everybody to understand that

2    you're looking out for yourself when you walk over that cable.

3         Anybody got a problem with that?  Okay.  Hearing none,

4    we'll hook it up.

5         Do you need it before the lunch break, Ms. Pollock?

6         MS. POLLOCK:  No.  But thank you very much.

7         THE COURT:  Glad to accommodate.  This stuff is hard wired

8    in and we are not wireless yet here.  Thank you all.  We'll be

9    in recess.

10        (A recess was taken from 10:19 a.m. to 10:47 a.m.)

11        (Jury entered courtroom at 10:47 a.m.)

12        THE COURT:  The record will reflect that all parties and

13   counsel are present in the room, along with all members of the

14   jury.  The witness is seated on the stand.

15        I remind you you remain under oath.

16        Mr. West, you may redirect.

17        MR. WEST:  Thank you.

18                     REDIRECT EXAMINATION

19   BY MR. WEST:

20   Q.   Mr. Fajardo, I have a few follow-up questions based on the

21   questions that defense counsel asked you.

22   A.   Yes.

23   Q.   At all times through this matter, you had an attorney,

24   correct?

25   A.   Yes.

CEDRIC FAJARDO - REDIRECT

1   Q.   Is she in the courtroom?

2   A.   Yes, she is.

3   Q.   Is that the lady in the striped shirt back there?

4   A.   Yes, Ms. Pam Ledgewood, yes.

5   Q.   Now, Mr. Stephens began yesterday asking you questions

6   about your plea agreement, correct?

7   A.   Correct.

8   Q.   If I understand right, the law has changed since you

9   signed your plea agreement?

10  A.   Yes, it has.

11  Q.   What is your understanding of the maximum penalties at

12  this point that you could face?

13  A.   I'm not quite sure.  I've read the whole bill, but there's

14  just a lot of fine print.  I know the mandatory minimums have

15  been lowered --

16  Q.   Okay.

17  A.   -- I believe, and also with the change of the Attorney

18  General.

19  Q.   Let me ask this a simpler way.  At one point you had faced

20  20 to life, correct?

21  A.   Right.

22  Q.   Has that been reduced?

23  A.   Yes, I believe so.

24  Q.   And now is it accurate that you face ten years?

25  A.   Yes.

CEDRIC FAJARDO - REDIRECT

1  Q.   All right.  You've not been sentenced yet, correct?

2  A.   I have not.

3  Q.   They asked you about whether or not you met with the

4  United States, either Mr. Slavin, Mr. Moynahan and myself and

5  the agents.  Have you done that, sir?

6  A.   Yes, I have.

7  Q.   Were you told anything about what to testify to or how to

8  testify?

9  A.   No.

10  Q.   Did anybody ask you to fib on somebody else?

11  A.   No.

12  Q.   Ask you to make up stories on somebody else?

13  A.   No.

14  Q.   Now, in this case you said, towards the end of Mr. Mason's

15  testimony, that you don't even know some of the people in the

16  courtroom, correct?

17  A.   Correct.

18  Q.   This gentleman here in the dark jacket with the gray suit,

19  do you know him, sir?

20  A.   I don't know him at all.

21  Q.   What about this gentleman here, please, dark hair, dark

22  suit?

23  A.   No.

24  Q.   What about the gentleman here in the gray hair?

25  A.   No, sir.

CEDRIC FAJARDO - REDIRECT

1   Q.   Do you know him?

2   A.   No.

3   Q.   Is there one person in the courtroom that you do know?

4   A.   I do know Katie Matthews.

5   Q.   Was she involved in the smuggling operation that you were

6   in?

7   A.   Yes, on my first plane thrip.

8   Q.   You said you went to Santa Ana and picked up money,

9   correct?

10  A.   Yes.

11  Q.   Do you know the names of those people?

12  A.   I do not know the names of those people.

13  Q.   You met Jorge?

14  A.   I did.

15  Q.   Do you know Jorge's last name?

16  A.   I do not.

17  Q.   Mr. Stephens asked you questions about your mother in this

18  matter.  I am going to refer particularly to the testimony you

19  gave about the investigation in Fort Sill, Oklahoma, about the

20  money.

21  A.   Yes.

22  Q.   Did you ever get charged or anything at Fort Sill?

23  A.   Excuse me?

24  Q.   Charged in any of that money investigated at Fort Sill?

25  A.   I was mentioned in an indictment but I was never -- I was

CEDRIC FAJARDO - REDIRECT

1    never convicted or fully charged.

2    Q.   Were you charged at all?

3    A.   I'm not sure at what point the investigation went to, but

4    I don't know if I was indicted or just went to a grand jury.

5    But it never went to a full, where there was like a full case

6    on me.

7    Q.   Okay.  Now, you cited yesterday that one of the reasons

8    why you did this was a misguided sense of loyalty towards

9    Mr. Carlson.

10   A.   Yes.

11   Q.   Do you recall saying that, sir?

12   A.   Yes, I do.

13   Q.   But Mr. Fajardo, who was responsible for you sitting right

14   there today and you coming to this courtroom?

15   A.   Me, myself and I.

16   Q.   Anybody else force you to do this?

17   A.   No.

18   Q.   Duress?

19   A.   No.

20   Q.   Kidnap you?

21   A.   No.

22   Q.   Anybody force you to count out those 80 kilos?

23   A.   Nope.

24   Q.   When you testified that Katie Matthews was there on the

25   first flight, when the 80 kilos was there, did you persuade

CEDRIC FAJARDO - REDIRECT

1   her, coerce her, tell her she's got to show up?

2   A.   No.

3   Q.   Before this time on the first trip that you talked about,

4   had you seen Ms. Matthews before?

5   A.   Yes, just in passing.

6   Q.   Do you recall testifying yesterday that when you saw her

7   on the plane, that's the first time you saw her in that

8   capacity, was the word that you used?

9   A.   Yes.

10  Q.   What do you mean by "capacity," sir?

11  A.   Capacity is meaning on a private plane with the intention

12  of delivering a massive amount of drugs --

13  Q.   Okay.

14  A.   -- to somebody on the East Coast.

15  Q.   Do you know if Ms. Matthews and Mr. Carlson were ever

16  business partners or had legitimate business partners -- I

17  ought to clarify that -- legitimate business partners in some

18  of the corporations you mentioned in response to Mr. Mason's

19  questions?

20  A.   No.

21  Q.   At what other locations had you seen Ms. Matthews?

22  A.   At his house.

23  Q.   Malibu or Pacific Palisades?

24  A.   Both, Malibu and Pacific Palisades.

25  Q.   I think you testified there was no offices at that time

CEDRIC FAJARDO - REDIRECT

1    but Carlson's garage?

2    A.    It was just Carlson's garage, yeah.

3    Q.    Did you ever see her on 12th Street in Santa Monica that

4    you mentioned before?

5    A.    No.

6    Q.    You talked about kitty litter.  Do you know where that

7    kitty litter came from, sir?

8    A.    I did not see them personally, but from what Rob Carlson

9    told me and by the time line of events and where he told me to

10   stay and not come up, before I came up, somebody had came in

11   there and drove to the hotel and dropped that kitty litter off.

12   Q.    You did not see that person?

13   A.    I did not see that person.

14   Q.    Did you ever hear any names or see any photographs of

15   someone who was represented to be that person?

16   A.    No.

17   Q.    You said yesterday, in response to one of Mr. Stephens'

18   questions, that Carlson told you that Katie Matthews had been

19   on other trips.  Do you recall saying that yesterday?

20   A.    Yes.

21   Q.    Did Mr. Carlson tell you how many times Katie had been on

22   trips?

23   A.    No.

24   Q.    The word "trips," what did you understand that -- what was

25   that reference to?

4 - 59

CEDRIC FAJARDO - REDIRECT

1    A.   The previous plane flights that -- with the intention of

2    doing the same thing, which is delivering cocaine.

3    Q.   Now, Mr. Mason asked you a number of questions about your

4    attorney or attorneys that you were charged with in LA.

5         Do you recall those set of questions?

6    A.   Yes.

7    Q.   I heard the name Freddy Sayegh.

8    A.   Correct.

9    Q.   Is that S-a-y-e-d?

10   A.   S-a-y-e-g-h.

11   Q.   Does that person have anything to do with the

12   circumstances of these drug flights?

13   A.   Zero.  It's like a very isolated incident.

14   Q.   Okay.

15   A.   Where, yes, there was a -- there was a similar drug

16   involved, but it's a very, very tiny amount and it was personal

17   and had nothing to do with -- I wasn't even talking with Rob

18   Carlson.  I wasn't flying any planes.  I wasn't selling any of

19   that drug.  Nothing.

20   Q.   You were a user at that time; is that correct?

21   A.   Yes, I was.

22   Q.   Now, Mr. Mason asked you a lot of questions about

23   different enterprises, different businesses, different

24   corporations.

25        You said that Mr. Carlson had a number of these

CEDRIC FAJARDO - REDIRECT

1  corporations?

2  A.    Yes.

3  Q.    The physical location of these businesses, were they

4  multiple different locations, were they the same place?

5  A.    Yes.  They were multiple different locations, as far as

6  the address.

7  Q.    On these three flights that you took, did you ever take

8  any computers parts, computer servers, boxed-up server parts to

9  any of these hangars for these three flights, sir?

10 A.    No.  At that point he sold all his extra parts to Isaac is

11 what he told me, and Isaac was trying to unload all the parts

12 by himself.

13 Q.    On those trips that Isaac went or that you saw, did

14 Mr. Isaac ever bring any computer servers?

15 A.    No.

16 Q.    In fact, at the hangars that we're talking about, did you

17 see any boxes of servers, any computer parts whatsoever in the

18 hangar before you got on these planes?

19 A.    There was none.

20 Q.    You mentioned, in regards to one of Mr. Baldani's

21 questions -- I'm sorry, Mr. Stephens -- that occasionally

22 Mr. Carlson would give you like 50 bucks or a hundred bucks

23 here and there.

24 A.    Yes.

25 Q.    Can you tell how frequent that was?

CEDRIC FAJARDO - REDIRECT

1    A.   Basically every time I came up to see him, you know, for
2    gas to get there, get something to eat.
3    Q.   Now, you also mentioned that occasionally he would let you
4    drive his cars.
5    A.   Yes.
6    Q.   Do you know what kind of cars of Mr. Carlson that you
7    drove?
8    A.   One was a Porsche Panamera, let me drive for a couple of
9    days.  Maybe for a couple of weeks, a BMW 755.  And any car
10   that he had, he went through quite a few cars.  His Mercedes
11   G -- I don't know if it was a 550 or 500, GL500, which is an
12   SUV.
13   Q.   You said a couple weeks, sometimes you were allowed to
14   drive these?
15   A.   Yes, especially if he was on vacation.
16   Q.   Not like going to Starbucks and getting a coffee and
17   coming back, right?
18   A.   No, although that as well, but --
19   Q.   Yeah.
20   A.   -- I didn't care about that.
21   Q.   Mr. Fajardo, how did that make you feel when you're
22   driving these cars?
23   A.   It made me feel privileged, like -- I was in a luxury
24   vehicle, it felt good and I liked vehicles, I like cars.  It
25   drove better than mine and I felt cool.

CEDRIC FAJARDO - REDIRECT

1   Q.   Okay.  Mr. Baldani asked you a question, the persona that
2   Mr. Carlson put out was a facade to the world.  Was it that
3   big, worldwide?
4   A.   I don't know if it was worldwide.  It was his own little
5   world.  I mean to him, it was important, that facade.
6   Q.   How did you feel when you were driving these?  Did you
7   feel like you had a facade when you were driving these
8   vehicles?
9   A.   I kind of separated.  I felt good, but I knew it wasn't --
10  it wasn't mine.  It was more the enjoyment of driving the
11  vehicles themselves, but I know that I myself could not afford
12  those and I probably never would be able to.
13  Q.   Understood.  In response to one of Mr. Baldani's
14  questions, you mentioned an $18,000 cash payment to Bob
15  Wallace.
16       Do you recall saying that this morning?
17  A.   Yes.
18  Q.   Tell the jury what you mean by that.
19  A.   So on the day of the first flight, there's a restaurant
20  that's pretty much halfway, right on the corner of -- halfway
21  between the private hangars gate and then the Van Nuys Airport
22  gate.  And I guess it's a meet-up place usually for a lot of
23  people out of the aviation community.
24  Q.   Tell us what happened with regards to that $18,000 cash
25  payment you mentioned.

CEDRIC FAJARDO - REDIRECT

1    A.   Rob had given it to me and told me to give it to Bob

2    Wallace when I was on the plane.

3    Q.   Rob Carlson told you this?

4    A.   Yes, Rob Carlson.

5    Q.   Okay.

6    A.   And then somehow he had wanted to meet in the parking lot

7    with Bob Wallace --

8    Q.   Okay.

9    A.   -- to discuss the particulars.  And I was in the back seat

10   with Bob Wallace.  And Rob said, I have the money, just to give

11   it to him when we got on the plane.  And Bob Wallace said, no,

12   no, I'll take it now.

13       And I had the envelope and I said, well, I have to take

14   the 500 that he said he was going to give to me, that Rob

15   Carlson was going to give to me, out of it.

16       And Bob Wallace said, no, I'm going to take that as a tip.

17   And then he took the whole envelope.

18   Q.   Again, was Bob the pilot on the first flight?

19   A.   Yes, he was the pilot.

20   Q.   This was before the flight took off?

21   A.   Yes, this was before.  And that was -- I was told that's

22   only going to cover his gas.

23   Q.   Rob Carlson told you that?

24   A.   Bob Wallace.

25   Q.   Bob Wallace.

1        Now, Mr. Baldani, one of the very last questions that he

2   asked was whether or not Rob Carlson was good at what he did.

3        And your response was?

4   A.   Yes.

5   Q.   And you mentioned something about greed.

6   A.   Yes.

7   Q.   Explain that again.

8   A.   Well, what perpetuates a con is somebody wants to make

9   more money, and that there's a loophole and that somebody like

10  Rob Carlson could provide this.  There's a chance to make extra

11  money and easy money.  And Rob kind of, he pushes that.  He

12  doesn't really push that on people, it just kind of becomes a

13  reflection of the other person's greed.

14  Q.   All right.  You used the term applied to their greed.

15  A.   Yes.

16  Q.   Rob Carlson's greed or the other person's greed?

17  A.   Other person.

18       MR. WEST:  That's all of this witness, Your Honor.  He is

19  subject to recall, please.

20       THE COURT:  All right.  The witness may step down.  Why

21  don't we send the jury out for just a minute?

22       Members of the jury, just step out into the jury room for

23  a second, if you would, and I'll have you back in here in just

24  a minute.

25       (Jury left courtroom at 11:03 a.m. and reentered at 11:05

4 - 65

MICHAEL VIERGUTZ - DIRECT

1  a.m.)

2      THE COURT:  All jurors are present in the courtroom,

3  please be seated.

4      The United States may call its next witness.

5      MR. SLAVIN:  Thank you.  The United States calls Michael

6  Viergutz.

7      **MICHAEL VIERGUTZ, GOVERNMENT WITNESS, SWORN**

8      THE COURT:  The Court will ask the witness to speak up and

9  speak into that microphone.

10      Mr. Slavin, you may proceed.

11      MR. SLAVIN:  Thank you, Your Honor.

12                    MICHAEL VIERGUTZ

13                    DIRECT EXAMINATION

14  BY MR. SLAVIN:

15  Q.   Mr. Viergutz, can you please introduce yourself to the

16  jury and spell your last name?

17  A.   Sure.  Detective Michael Klaus Viergutz.  Viergutz is

18  V as in Victor, i-e-r-g-u-t-z.

19  Q.   Thank you, Detective.  What do you do?  What is your job?

20  A.   Currently employed by the Kentucky State Police,

21  Electronic Crimes Branch.  One portion of many things that the

22  state police does.

23  Q.   And what does the Electronic Crimes Branch do?

24  A.   Kind of twofold.  We have an Electronic Crimes Branch that

25  deals with primarily investigations, and then we have the

4 - 66

MICHAEL VIERGUTZ - DIRECT

1    examination portion of the branch which examines digital

2    evidence from anywhere in the state of Kentucky.

3    Q.    What is your job specifically?

4    A.    I'm an examiner and sometimes director of the flow of

5    paperwork and caseload and stuff like that.

6    Q.    How long have you been doing that?

7    A.    Been with the state police since 2003, been with the

8    Electronic Crime Branch since 2005.  A portion of that was with

9    the KRCFL, or Kentucky Regional Computer Forensics Laboratory,

10   in Louisville, which is a subdivision of -- it's an FBI lab,

11   but I was still underneath the Electronic Crimes Branch.

12   Q.    Have you been involved with the investigation that began

13   on April 21, 2017?

14   A.    Yes, I have.

15   Q.    What has been your involvement in that investigation?

16   A.    On -- via the evidence that was submitted, I believe that

17   Sergeant Fieger, who is with DESI, which is another part of the

18   state police, the special investigations unit, they also deal

19   with drugs and whatnot.  He had submitted some digital evidence

20   involving I guess a traffic stop that came from an airplane and

21   a lot of money and drugs.

22        The digital evidence that was submitted, eventually that

23   examination was assigned to me and I performed the exams.

24   Q.    You say "eventually."  Do you remember what date you

25   actually received evidence?

MICHAEL VIERGUTZ - DIRECT

1    A.    The evidence was actually brought up to the branch on

2    April 25th.  And then we actually started the examinations once

3    we had our proper legal authority, making sure that we didn't

4    search something inappropriately, I believe on the 2nd of May.

5    One of the items was held over to the 3rd of May.

6         And then as we actually got some passwords that came in

7    that helped us facilitate the extraction of the data later on.

8    But it started the 2nd of May.

9    Q.    What devices or items did you receive?

10   A.    Total, I believe there were seven iPhones, two MacBooks,

11   one BlackBerry and one tablet.

12   Q.    Let's first talk about the BlackBerry.  Did you have any

13   concerns about the BlackBerry?

14   A.    As with all digital evidence, once it had been received or

15   taken out of digital evidence, like the evidence storage,

16   precautions are made to make sure that the data doesn't get

17   altered in any way.  And one of those is by removing the SIM

18   card, blocking it from any kind of signal that could possibly

19   wipe the device once it's turned on.

20        And the BlackBerry was one that was -- kind of an odd one

21   because there was -- there wasn't a way to really attach any

22   cables or whatever and turn it on without it getting a signal.

23   So I had to take it to the RCFL where I was previously

24   assigned.

25   Q.    Why do you have concerns about devices receiving signals?

MICHAEL VIERGUTZ - DIRECT

1    A.    Because it's going to change evidence.  Cell phones and

2    mobile devices, they are a little bit -- well, quite a bit

3    different than a hard drive.  A hard drive, once it's off, it's

4    off.  You can turn it on and review it with the write blocker

5    so it's not going to change anything.

6         But a phone, when you turn it on, it's constantly

7    changing.  It actually can receive data or receive wireless

8    input either through wifi or cellular, that could alter the

9    data or even remotely wipe the data.

10        So that was one of our concerns with the BlackBerry, so we

11   took it to the RCFL and used a Faraday box.

12   Q.    What is a Faraday box?

13   A.    The Faraday box basically allows the examiner to review

14   the evidence within a container that prohibits any digital

15   manipulation or any kind of signal attacking the device.

16        But once we took the BlackBerry to the RCFL into the

17   Faraday box, unfortunately it had already been wiped, which

18   does happen.

19   Q.    We'll talk about that in a second.

20        Did you take similar precautions with the other devices

21   that you received?

22   A.    We did.  We also have a Faraday bag, which is similar to

23   the Faraday box, but when we were taking the SIM card out of

24   the iPhone -- which the bulk of these were iPhones -- we

25   wouldn't have to worry about a cellular attacking the iPhones

1    as much as the BlackBerry.

2         The BlackBerry was a bit of an unknown.  It was a

3    brand-new BlackBerry, so we were a little more concerned about

4    that.  So basically we had just done it a little bit

5    differently.

6         So what was the question again?  I'm --

7    Q.   That's okay, you answered it.

8         Did you have -- you said the BlackBerry was wiped.  What

9    does that mean?

10   A.   So upon reviewing the BlackBerry within the Faraday box

11   and powering it on, it basically was like it had never been

12   used before.  It was factory reset.

13        Wiped is something that a lot of phones will have the

14   capability of.  If you were to lose your phone, you could send

15   a signal to it and have all the data on it basically wiped over

16   or extracted, or you could have the phone just locked so nobody

17   could use it except somebody that knew the passcode.  So wiped

18   basically just meant it was reset.

19   Q.   Once the device is wiped, is there any way for you to get

20   the data on that device back?

21   A.   When the device is wiped or the digital evidence is wiped,

22   no, we cannot.

23   Q.   You said you put the BlackBerry in a Faraday box.  How

24   could it have been wiped if it was in a Faraday box?

25   A.   More than likely before we even received the evidence on

4 - 70

MICHAEL VIERGUTZ - DIRECT

1   the 25th of April, it was probably already wiped.

2        There were a few devices that were seized, I guess on the

3   day, on the 21st of April, that immediately when they are

4   seized, ideally, law enforcement knows to put it into flight

5   mode, if possible, or turn them off, or remove a SIM card but

6   keep it with it.  It's just kind of evidence-handling

7   procedures.

8        Unfortunately, the BlackBerry had not been turned off or

9   it was not protected in way in which the signal still got to

10  it.

11  Q.   Does the person wiping the BlackBerry have to have

12  physical access to it?

13  A.   No.  Basically a signal can be sent from anywhere in the

14  world.  And if it has access to a cellular signal, technically

15  it can be told go on and clear all the data off of it.

16  Q.   Did you ever come to find out who that BlackBerry belonged

17  to?

18  A.   There was a number of evidence items submitted.  As I had

19  identified them as Exhibits 1 and 2, I believe it was a

20  Mr. Rosas.  Exhibit 3, which was an iPhone, was Mr. Fajardo.

21  I apologize if I misspoke his name.

22        Item 4, which was the BlackBerry, I believe it was in the

23  possession of Mr. Carlson or Robert Carlson.  And then there

24  were other items.

25  Q.   The other items that you received, did you review them to

MICHAEL VIERGUTZ - DIRECT

1   see if there had been any tampering or manipulation with them

2   after they were seized?

3   A.   None of the other items when wiped, per se.  We did take

4   precautions to make sure no data was going to be changed any

5   more than if you turned the item on.

6       I don't recall anything other than normal deleted-type

7   items, as far as just by average use of a phone.

8   Q.   So by "deleted," do you mean deleted before you got the

9   phones or remotely?

10  A.   Prior to them seizing the phones, they would have been

11  already deleted.  Like something before the 21st, at the time

12  of the traffic stop.

13  Q.   Other than the BlackBerry, what did you do with the other

14  devices when you got them?

15  A.   They were all either -- basically extracted, data was

16  extracted from them.  There are a few items that were locked

17  and we were unable to access them without a passcode or some

18  kind of password.

19      As we were actually able to get that information from

20  cooperating witnesses and whatnot, we were able to extract the

21  data the best we could.

22  Q.   Is it a perfect process?

23  A.   Unfortunately it's not always a perfect process.

24  Q.   Were there things you were unable to extract from the

25  devices?

MICHAEL VIERGUTZ - DIRECT

1    A.    One of the bigger challenges unfortunately was a MacBook.

2    Apple had recently switched to a new file system around the

3    same time as early April.  We just didn't have the tools to

4    basically extract the data as I would like or as most forensic

5    people would like.

6          Per discussion with the detective at the time, or actually

7    the case agent, Mike Romagnoli, and the prosecutor, I don't

8    know if it was you or someone else, that it was okay for me to

9    access the MacPro once we had a password for it.

10         As far as other stuff, that was probably the most

11   challenging one, aside from getting the passcodes for some

12   iPhones.

13   Q.    Over the time that you had the devices, what were the

14   kinds of things that you extracted from them?

15   A.    Basically anything that would be present -- resident on a

16   cell phone, whether it be text messages, emails, emails or text

17   messages that used to be there that may have been deleted.

18   Pictures, movies, contacts.  You name it.  Videos that had been

19   watched.  A number of things.

20   Q.    Were there some screen shots that you pulled off as well?

21   A.    There were screen shots.  They were basically just a

22   picture of whatever you're looking at on the screen, those were

23   also found.

24         Most of the focus was on Exhibit 8, which would have been

25   the iPhone belonging to Mr. Carlson.

4 - 73

MICHAEL VIERGUTZ - DIRECT

1   Q.   In talking about that iPhone, in your extractions, were

2   you able to tell who the various -- whether the various items

3   on their screen shots, pictures and the like, were sent to

4   other people?

5   A.   Yes.  It's just like basically a transactional log as far

6   as what has been done as far as text messages sent or received,

7   and then the participants within that text message or email or

8   what have you.  So the details of the data that's found is also

9   recovered.

10  Q.   Detective Viergutz, I am going to direct your attention to

11  what has been marked as Exhibit 8V5.

12       Do you see that in front of you?

13  A.   Yes, I do.

14  Q.   Do you recognize that?

15  A.   I do.

16  Q.   Can you tell us generally what it is?

17  A.   That is actually from a screen shot taken from Exhibit 8,

18  it's a track or a path of a map.

19  Q.   Stop you there.  You said it was taken from Exhibit 8.

20  What was Exhibit 8 again?

21  A.   Exhibit 8 was an iPhone that was taken from Mr. Carlson.

22  Q.   Did you determine whether that screen shot was sent to

23  anybody?

24  A.   It was.  I don't see the details on here.  I just see when

25  it was created, as far as when the screen shot was actually

1    taken.  But it had been in a communication between Mr. Sarkhosh

2    and a communication sent from Mr. Carlson's phone to a

3    Mr. Sarkhosh.

4         MR. SLAVIN:  We can take down that exhibit, please.

5    Q.   You had mentioned deleted messages.  Did you find that

6    there were items on Exhibit 8 that had been deleted?

7    A.   There were a number of items that had deleted.  One of the

8    positive things about the iPhone iOS, or the operating

9    system, it has like a recycle bin, kind of like your computer.

10   A lot of phones, they have it but it may not be as readily

11   available.  But fortunately on iPhones, some of that stuff does

12   stay resident and can be recoverable.  There were some deleted

13   text messages.

14   Q.   And were you able to -- was there any specific individual

15   person, regarding those deleted messages, who most of those

16   messages were sent to?

17   A.   There were a few more than normal.  I mean, most of your

18   text messages will just delete in time.  But I believe it was a

19   Katie -- I apologize, I don't recall the last name, Katie Smith

20   or Katie something.  Because normally on the display it just

21   has the user's name.  I don't recall.

22   Q.   So the text messages were predominantly with a specific

23   first name that you remember?

24   A.   Yes.

25   Q.   And what was that first name?

4 - 75

MICHAEL VIERGUTZ - DIRECT

1   A.    Katie, K-a-t-i-e.

2   Q.    And just to clarify, would you say -- did you say that

3   those were the predominantly deleted messages?

4   A.    There were a number of those found, yes.  Predominantly,

5   potentially, yes.  I mean, there were a lot of deleted messages

6   that -- Katie Matthews I believe was the name.  I apologize, I

7   think that's the last name.  Don't quote me on that.

8   Q.    We're on the record, so you're going to be quoted on

9   everything you have say.

10  A.    Sorry.

11  Q.    Who would have deleted those messages?

12  A.    The users of the phone, whoever would have had access to

13  the phone.

14  Q.    And in that case, who was the user of that phone?

15  A.    Mr. Carlson, this was Mr. Carlson's phone.

16  Q.    I'm going to direct your attention to -- an item marked

17  Exhibit 26L, please.

18        MR. SLAVIN:  Show that to the witness and counsel.

19  Q.    Do you recognize that?

20  A.    I do.

21  Q.    How do you recognize it?

22  A.    It's taken from a report that was produced in reference to

23  some images that had been found, sent back -- well, back and

24  forth.  But sent, and I can't really see it real well, but I

25  believe on the one line where there is three photos.

MICHAEL VIERGUTZ - DIRECT

1   Q.   Before we talk about what's in there, who created that

2   report?

3   A.   I created the report.

4   Q.   What is this a report of, generally?

5   A.   The contents of the iPhone belonging to Mr. Carlson.

6   Q.   And are these any kind of specific communications?  Are

7   they emails, are they text messages, what are they?

8   A.   I would have to see it a little more clear.  It's kind of

9   blurry up here.  But it appears to be either text messages or

10  emails.

11       If you could zoom it in, that would be helpful.  Okay.

12       MR. SLAVIN:  Zoom in on the lower portion.  Is that

13  page 6?

14  Q.   Now that you can look closer, can you tell what these are?

15  A.   Yes, they appear to be text messages from either Katie

16  Matthews or Robert Carlson.

17  Q.   So is it a text conversation between two people?

18  A.   Yes, sir.

19  Q.   And who are those two people?

20  A.   Katie Matthews and Robert Carlson, according to the

21  numbers and what's been saved in the contacts.

22       MR. SLAVIN:  Your Honor, at this point the United States

23  moves to admit Exhibit 26L into evidence.

24       THE COURT:  26L?

25       MR. SLAVIN:  Yes, 26L, Your Honor.

4 - 77

MICHAEL VIERGUTZ - DIRECT

1      THE COURT:  F?

2      MR. SLAVIN:  L.

3      THE COURT:  It will be admitted.

4      MR. SLAVIN:  As in Lima.

5      THE COURT:  Lima.  L.

6          (Government Exhibit 26L was admitted.)

7      MR. SLAVIN:  I've learned a bit of airplane lingo from

8  this trial.  May we publish it?

9      THE COURT:  You may.

10  BY MR. SLAVIN:

11  Q.   Mr. Viergutz, can you read the text messages with the

12  person who is sending it that are in front of you on your

13  screen?

14  A.   The blown-up portion on --

15  Q.   Yes, please.

16  A.   -- on March 15, 2017?  It's leaving -- or, actually, it's

17  incoming from a Katie Matthews at that phone number.

18      And the message says:  Where is dude.  Where is this dude,

19  question mark.

20  Q.   Go ahead and read, go through the --

21  A.   Next line, about four minutes -- approximately four

22  minutes later, an outgoing message from Robert Carlson, leaving

23  his phone, going out:  I will ask.

24      The next line, same date at 2:46 a.m. with UTC is incoming

25  from Katie Matthews:  Is this guy ever showing up, question

MICHAEL VIERGUTZ - DIRECT

1    mark.  It's been two hours since he said 45 minutes.

2         Same date, 2:48:30 a.m. UTC, an outgoing from Mr. Carlson,

3    meaning leaving his phone:  He is on his way.  Just running

4    late as always.  Paper is coming back at 7 a.m.

5    Q.   Thank you.  I'm going to show you a few other excerpts

6    from this exhibit.

7         Just to save everybody time, can you just say Person X

8    said this and then Person Y said that, just so we can move

9    things along, please?

10   A.   Yes, sir.

11        MR. SLAVIN:  Pull up the next excerpt.

12   Q.   Can you just read through that, please?

13   A.   Date and incoming from Katie Matthews:  He counted and

14   text L that's 65.

15        Another incoming from Katie Matthews:  He's coming back at

16   9/9:30 a.m. with paper.

17        Next message coming from Katie Matthews:  Will there be a

18   payment as well?  If so, how much?

19        Next line down, outgoing from Robert Carlson:  You were

20   supposed to tell me and I was supposed to confirm with L.

21        Next line down, outgoing message:  Not sure of the

22   payment, probably 50K -- $50,000 -- please do not take anything

23   out for yourself, period.  I already paid the apt -- probably

24   apartment, maybe -- and paying the two car payments, period.  I

25   have -- I have to pay off airplane bill and go get it Thursday,

1    period.

2         Next line down is outgoing from Robert Carlson:  Should I

3    tell Bob to aim for a 11:00 a.m. departure, question mark.

4         MR. SLAVIN:  If we can skip ahead to page 9, please.

5    Q.   Do you see three images there in front of you?

6    A.   Yes, I do.

7    Q.   Who sent those images, according to your report?

8    A.   The incoming from Katie Matthews and then, yes, three

9    attached documents.

10   Q.   I'm not going to ask you to describe the documents.

11        MR. SLAVIN:  Can you zoom in on those please, if it's

12   possible.  Show the next two messages, please.

13   Q.   What are the messages that follow those pictures, please?

14   A.   Same date as mentioned, from Katie Matthews:  32 total.

15        And then coming from Katie Matthews to Mr. Carlson's

16   phone:  9 in one, 12 in other and 11 in last one.

17        Last message listed here:  Tell him please take the

18   account and have L text me before he leaves.

19   Q.   Thank you.

20        MR. SLAVIN:  You may take this exhibit down, please.

21   Q.   Detective Viergutz, did you run searches this week on

22   phone events between Mr. Carlson and various other people?

23   A.   Yes, I did.

24   Q.   Can you explain what a phone event is?

25   A.   Due to the large amount of data, one of our primary tools

MICHAEL VIERGUTZ - DIRECT

1    is Cellbrite.  Cellbrite is one of the generally accepted

2    forensic tools used in extraction of data on cell phones.

3    Obviously, there is a number of different items that can occur

4    involving the user of the phone and many of their contacts.

5         So a text message is one way of communicating, but each

6    text message wouldn't necessarily be an event.  A phone call

7    may be an event.  But a chat conversation, so you can have a

8    chat conversation with 50 communications or text messages back

9    and forth, but that's one event.

10        So there could be a number of events about text messages,

11   but you could also do FaceTime, if you have an iPhone and

12   they have an iPhone, that's another event.

13        So I think I did an okay job explaining events.

14   Q.   Did you determine between Mr. Carlson and Ms. Matthews the

15   number of phone events that occurred between them from the

16   devices you had?

17   A.   I did, among Ms. Matthews and I think two other people.

18   Q.   Do you recall the number for Ms. Matthews?

19   A.   Not having it right in front of me, approximately -- I

20   think it was just over a hundred, maybe 140 or so, or almost a

21   hundred and a half.

22   Q.   If you took a look at your report, would that refresh your

23   recollection?

24   A.   It would.

25   Q.   I'm going to -- do you remember the number for the other

MICHAEL VIERGUTZ - DIRECT

```
 1   people offhand?
 2   A.   I believe it was Mr. Sarkhosh.
 3   Q.   The question is, do you remember all of the numbers
 4   offhand right now?
 5   A.   Roughly.
 6   Q.   Would it help you if you took a look at all of the
 7   numbers --
 8   A.   It would.
 9   Q.   -- before you testify to them?
10   A.   Yes.
11        MR. SLAVIN:  I'm going to ask the witness be handed this.
12        THE COURT:  You may.
13   BY MR. SLAVIN:
14   Q.   Can you take a look at this to make sure you have the
15   numbers correct in your mind?  And then hand those back,
16   please.
17   A.   Okay.
18   Q.   Hold on to them, just leave them on the front.
19        Do you remember now the number for Ms. Matthews?
20   A.   Roughly, for Ms. Matthews, and I apologize, just over a
21   hundred, so it was 110.  I was a little off.
22   Q.   How about between Mr. Carlson and Mr. Torrey Ward?
23   A.   That was a lot less, there wasn't as much communication,
24   but 14 messages.
25   Q.   How about Mr. Carlson and Mr. Nader Sarkhosh?
```

MICHAEL VIERGUTZ - DIRECT

1   A.   That was probably the most, as far as communication-wise,

2   about 171.

3   Q.   How about Mr. Carlson and Mr. Robert Chipperfield?

4   A.   Chipperfield was kind of in the middle.  I would say

5   roughly 74 messages, that was the count.

6   Q.   You say "messages," but what you're talking about is phone

7   events, right?

8   A.   Phone events or communications.

9   Q.   That could possibly be a text string of a much larger

10  number of messages?

11  A.   Absolutely.

12  Q.   So the numbers you just described are the total

13  conversations that these two people had over this period of

14  time?

15  A.   That is correct.

16  Q.   One more thing I want to discuss with you.

17       Did there come a point where you reviewed a link that

18  Mr. Carlson sent to somebody?

19  A.   Can you repeat that?

20  Q.   Did you review a link that Mr. Carlson sent to another

21  person we've been discussing?

22  A.   I did.

23  Q.   Do you remember who that link was sent to?

24  A.   I believe it was Torrey Ward.  It was a communication

25  between Mr. Carlson and Mr. Ward in reference to -- it was a

MICHAEL VIERGUTZ - DIRECT

1   link to a movie.  Is that the one you're referring to?

2   Q.   Yes.  Who sent that link?

3   A.   It was sent from Mr. Carlson to Mr. Ward, and then there

4   was a communication afterwards.

5   Q.   Did you explore where that link led?

6   A.   I did.

7   Q.   Where did that link lead to?

8   A.   It wasn't so much a movie as it was actually a series

9   called Breaking Bad, it was a certain portion of a Breaking Bad

10  episode.

11  Q.   Are you familiar with the series Breaking Bad?

12  A.   I did quite some time ago, but I do vaguely recall this --

13  that clip.

14  Q.   What is the series about?  What is the show about?

15  A.   About a teacher, Bryan Cranston, who plays Walter Whitman,

16  who turns into basically I would say a bad guy because he's

17  making meth.  But that was his only way of making money that he

18  kind of needed to get into.  Not excusable by any means.

19       So he's making meth.  And eventually this younger fellow,

20  Jesse Pitman, I believe is his name --

21  Q.   That's enough.

22  A.   -- get together and they make meth together.

23  Q.   Did you specifically view this clip?

24  A.   I did.  I had to go back and watch the clip just to see

25  what it was in reference to.

MICHAEL VIERGUTZ - CROSS

1    Q.    What happens in this clip?

2    A.    This is actually a portion of the series in which

3    Mr. Whitman or Walt Whitman -- not Walt Whitman, Walter Whitman

4    is talking to Jesse, the younger man, about why he actually is

5    making this meth for distribution.

6         And you know, people ask you, is it because do you like

7    the drugs or because you like the money?  And it wasn't about

8    either one of those to him.  It was about building an empire,

9    basically taking over more and more land and property or

10   whatever as far as coverage of distribution of the drugs.

11        MR. SLAVIN:  Thank you.  No further questions.

12        THE COURT:  Mr. Stephens.

13        MR. STEPHENS:  Thank you.

14                        CROSS-EXAMINATION

15   BY MR. STEPHENS:

16   Q.    Do you have any idea back in 2017 how many people had cell

17   phone devices, iPhones, Android phones, things of that nature?

18   Do you have any idea how many people in the United States had

19   phones?

20   A.    I do not.

21   Q.    Would you say most everyone might very well have a phone

22   of some sort?

23   A.    In the United States, I would say a good portion of adults

24   would have one, maybe even two.

25   Q.    All right, sir.  And would you agree with me with cell

MICHAEL VIERGUTZ - CROSS

1   phone usage has become a primary means of communication between

2   a lot of people in addition to, you know, chatting with someone

3   live on a telephone?

4   A.   Yes, sir.

5   Q.   And text mailing is something that happens millions and

6   millions, maybe billions of times a day, does it not?

7   A.   I would have to agree with that.

8   Q.   And would you agree with me the same thing about emails?

9   A.   Emails aren't quite as prevalent, but yes, they are still

10  extremely prevalent.

11  Q.   It's a method by which we communicate oftentimes in

12  business, social functions, all kinds of areas of everybody's

13  lives, aren't they?

14  A.   They are.

15  Q.   And if you are a friend with someone, you might

16  communicate with them hundreds of times and there's nothing

17  unusual or different or necessarily bad or good about that, is

18  it?

19  A.   I would agree with that, depending on the conversation,

20  but yes.

21  Q.   Sure.  And you don't really know what all the

22  conversations in, say, 110 electronic phone events between two

23  people or two devices might contain if you can't actually see

24  them; is that correct?

25  A.   That is correct.

MICHAEL VIERGUTZ - CROSS

1   Q.   So whatever discussion or whatever email that might be,

2   it's difficult to say, other than to quantify how many times

3   the phone may have interacted with a specific other number?

4   A.   Unless there's the resident communication like remained

5   behind, or if it can be recovered deleted, if it were deleted

6   off the phone or just by attrition of the data.  Looking at the

7   content, there's all sorts of stuff that people communicate.

8   Q.   There's simply no telling what might be -- let's just use

9   the 110 contacts between those two devices.  There's no telling

10  what was conversed or said or anything else, is there, if you

11  can't see a hard record of it, correct?

12  A.   Unless I can get it recovered from the phone, it would be

13  difficult to say what the content was.

14  Q.   And with this 110 contacts, do you know over what period

15  of time that may have occurred?

16  A.   I have a rough estimate on here.  Can I take a quick

17  review of that?

18  Q.   Do you have a rough estimate?

19  A.   Do you have a particular person or all?

20  Q.   The 110 contacts between Carlson and Matthews.

21  A.   Roughly, there was one as early as 2005, but I found that

22  suspicious because it was a deleted item.  And deleted gets

23  into not a great area of forensics, but it does, it's there.

24  From roughly 2005 to roughly 2017, maybe.

25  Q.   So that's a period of 12 years.  And 110 communications,

MICHAEL VIERGUTZ - CROSS

1   that's about 10 a year, right?

2   A.   On this device.

3   Q.   On that device.  Okay.  Your opinion is limited to the

4   devices and the numbers -- the SIM cards that are within your

5   purview and ability to review, correct?

6   A.   Upon what's submitted, yes, sir.

7   Q.   And do you have any idea how many pairs of devices there

8   might exist in the United States that would have at least ten

9   communications with each other over a period of 12 to 15 years?

10  Would that be literally millions and millions and millions?

11  A.   I would imagine so.  That does seem like a small amount

12  between two.

13  Q.   A fairly small amount.  So when you said the most at 110,

14  and I think somebody may have had 171, over the length of those

15  two devices communicating with each other, it really is fairly

16  insignificant, isn't it?

17  A.   It could be.

18  Q.   It could be.

19       MR. STEPHENS:  I think that's all I have, Your Honor,

20  please.  Thank you.

21       THE COURT:  Mr. Mason.

22       MR. MASON:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24  BY MR. MASON:

25  Q.   Good morning, sir.

MICHAEL VIERGUTZ - CROSS

1    A.    Good morning.

2    Q.    You ran an exam to see the number of communications

3    between particular contacts, correct?

4    A.    It was a full extraction of the phone.  Once the data is

5    extracted, then I can basically review to get a count of

6    possibly what kind of communications and that matter, but I

7    think so.

8    Q.    Right.  So I'm asking about your testimony about the

9    numbers of contacts that you just gave.

10    A.    Yes, sir.

11    Q.    Okay.  Now, as far as the contents of those

12    communications, the best way to determine what was said on

13    those communications would be to look at them, right?

14    A.    If they are visible, as far as text messages and emails.

15    If there were a video, it would be close to impossible, unless

16    it's recorded.

17    Q.    Well, you said you did extract some videos, right?

18    A.    Well, if an iPhone and iPhone are communicating via

19    FaceTime, those are not videos necessarily that would be

20    recorded, unless you could manually record them, which you

21    potentially could.

22         But if it's a video, like in reference to the Breaking Bad

23    video, that was just a link.  That video was not actually saved

24    on Mr. Carlson's phone.  It was just a link.  But there were

25    videos on the phone of Mr. Carlson and his daughter and

1    whatnot.

2    Q.    Okay.  So you made your best efforts to pull out all the

3    evidence you could?

4    A.    Yes, sir.

5    Q.    And the government thus is in possession of the contents

6    of all of the text messages that you were able to extract,

7    correct?

8    A.    Those were all provided to the case agent.

9    Q.    You're not here this morning to talk about the contents of

10   the text messages, correct?

11   A.    Not necessarily, unless it's describing something that may

12   have been visible or communicated, or what it appears to be.

13   Q.    Right, right.  Other than what Mr. Slavin asked you on

14   direct, you're not telling the jury anything else about the

15   contents of text messages, right?

16   A.    I couldn't tell you more than just what is visible from

17   right there.

18   Q.    Right.  That's not your job.

19   A.    I'm just an examiner.

20   Q.    So you would agree that if we wanted to know whether

21   particular text messages had any kind of particular information

22   or evidentiary value for the jury, we would need to look at

23   those text messages and discuss them with a different witness,

24   right?

25   A.    I would suggest that all messages be -- yes, if there's

1   someone that can speak specifically to those, that would be

2   best.

3   Q.   Right.  Because --

4   A.   Interpretation is just what's been extracted.

5   Q.   The fact of sending or receiving text messages is not

6   incriminating, right?

7   A.   As long as they are not child exploitation.

8   Q.   Right.

9   A.   Which --

10  Q.   So in and of itself, the fact of electronic communication

11  does not signify anything criminal or bad, right?

12  A.   The content could reference it, but no, of itself, unless

13  it's child exploitation.

14  Q.   Right.  And the content, which you're not here to talk

15  about, correct?  Because you haven't talked about the content

16  of the text messages.

17       You just indicated that you had a number of text messages

18  that you saw between Carlson and Mr. Sarkhosh and Mr. Ward and

19  Mr. Chipperfield, but you haven't said anything about the

20  contents of those communications, right?  Because that's not

21  your job, right?

22  A.   My job is just to extract the data and possibly interpret

23  it, how it got from or where it may have gone.

24  Q.   So no one would be in a position to reach any conclusions

25  about the evidentiary value, for good or ill, of the contents

MICHAEL VIERGUTZ - CROSS

1   of those text messages that you just referred to until we've

2   had a chance to look at them; would you agree with that?

3   A.    Could you rephrase the question?  I apologize.

4   Q.    We, the jury, the Court, everybody here in this room,

5   we're not in a position to determine whether there's any

6   significance for good or ill about these numbers that you've

7   quoted of communications between Mr. Carlson and these

8   individuals here, until we have had a chance to look at them

9   and discuss their content with somebody who knows about the

10  content; would you agree with that?

11  A.    That is a very convoluted question.  May I summarize?

12  Because I think I know where you're going.

13  Q.    I'm happy to reask, sure, if that would help.

14  A.    The only reason I bring this up, child exploitation is

15  criminal.  I can look at that and say that it's criminal.

16        But as far as like the content of 550 or whatever, I don't

17  know what that's going to be in reference to, unless you take

18  the totality.  That's not my position.

19  Q.    Why do you keep saying the term "child exploitation"?  Do

20  you think that this is a child exploitation case?

21  A.    I do not; but unfortunately, primarily what I have to deal

22  with.

23  Q.    Right.  But here you were not asked to give any testimony

24  about the information, the content contained in the text

25  messages that you just referenced between Mr. Carlson and my

MICHAEL VIERGUTZ - CROSS

1  client or Mr. Ward or Mr. Sarkhosh.  You didn't tell us

2  anything about the contents of those messages, did you?

3  A.    No, just --

4  Q.    Okay.

5  A.    -- other than --

6  Q.    Just the numbers?

7  A.    -- what they were.

8  Q.    The number of times they occurred.  Because that's not

9  your job, right?

10  A.    If I'm asked if it's in the report, that's what I'm

11  providing, not to interpret it otherwise.

12  Q.    Okay.

13        MR. MASON:  Thank you.

14        THE COURT:  Mr. Baldani.

15        MR. BALDANI:  Thanks, Judge.

16                        CROSS-EXAMINATION

17  BY MR. BALDANI:

18  Q.    Good morning, Detective Viergutz.

19  A.    Good morning, sir.

20  Q.    I represent Torrey Ward.

21  A.    Yes, sir.

22  Q.    So you talked about events, and "events" being, I believe,

23  like a string of text messages, correct?

24  A.    Yes, sir.

25  Q.    And you counted the events for the four people sitting

MICHAEL VIERGUTZ - CROSS

1    here on trial, correct?

2    A.   Per request, yes, sir.

3    Q.   And what's the time period -- you gave numbers as to each.

4    You probably said it and I missed it.  What's the time period

5    for those events?

6    A.   If I may refresh from what has been provided?

7    Q.   Sure.

8    A.   Just for Mr. Ward, is that --

9    Q.   Well, I assume -- yeah, I guess.  I assumed you looked at

10   a specific time period for all four.  But if that's wrong,

11   correct me.

12   A.   You're not wrong.

13   Q.   Oh, good.

14   A.   Approximately from -- this is for Mr. Ward.  An early 2005

15   reference, and then all the way to around 2017.

16   Q.   So from 2005 to 2017, 14 events for Torrey Ward, correct?

17   A.   On this device, yes, sir.

18   Q.   And that's Carlson's iPhone 8?

19   A.   Yes, sir.

20   Q.   So 14 events in that period of many years.  And you're not

21   here to go through all the communications -- and I'm going to

22   focus on my client, Torrey.  You're not here to summarize and

23   tell the jury about all the communications between him and

24   Carlson, correct?

25   A.   To summarize the content, no.  Just that I have extracted

4 - 94

MICHAEL VIERGUTZ - CROSS

1   the data and there it is.

2   Q.   But the prosecutor asked you about one specific video that

3   was sent -- or link to a video from Carlson to Torrey Ward,

4   correct?

5   A.   Yes, sir.

6   Q.   Do you recall the date of that?

7   A.   I do not recall the date.  Possibly August of 2017 or so.

8   Q.   No.  I can help you with it.

9   A.   Please.

10  Q.   I've got -- I'm going to show you if I need -- if I can, I

11  don't intend to introduce this at this time, but if I could

12  have -- I made a line around it beginning in the part I want to

13  ask in red.

14       MR. BALDANI:  If I could ask the Court Security Officer to

15  show it?

16       THE COURT:  You may.

17       MR. BALDANI:  I didn't know this was coming up, so I

18  didn't bring an extra copy.  So can I give it to him, let him

19  look at it and then take it back, I hope?

20       THE COURT:  Yes.

21  BY MR. BALDANI:

22  Q.   So if you would, focus in on the, I believe it's not 2017

23  at all, it's 2016.  But take a look at what I have framed in

24  red, if you would.

25       THE COURT:  Mr. Baldani, if you want to question from the

4 - 95

MICHAEL VIERGUTZ - CROSS

```
 1   Elmo so you can both see it, feel free.
 2         MR. BALDANI:  I don't want to display my tech ignorance.
 3   It's just a little chunk.
 4         THE COURT:  We have a 12-year-old available to help you,
 5   Mr. Baldani.  That's just a little bit of humor.
 6         MR. BALDANI:  I'm just going to ask him a handful of
 7   questions.  And if I need to try that, I'll do it.
 8         THE COURT:  I want to be sure that you know you can.
 9         MR. BALDANI:  I appreciate that.
10         THE COURT:  Excuse my having a little laugh at your
11   expense.  Because we're about the same age.
12         MR. BALDANI:  Have at it.
13   BY MR. BALDANI:
14   Q.   Are you with me?
15   A.   I vaguely recall.
16   Q.   So isn't 12/10/16 rather than 2017, as you thought?
17   A.   Yes, around December of 2016.
18   Q.   So you had a chance to read the portion I bracketed in
19   red, correct?
20   A.   Just very briefly.
21   Q.   And so it shows -- so when it says 8:24:19, does that mean
22   this 8:24, 19 seconds, like Pacific, California time?
23   A.   8:24, 19 seconds but I believe all of those are in UTC.
24   Q.   Which is in the middle of the country, am I right?
25   A.   No, UTC has to do with the time offset.  So it would be,
```

4 - 96

MICHAEL VIERGUTZ - CROSS

1   for California, eight minus I think it's five -- might be three

2   hours, excuse me.

3   Q.   So you're not sure about that?

4   A.   Well, you would take eight minus the three, so it would

5   be, I believe that's five.

6   Q.   Okay.  So 5 p.m. then, is that what you're saying?

7   Regardless, it doesn't matter what time.

8        Let me just say this.  The part that I bracketed, Carlson

9   asks Torrey Ward at 8:24:19, what are you doing today?

10       Do you remember reading that just a second ago?

11  A.   Yes, sir.

12  Q.   And there's no answer from Torrey Ward, is there?

13  A.   I don't recall seeing one.

14  Q.   Then Carlson sends him a link to a video, correct?

15  A.   Yes.

16  Q.   That's what you had answered to the prosecutor about?

17  A.   Yes, sir.

18  Q.   And you gave them a little summary of Breaking Bad, right?

19  A.   A basic, yes, sir.

20  Q.   And it's Walt White, not Walt Whitman.  I think Whitman is

21  like the poet or the author, right?

22  A.   Spoiler alert.

23  Q.   So anyway, so he sends him a video.  And you have looked

24  at that video, right?

25  A.   I did watch the video.

MICHAEL VIERGUTZ - CROSS

1    Q.   It's a couple-minute clip, correct?

2    A.   Yes, sir.

3    Q.   In other words, it's not a whole episode, right?

4    A.   It was not a full episode.

5    Q.   At the end of the clip, Walter White, former teacher,

6    tells his former student, Jesse Pinkman, I'm in the empire

7    business, right?

8    A.   That's the summary of it.

9    Q.   That's the end of the clip?

10   A.   Right.

11   Q.   Okay.  This part that I just showed you in brackets, so we

12   got Carlson saying:  What are you doing today?

13        No answer.

14        Carlson's sending a clip unsolicited with -- a two-minute

15   clip with Walter White saying, I'm in the Empire business,

16   right?

17   A.   The video, yes, sir.

18   Q.   Yeah, yeah.  And then Torrey Ward responds:  You are in

19   the Empire business?

20        You read that a minute ago, didn't you?

21   A.   That was sent by --

22   Q.   That's Torrey Ward's response to this video that the

23   prosecutor wanted to ask you about.

24   A.   Yes, sir.

25   Q.   You are in the empire business, right?

MICHAEL VIERGUTZ - CROSS

1    A.    It was a question.

2    Q.    Yeah.

3          And Carlson responds:  Yes.  Starting at the very bottom.

4          Right?

5    A.    I believe that's what the text message is.

6    Q.    And then Torrey Ward says:  Was that the meaning of the

7    video you sent me?

8          Right?

9    A.    That's the next line down.

10   Q.    All right.  The prosecutor brought up the fact that the

11   BlackBerry had been wiped, correct?

12   A.    Correct.

13   Q.    And you testified there's two branches to what your --

14   whatever you call it, the Forensic Unit does, there's

15   investigation and examination, correct?

16   A.    Yes, sir.

17   Q.    And you have done both, right?

18   A.    I was an investigator prior to being an examiner.

19   Q.    Okay.  When you were an investigator, you would find that

20   on occasion someone would get arrested, and -- very often in

21   drug cases and when they get arrested, the police take their

22   device, correct?

23   A.    Ideally, yes.

24   Q.    Like what happened -- good point.  Like what happened in

25   this case, right?

MICHAEL VIERGUTZ - CROSS

1    A.    Correct.

2    Q.    Your understanding that this iPhone 8 or Exhibit 8 was

3    taken from -- the BlackBerry, I should key in on, was taken

4    from Carlson at the time of his arrest, right?

5    A.    I believe it was.

6    Q.    Okay.  From your work as an investigator, you know that

7    many times, I think you mentioned, called him the bad guy, the

8    bad guy's booked into the jail, the bad guy gets on the phone

9    to somebody and says wipe that phone, right?  You have seen

10   that happen, haven't you?

11   A.    I don't recall using the word "bad guy," but I probably

12   could have.  But that's the fear --

13   Q.    That happens --

14   A.    -- for evidence preservation.

15   Q.    -- right?

16   A.    Absolutely.

17   Q.    So you don't know who wiped that BlackBerry, do you?

18   A.    I do not know who wiped the BlackBerry.

19   Q.    You have no idea if Carlson wasn't integral in wiping that

20   BlackBerry, do you?

21   A.    If he could have called somebody to have them potentially

22   do that, then it's possible.

23   Q.    That's all.

24   A.    If I may?  Because you had asked, there was one more line

25   after the empire.  Do you have that on there?

MICHAEL VIERGUTZ - CROSS

1   Q.   Yeah, I got it.  I got the whole exchange.

2   A.   The one right after, are you in -- I think it was posed to

3   Carlson and Carlson said:  I'm at the bottom.

4        What was the line right after that?

5   Q.   Okay.  Well, you tell me.

6   A.   Was it something --

7   Q.   Was that the meaning of the video you sent me.  Right?

8   A.   Right, the next line down.

9   Q.   Yeah.  And Carlson says:  I just like it, right?

10  A.   Correct.

11  Q.   And I guess you want -- and then Torrey Ward says:  I like

12  the sound of empire business.

13       Is that what you're talking about?

14  A.   I think that's why it was possibly brought up, as far

15  as --

16  Q.   Well, I mean, it's not -- you have testified many times

17  before, right?

18  A.   I have.

19  Q.   Is it your -- do you feel it's your role to tell the jury

20  why a piece of evidence is introduced, or just your role to

21  answer the questions?

22  A.   If I'm asked why it was introduced --

23  Q.   Well, I didn't ask you why it was introduced.

24  A.   Okay.

25  Q.   Okay.  So you told the jury a little bit about Breaking

MICHAEL VIERGUTZ - CROSS

1    Bad, didn't you?

2    A.    A brief little bit that I knew.

3    Q.    So you know a little bit about it, right?

4    A.    I had watched the series a while ago.

5    Q.    And Walter White in the show is the kingpin drug dealer,

6    right?

7    A.    I believe he does become it, yeah.

8    Q.    So when he sent this link, Torrey Ward didn't say, oh,

9    cool, you're Walt White, I'm Jesse Pinkman, did he?

10   A.    No, I didn't see that.

11   Q.    All right.

12        MR. BALDANI:  That's all, Your Honor.

13        THE COURT:  Ms. Pollock.

14        MS. POLLOCK:  Just a couple of questions.

15                              CROSS-EXAMINATION

16   BY MS. POLLOCK:

17   Q.    Good morning, Detective.  I'm the attorney for Nader

18   Sarkhosh.

19        The events that you just testified about, the 171, those

20   were primarily text messages?

21   A.    A combination of things.  But there were a number of text

22   messages.

23   Q.    And is it fair to say that most of those text messages are

24   from the end of May of 2016 until the end of December 2016?

25   A.    I really don't have the dates in front of me, there were a

MICHAEL VIERGUTZ - REDIRECT

1   number.  I believe for Mr. Sarkhosh, it was a brief or a

2   smaller window of contact.  Is that what you're referring to,

3   like how long they had known each other?

4   Q.    Correct.  And a smaller period of time that they knew each

5   other.  And the text messages are in, as you said, a smaller

6   window, a short period of time?

7   A.    I believe so.

8   Q.    You just don't remember the exact months?

9   A.    I don't have the exact amount in front of me.

10  Q.    Thank you very much.

11  A.    Yes, ma'am.

12        THE COURT:  Redirect?

13        MR. SLAVIN:  Yes, Your Honor.

14                        REDIRECT EXAMINATION

15  BY MR. SLAVIN:

16  Q.    The year 2005 was brought up, right?

17  A.    Yes, sir.

18  Q.    And you said that that date was a little suspicious to

19  you.

20        Do you remember saying that?

21  A.    I do.

22  Q.    Is that because all of the deleted messages came up with a

23  certain date?

24  A.    The deleted messages that were recovered appear to have

25  that 2005 time stamp.

MICHAEL VIERGUTZ - REDIRECT

1    Q.   But when you looked at that date, did it make sense that

2    all those messages would have been sent to 2005?

3    A.   It didn't.  Because the problem with deleted items, and

4    especially deleted and recovered, your time and dates aren't --

5    I don't say they're not as good, but you have to look at

6    further interpretation of it.

7         This phone had been passed down a number of other devices,

8    so this was the iPhone -- or actually, it was our first 7 plus,

9    256-gig, big iPhone.  But you could see where he had the

10   previous iPhones that had been basically brought down from

11   the iCloud as he progressed into the new IOSs.

12   Q.   Did iPhones even exist in 2005?

13   A.   I believe 2008 is when they started.

14   Q.   So those messages couldn't possibly have been sent in 2005

15   then?

16   A.   Unless it was on like maybe a phone that it could be

17   imported into, which that would be tough.

18   Q.   You had mentioned just now that the message with

19   Mr. Sarkhosh fell into a much briefer window than with other

20   people?

21   A.   I believe so.  Could I look at --

22   Q.   Just -- you just said that, right?

23   A.   Yes, I did.

24   Q.   Can you tell us again the number of phone events that

25   happened during that brief window?

MICHAEL VIERGUTZ - REDIRECT

```
 1        MS. POLLOCK:  Objection.  Asked and answered.

 2        THE COURT:  Please move on.

 3        MR. SLAVIN:  That's fine.  I have no further questions.

 4   Thank you.

 5        THE COURT:  Witness may step down.

 6        THE WITNESS:  Thank you, Your Honor.

 7        THE COURT:  Members of the jury, this seems like a

 8   reasonable time to break for lunch.  Leave your notebooks there

 9   in your chairs, remember all of my instructions.  Be careful,

10   it's cold outside.  I'll see you back here at 1:15.

11        (Jury left courtroom at 12:00 p.m.)

12        THE COURT:  Parties and counsel may be excused.  I'll see

13   you back here at 1:15, unless you need to see me before.

14        (A recess taken from 12:01 p.m. to 1:31 p.m.)

15        THE COURT:  The record will reflect that all members of

16   the jury are present in the courtroom, along with all parties

17   and counsel.

18        Mr. Slavin, the United States may call its next witness.

19        MR. SLAVIN:  Thank you, Your Honor.  The United States

20   calls Greer Rabiega.

21        GREER RABIEGA, GOVERNMENT WITNESS, SWORN

22        THE COURT:  You may.

23        MR. SLAVIN:  Thank you, Your Honor.

24        THE COURT:  Please keep your voice up.  The acoustics in

25   this room are not very good.
```

GREER RABIEGA - DIRECT

1      THE WITNESS:  Okay.

2                          GREER RABIEGA

3                       DIRECT EXAMINATION

4   BY MR. SLAVIN:

5   Q.   That works great, keep doing that.

6        Can you please introduce yourself to the jury and spell

7   your name, please?

8   A.   Sure.  My name is Greer Rabiega.  First name is spelled

9   G-r-e-e-r, last name R-a-b-i-e-g-a.

10  Q.   Mr. Rabiega, what do you do?

11  A.   I'm a pilot.

12  Q.   How long have you been a pilot?

13  A.   About ten years.

14  Q.   Have you ever flown flights for a Mr. Robert Carlson?

15  A.   Yes.

16  Q.   How many flights have you flown with Mr. Carlson?

17  A.   A total of four -- well, four trips.

18  Q.   Did you fly those trips as the pilot in charge of the

19  plane?

20  A.   I was the second-in-command.

21  Q.   What is the second-in-command?

22  A.   The PIC, the pilot in charge, is the commander of the

23  flight.  They are responsible for really everything that

24  happens on the flight.  And the second-in-command assists them

25  with the operation of the aircraft or any other tasks that are

GREER RABIEGA - DIRECT

1    assigned.

2    Q.    And who were the pilots actually in charge of the flights

3    you flew for Robert Carlson?

4    A.    The four trips I did, three were with Bob Wallace, and one

5    was with Bob Chipperfield.

6    Q.    Before we get into the details of those trips, what is

7    your current job?

8    A.    I currently am a pipeline patrol local pilot for Pacific

9    Gas & Electric.

10   Q.    What does that mean?

11   A.    I fly small planes around the state of California and we

12   inspect primarily gas pipelines.  We're looking for

13   agricultural workers or other builders digging into the

14   pipeline.  So it's a safety job.

15   Q.    What did you do before you began that work?

16   A.    I was an aerial survey pilot for a company called Aperture

17   Aviation.

18   Q.    How about before that?

19   A.    Before that, I was a flight instructor.

20   Q.    Have you ever flown -- have you ever been part of the

21   charter jet industry?

22   A.    Not charters specifically.  The closest I came was with

23   Bob Wallace, we did some private jet travel.

24   Q.    Who is Bob Wallace?

25   A.    He is a pilot who I flew with.  I met him originally at

GREER RABIEGA - DIRECT

1    Aperture Aviation and then continued to fly with after that.

2    Q.    How did you first meet Bob Wallace?

3    A.    He was a co-worker at Aperture Aviation.

4    Q.    What is your seniority level in terms of flying relative

5    to Bob Wallace?

6    A.    I am a relative neophyte.  He is a long-experienced pilot,

7    30 years, 40 years as a pilot.

8    Q.    Would you say that in your relationship with him that

9    you'd defer to him?

10   A.    Absolutely.

11   Q.    Why is that?

12   A.    He was the more experienced pilot.  He was a friend.  And

13   those are the primary reasons.

14   Q.    When did you start flying with Bob Wallace?

15   A.    At Aperture Aviation or outside of that?

16   Q.    Outside of your co-worker stay at Aperture.

17   A.    The exact date, I am not sure.  If I have my flight logs I

18   could take a look.  But I think about 2015, 2016.

19   Q.    And what planes were you and Bob Wallace flying?

20   A.    A Hawker 700, November 1-8 Charlie Charlie, and later a

21   Gulfstream, a GIII.

22   Q.    You mentioned that those private flights that you did with

23   him don't correspond to the rest of your work.  How did you end

24   up getting involved in those flights?

25   A.    It was ad hoc work.  Bob was one of the partners on the

GREER RABIEGA - DIRECT

1    aircraft.  And he was kind of doing me a favor as a young pilot

2    and asked me if I would like to be his SIC on some trips as my

3    primary work schedule at Aperture Aviation allowed.

4    Q.   Explain why that would be a favor to you.

5    A.   So the pilot career, it can go several ways.  But in

6    general, it transitions from planes to bigger planes to the

7    biggest planes, like the airlines, like Delta.

8        And the work I was doing at Aperture Aviation is really

9    small planes, like little six-seaters with props on the front.

10   And there's an intermediate step you usually have to take

11   working freight or at a commuter airline.

12       But you can, if you have someone doing your favor, go

13   straight to charter or private corporate, that sort of thing.

14   That's what Bob Wallace was doing for me.

15   Q.   How did you first end up doing a trip for Robert Carlson?

16   A.   The same way most trips with Bob Wallace would work.  Bob

17   called me on the phone, said, hey, I have a trip at this date,

18   it's going to this location, are you available?  And I was, so

19   I said yes.

20   Q.   So your first contact regarding Rob Carlson, did that

21   start with one of these phone calls?

22   A.   Yes.

23   Q.   Can you describe what that phone call was like?

24   A.   Sure.  I don't recall the exact dates off the top of my

25   head.  But Bob Wallace called me and said, I've got this trip,

GREER RABIEGA - DIRECT

1  it's a weekend or an overnight trip.  It's out to Teterboro and

2  back.  Are you available?

3  Q.    Where is Teterboro?

4  A.    It's in New Jersey.

5  Q.    And where were you based?

6  A.    Marina, which is near Monterey in California.

7  Q.    Which part of California is that?

8  A.    Northern California.  San Francisco would be the nearest

9  big city.

10  Q.    Did you get any more information about this potential

11  trip?

12  A.    Yes.  Yeah.

13  Q.    What other information did you get?

14  A.    I asked, you know, who is the customer, you know, what are

15  we doing.

16  Q.    What did you learn?

17  A.    I learned the customer's name, Rob Carlson.  And that the

18  trip was -- they were moving servers, sort of last-minute,

19  on-demand server sales.  We're going to be actually taking some

20  boxes rather than primarily passengers.

21  Q.    And what was your reaction to that?

22  A.    It was a little odd.

23  Q.    Did you do any follow-up?

24  A.    Yes.  I -- well, I Googled Robert Carlson and I found he

25  was out of Malibu, California.  And I found like some Better

GREER RABIEGA - DIRECT

1    Business reviews saying he was involved in tech, and they

2    weren't very kind, but they were Robert Carlson, involved in

3    tech.

4    Q.    And did that calm you a little bit?

5    A.    Yes, it seemed plausible.

6    Q.    What happened when you arrived for this first trip?

7    First, where did you arrive for this first trip?

8    A.    The trip departed initially out of Marina.

9    Q.    What happened when you arrived at Marina?

10   A.    When I got there, the plane was already loaded.  There

11   were several boxes onboard.  And this was pretty typical that

12   the plane would be ready by the time I got there.  We did the

13   performance calculations and departed.

14   Q.    How many boxes, approximately, were there?

15   A.    I would guess between three and five, maybe as many as

16   seven.

17   Q.    Was the plane fully loaded with boxes or was it still

18   pretty empty or somewhere in between?

19   A.    Somewhere in between.

20   Q.    At this time did you have any concerns?

21   A.    I asked Bob if, you know, if he had looked at the boxes.

22   Q.    Why did you ask him that?

23   A.    Boxes are weird.  We're a passenger plane.  What he told

24   me, but still, it's a little odd.

25   Q.    You had said that you already looked up Mr. Carlson and

GREER RABIEGA - DIRECT

1   that's what calmed you.  Is there something new that came up

2   that made you again concerned about the boxes?

3   A.   Nothing new, just furthering of the same questioning.

4   Q.   At this time, when you were at Marina, were there any

5   other things that stood out to you about this trip?

6   A.   Yes.

7   Q.   What were those?

8   A.   So the boxes came and they loaded in Marina, but then we

9   were flying down to Camarillo, which is down near LA, to

10  actually pick up passengers.

11  Q.   How far away is the Los Angeles area from the Northern

12  California, kind of San Francisco area?

13  A.   It's like a ten-hour drive.  It's a few hundred miles.  It

14  would be like going to Miami from here.

15  Q.   So why would that have been odd to you?

16  A.   It's just strange to me that the baggage and the

17  passengers are in different locations.  You expect them to be

18  in the same place.

19  Q.   Did anyone get on the plane in Marina?

20  A.   I think I recall one person.

21  Q.   Do you remember his name at all?

22  A.   I believe that was Isaac.

23  Q.   So what happens next?

24  A.   We fly down to Camarillo, we pick up Rob Carlson and maybe

25  one or two other people.  And then we fly out to Teterboro.

GREER RABIEGA - DIRECT

1      MR. SLAVIN:  Give me one second.

2  Q.   I want to show you what's been marked as Exhibit 26C,

3  please.

4      Do you recognize that?

5  A.   Yes.

6  Q.   What is it?

7  A.   That is my logbook.

8  Q.   And if we can flip to the second page, please.

9      Do you see something handwritten in there?

10 A.   Yes.

11 Q.   Do you recognize the handwriting?

12 A.   That is my handwriting.

13     MR. SLAVIN:  Pursuant to a stipulation that all the

14 attorneys entered, we would move this exhibit into evidence.

15     THE COURT:  It will be admitted.

16        (Government Exhibit 26C was admitted.)

17     MR. SLAVIN:  Can we publish to the jury?

18     THE COURT:  You may.

19 BY MR. SLAVIN:

20 Q.   This is probably going to be hard to see, but can you just

21 explain what logbooks are?

22 A.   Sure.  As a pilot, we maintain a book which catalogs the

23 flying we do.  We do it to monitor how much time we fly, our

24 currency in terms of take-offs and landings, which is for

25 regulatory purposes.  And experience level, just sort of for

GREER RABIEGA - DIRECT

1    our own edification, just to see what we've done.

2    Q.   Are all the trips, the one we just started talking about

3    and the other ones you mentioned, are they all recorded in

4    these logbooks?

5    A.   Yes.

6    Q.   If you ever need to refer to that to help your memory,

7    just let me know, please.

8         So you talked about -- we talked about arriving in the Los

9    Angeles area.  Did you say what happened next?

10   A.   We picked up Rob and a couple of passengers and left for

11   the East Coast.

12   Q.   What happened when you arrived in Teterboro?

13   A.   It was a pretty quick turn.  We were behind schedule.  Rob

14   Carlson took us to Sonic to get a meal and --

15   Q.   You laugh when you say that.  Was that -- is that not

16   normal?

17   A.   It was odd, a little.

18   Q.   Why was it odd?

19   A.   So passengers don't necessarily eat with pilots.  You

20   know, some like to do it, some don't, and that's fine.  But the

21   ones that do -- I mean, these are people with the money to

22   charter an aircraft.  They tend to take you to nice places like

23   a Ruth's Chris or a nice Italian restaurant.  Sonic was weird.

24   Q.   I passed over one thing.  You mentioned at Marina, that

25   you were concerned about the boxes and you had a conversation

GREER RABIEGA - DIRECT

1    with Bob Wallace.   Am I recounting that correctly?

2    A.    Yes.

3    Q.    What was that conversation like?

4    A.    I just asked Bob Wallace if he had looked in the boxes.

5    You know, were these servers, and he said he had and that they

6    were.

7    Q.    Why did you ask him that?

8    A.    As I stated before, it just -- boxes are sort of weird.

9    You know, I had looked up Carlson and I wanted to make sure

10   that the IT story, you know, held water.

11   Q.    Did you believe Mr. Wallace when he told you they were

12   servers in the boxes?

13   A.    Yeah.

14   Q.    Why did you believe him?

15   A.    He was a friend.   He was the pilot-in-command.   I had no

16   reason to doubt him.

17   Q.    Now, did anything else happen in Teterboro or did you just

18   return back home?

19   A.    We swapped out some bags, I believe -- or we got rid of

20   the boxes.   And there might have been some bag changes, I'm not

21   sure.   And, yeah, then we flew back.   We were behind schedule

22   at that point.

23   Q.    You said behind schedule.   How long did you spend in

24   Teterboro?

25   A.    I believe it was several hours.

GREER RABIEGA - DIRECT

1    Q.   Is that normal to cross the country and after a few hours

2    fly right back?

3    A.   It is atypical.

4    Q.   Why is it atypical?

5    A.   It's a really long day to do that.  The Hawker isn't an

6    especially fast plane as jets go.  So you're looking, if you

7    say, five hours in one direction.  And, you know, in fact you

8    might be looking at ten hours of flight duty, which is really

9    long.

10   Q.   On the way back, did you stop anywhere?

11   A.   We did.  We had a scheduled stop in Kansas City for fuel.

12   And we had one additional stop.

13   Q.   What was the additional stop?

14   A.   Santa Rosa, California.

15   Q.   Why did you stop in Santa Rosa?

16   A.   It was a last-minute addition.  I actually forgot a stop.

17   It was a last-minute addition from Rob to drop off a passenger.

18   Q.   You said you forgot a stop.  What was the stop you forgot?

19   A.   So we went Teterboro, Kansas City, then Camarillo to drop

20   off Rob Carlson; then up to Santa Rosa to drop off his

21   passenger; and then to Marina to put the plane away.

22   Q.   And was that last-minute addition, did that raise any

23   concerns with you?

24   A.   Yes.

25   Q.   Why did it raise concerns?

GREER RABIEGA - DIRECT

1   A.   Like I said, it was already a long flight and we were

2   behind schedule.  It made an already incredibly long day just

3   insanely long.  And it was just last-minute changes like that

4   aren't unheard of, but they are unusual in general.

5   Q.   So you started in Northern California?

6   A.   Yes.

7   Q.   Then you flew down where, to Southern California; is that

8   right?

9   A.   On this trip back or on the trip out?

10  Q.   Outwards.

11  A.   Outwards?  Northern California, Southern California, New

12  York.

13  Q.   How many hours is that?

14  A.   Can I check my logbook?

15  Q.   Yes.

16       MR. SLAVIN:  If you bring that up, please, for him.

17  A.   I think it's the next page.  It's hard to read.  It looks

18  like I have it as about 4-point something, so let's call it 4.5

19  hours in the air on the outbound.

20  Q.   And how much time coming back?

21  A.   It's hard to read.  I think it was close to nine hours on

22  the return.

23  Q.   Is that including all the stops?

24  A.   That would not include the fuel stops.  That's just time

25  in the air.

GREER RABIEGA - DIRECT

1   Q.   And how much time did you get in between at Teterboro?

2   A.   Maybe four hours.

3   Q.   Thank you.

4        Did there come a time when you did a second trip for

5   Mr. Carlson?

6   A.   Yes.

7   Q.   How did that second trip come about?

8   A.   Same way as the first.  I got a call from Bob Wallace

9   saying I have a trip, these are the dates, this is where it's

10  going, it's going to New York again, but this time Stewart, and

11  it is for Rob Carlson again.

12  Q.   Where did you meet this flight?

13  A.   This flight started in Marina as well.

14  Q.   What happened when you got to Marina?

15  A.   This time when I got to Marina, the boxes were still being

16  sealed.  They had got in there before I did.

17  Q.   Who was sealing the boxes?

18  A.   Isaac.

19  Q.   Did you see what was in the boxes as they were being

20  sealed?

21  A.   No.  I mean, they were already closed.  They were just

22  putting tape on them.

23  Q.   That day was there somebody else who was doing it, was

24  helping Isaac?

25  A.   I think Bob Wallace might have helped him put some tape on

GREER RABIEGA - DIRECT

1   them.  But I got there, there was some tape and we loaded the

2   plane.

3   Q.   What happened next?

4   A.   We flew.  This time we did not stop in SoCal.  We were

5   going to Stewart.  And we did a fuel stop in Salina, Kansas.

6   Q.   Did Rob Carlson come on this trip?

7   A.   I don't remember for sure.  I don't think so.

8   Q.   What happened when you got to New York?

9   A.   We got to the airport, they offloaded the boxes.  This

10  time we spent the night like we should have the first time.

11  And the next day, we got passengers and departed.

12  Q.   Did you do anything else while you were in New York?

13  A.   Had a meal with Isaac.

14  Q.   What was that meal like?

15  A.   We were at a diner.  Pretty, you know, lunch at a diner.

16  Q.   Did Isaac talk at all about his work for Rob Carlson?

17  A.   Yeah, we talked.  We talked a little shop just to pass the

18  time.

19       We asked Isaac how he had met Robert Carlson and --

20       MR. BALDANI:  Object to any potential hearsay, Your Honor.

21       THE COURT:  All right.  Proceed.  You may lead to avoid.

22  BY MR. SLAVIN:

23  Q.   Did you have any -- did you learn anything new about Rob

24  Carlson's server business during this conversation with Isaac?

25  A.   No.

4 - 119

GREER RABIEGA - DIRECT

1   Q.   Did you find that odd?

2   A.   A little.

3        MR. BALDANI:  Your Honor, I think the question is asking

4   for hearsay.  I want to object again.

5        THE COURT:  Approach.

6        (Bench conference on the record.)

7        THE COURT:  Hearsay.

8        MR. BALDANI:  What did you learn?  I mean, it seems like

9   he's on the verge of saying what Isaac told him at dinner, and

10  I don't think that's proper.

11       MR. SLAVIN:  May I respond, Your Honor?

12       THE COURT:  You may.

13       MR. SLAVIN:  It's not being offered for the truth of the

14  matter asserted.  In fact, we would say the server business

15  never existed; and, therefore, the truth value of that

16  statement is entirely irrelevant.  It's all about what the

17  witness's impressions were.

18       MR. BALDANI:  I didn't know what his answer is going to

19  be, I mean, so -- I couldn't -- so basically he's going to say

20  that Isaac was saying that it was a legit server business?

21       MR. SLAVIN:  No.  The point is that Isaac never said

22  anything about the server business.

23       THE COURT:  I'll allow it.

24       MR. BALDANI:  Okay.

25       THE COURT:  I'll let you cross.

GREER RABIEGA - DIRECT

1      MR. BALDANI:  You do see --

2      THE COURT:  I understand your concern, yeah.

3      (Bench conference concluded.)

4   BY MR. SLAVIN:

5   Q.   Did you get any information regarding conversations about

6   his work for Carlson?

7   A.   He was friendly, maybe a little evasive, but seemed like a

8   nice guy.

9   Q.   Did you -- what happened next on this flight?

10  A.   We flew back to Marina with a fuel stop in Salinas.  Or,

11  actually, can I have my logbook again?

12  Q.   Yes.

13      MR. SLAVIN:  If you can please bring it up again,

14  Ms. Warner.

15  A.   We did do a stop in Santa Rosa on the way back from this

16  one as well.  So Stewart, Salina for fuel, a stop in Santa Rosa

17  and then back to Marina.

18  Q.   Do you remember why you would stop in Santa Rosa?

19  A.   Dropping a passenger, like the previous time.

20  Q.   So was there someone else on this flight along with Isaac

21  then?

22  A.   Yes.

23  Q.   Do you remember anything about this person?

24  A.   It was a woman, dark hair, short.  I didn't interact with

25  the passengers very much.

4 - 121

GREER RABIEGA - DIRECT

1    Q.   Is Santa Rosa on the way to Marina?

2    A.   No.  Marina is south of San Francisco, by about 50, 60

3    miles.  Santa Rosa is north of San Francisco by about 60 miles.

4    Q.   Did there come a time when you did a third flight for

5    Robert Carlson?

6    A.   Yes.

7    Q.   How did that come about?

8    A.   This one was a little different.  Bob Wallace was in

9    Africa with his, I think, then fiancée at the time, and he had

10   told me that while he was gone, Carlson might have wanted --

11   might want to do a flight in 1-8 Charlie Charlie, and he would

12   contact me if he did.

13   Q.   What is 1-8 Charlie Charlie?

14   A.   That's the Hawker, which -- the aircraft which Bob was a

15   partner in, in which we did the trips in.

16   Q.   Please continue.  What else did you learn about this third

17   flight?

18   A.   And so Carlson was to contact me and that the PIC would be

19   Bob Chipperfield, who Bob Wallace had flown with before and

20   said was a good pilot and vouched for.

21        And indeed, Carlson did contact me about a flight.  There

22   was one strange aspect of it, so I wanted to double-check it

23   with Robert Wallace before.

24   Q.   What was the strange aspect about the planning of this

25   flight?

GREER RABIEGA - DIRECT

1   A.   The strange aspect was that, at the conclusion of the
2   trip, the plane would stay in Van Nuys, which is in the LA
3   area, rather than coming back to its home base in Marina.
4   Q.   You said you checked that with Bob Wallace.  What was the
5   response?
6   A.   It took a little while because talking to someone in
7   Africa, his response was yes, that's a little strange, but
8   that's okay.
9   Q.   Did you agree to do this flight?
10  A.   Yes.
11  Q.   Where did you meet this plane?
12  A.   So we departed from Marina.  Bob Chipperfield flew into
13  Monterey, the nearest commercial airport, and I picked him up
14  there.  We flew the plane from Marina to Van Nuys, and that was
15  where we picked up Carlson and his contingent.
16  Q.   What was his contingent?
17  A.   Several people, maybe two or three.
18  Q.   Was there anyone you recognized?
19  A.   No one who I recognized from previous flights, no.
20  Q.   Do you remember anything about the passengers at all?
21  A.   There was one tall blonde woman, but other than that,
22  Carlson and maybe one other person.
23  Q.   Did they have anything with them?
24  A.   They had bags.
25  Q.   Did they have the boxes that you saw on the previous

4 - 123

GREER RABIEGA - DIRECT

1    flights?

2    A.   No boxes on this trip.

3    Q.   Was it weird to you that all of a sudden the boxes were

4    gone?

5    A.   At the time I didn't really think about it.

6    Q.   So what did they have with them instead?

7    A.   Ask that again.

8    Q.   What did the passengers -- what did the passengers have

9    with them?

10   A.   They had several bags and -- passengers and they had bags.

11   Q.   Can you describe the bags, please?

12   A.   Sure.  They were, you know, a combination of your standard

13   rollaboards and stuff.  They were pretty unremarkable except

14   that several of them were notably heavy.

15   Q.   Did you lift the bags?

16   A.   Yes.

17   Q.   What did it feel like when you lifted the bags?

18   A.   So can I like make an allusion or analogy?

19   Q.   However you need to explain it.

20   A.   So I used to work and do archeology in Turkey a long time

21   ago.  Whenever I went on those trips, I would buy a bunch of

22   carpets there because you can buy them cheap there, and I'd

23   bring them back for friends as gifts and whatnot.

24        When I did that, I would load the carpets really just as

25   tight as I could.  And the bags, when I did that, were insanely

4 - 124

GREER RABIEGA - DIRECT

1  heavy.  Not like 30 pounds of clothes, like 50, 60 pounds of

2  stuff.  And these bags were like those heavy bags I loaded.

3  They were -- yeah, they were really heavy.

4  Q.  Did the weight feel consistent with bags that would be

5  full of clothing?

6  A.  Not unless they were packed to an insane level, which

7  would be unusual for an overnight trip.

8  Q.  How many bags were there, approximately?

9  A.  I would guess maybe seven or eight.

10  Q.  Did the number of bags correspond to the number of

11  passengers?

12  A.  It was high.  It wasn't outside of the realm, possibility,

13  but it was noticeably high.

14  Q.  How long was this trip supposed to be?

15  A.  It was an overnight trip.

16  Q.  Did you find it odd that for an overnight trip, the

17  passengers would have so many and such heavy bags?

18  A.  Yes.

19  Q.  Who handled the bags and got them onto the plane?

20  A.  Primarily me.

21  Q.  Was Robert Chipperfield involved at all?

22  A.  I can't recall if he helped with the bags or not.

23  Q.  What happened next?

24  A.  We flew.  This trip was -- let's see.  We initially went

25  to Charlotte, North Carolina.  We did a quick turn there.

GREER RABIEGA - DIRECT

1    Q.   Before we go on, what happened when you landed in

2    Charlotte?

3    A.   Charlotte was a really quick turn.  We landed, I was up in

4    the cockpit and I was primarily working out our flight

5    clearances and, you know, doing the performance calculations

6    for the trip out.

7         But I believe in the back they were -- there was some

8    changes.  Maybe they were loading bags, changing bags or

9    changing passengers.

10   Q.   You talked about a quick turn.  What is a quick turn?

11   A.   We were on the ground for -- it was really short, less

12   than an hour.  Maybe 20 minutes.

13   Q.   What happened next?

14   A.   We flew to Peachtree City, which is Atlanta.  And we did

15   an overnight.

16   Q.   Where did you stay in Atlanta?

17   A.   We were at the Hilton downtown, I think.

18   Q.   Do you know what the passengers did while you were

19   overnighting in Atlanta?

20   A.   No idea whatsoever.  We went our separate ways from the

21   airport.

22   Q.   What happened the next morning?

23   A.   The next morning, we come back to the airport, we get the

24   passengers, we get the bags, and then we depart back for the

25   West Coast.

GREER RABIEGA - DIRECT

1  Q.   When you arrived the next morning, did you also help load

2  bags again?

3  A.   I did.

4  Q.   Were they the same bags as had arrived there?

5  A.   I don't think they all were.

6  Q.   What do you mean by that?

7  A.   So there was some bags which were definitely the same.

8  But of like the rollaboards, some I recall being different.

9  Like we had three black ones on the outbound.  On the way back

10  we had a black one and two silver ones.

11  Q.   What was your reaction to that?

12  A.   Rich people are weird.  It was odd.

13  Q.   Why is that odd?

14  A.   I don't know why you would on an overnight change -- why

15  you would get rid of a bag and replace it with another.  I

16  could understand if you, say, went shopping and brought more

17  bags, but to have different bags was strange.

18  Q.   Did you feel the weight of these bags?

19  A.   Some were heavy.

20  Q.   How did they compare to the bags that went out?

21  A.   I recall them being similar in weight.

22  Q.   Before you returned to the West Coast, did you stop

23  anywhere else on the East Coast?

24  A.   Yes.  We were originally going to stop in Charlotte again,

25  but they had flow into Charlotte, which basically for air

GREER RABIEGA - DIRECT

1    traffic control means it was going to take a long time to get

2    in there, so we went to Concord, which is a smaller, general

3    aviation airport on the outskirts of Charlotte.

4    Q.   How long ago had you been to Charlotte on the outbound?

5    A.   The previous day.

6    Q.   Hour-wise, estimate?

7    A.   Less than 24 hours, maybe 18 hours.

8    Q.   Did you need to stop in Charlotte or Concord for fuel?

9    A.   No.

10   Q.   What happened in Concord?

11   A.   It was, as far as I know, similar to what happened in

12   Charlotte on the outbound.  Again, I was in front doing the

13   airport paperwork.  But I believe there was some changes in the

14   back made with bags or passengers.

15   Q.   Then what happened?

16   A.   Then we started our return back.  We did a fuel stop in

17   Tulsa.  And our ultimate destination was, of course, Van Nuys.

18   Q.   During these flights, was there -- does the Hawker have a

19   cockpit door?

20   A.   I can't recall if this one did.  If it did, it would

21   rarely be closed.  The Hawker is very loud.

22   Q.   Do you remember a closed door in between you and the

23   passengers on these flights?

24   A.   No, but I never looked back there.

25   Q.   At the end of this flight, did you make any decisions

GREER RABIEGA - DIRECT

1    about future flying with Rob Carlson?

2    A.    Not immediately then, but shortly thereafter.

3    Q.    What decision did you make shortly thereafter?

4    A.    Just not to fly with this guy anymore.

5    Q.    Why did you make that decision?

6    A.    It was -- there were a lot of red flags.  You know, I

7    hadn't seen anything that was definitively, you know, wrong or

8    illegal, but it just -- there was a lot of smoke and I was no

9    longer comfortable flying with Carlson.

10   Q.    Other than the things you've already gone through, was

11   there other smoke, things that you would describe as smoke?

12   A.    Sure.  At that Tulsa stop on that last trip, Carlson

13   didn't pay for the fuel or the catering.  You know, he left the

14   poor line guy who was running the FBO there high and dry.

15   That's, you know, thousands of dollars of bill.

16   Q.    Who was the pilot on this flight?

17   A.    That was Chipperfield.

18   Q.    Did he have any reaction to that?

19   A.    I mentioned it to him, but he didn't make a big deal out

20   of it.

21   Q.    Were there any other things that you would consider smoke?

22   A.    Carlson's just a slimy guy.  You know, he would have

23   issues with, according to Bob Wallace, paying on time.  He

24   would pay in cash sometimes.  Getting him to pay for fuel was

25   always an issue.

GREER RABIEGA - DIRECT

1      I was told later that the trip sheet, which is the log I

2  would maintain of any trip that Hawker goes on for maintenance

3  purposes, the trip sheet from that trip we just described to

4  Peachtree disappeared when Bob Wallace eventually got the plane

5  back.  It was just not a comfortable situation.

6  Q.   Was the timing of the flights ever something that was an

7  issue for you?

8  A.   How do you mean?

9  Q.   Anything about times they were leaving, coming back,

10  anything like that.

11  A.   I mean, the trips were almost always running late, behind

12  schedule.  There were, you know, a lot of flying at night,

13  which in and of itself isn't necessarily a flag, but combined

14  with all the other things is a question mark in my head.

15  Q.   I want to run back and just confirm the dates of these

16  flights with you.  Is this something you need to check your

17  logbook for?

18  A.   Yes.

19      MR. SLAVIN:  If we can get those back up for him,

20  Ms. Warner.

21  Q.   The first flights that you described for Mr. Carlson, once

22  we pull it up, can you tell us what the dates of that were?

23  A.   Can you zoom in a bit?  That would be August 21 and 22 of

24  2016.

25  Q.   How about the second flight?

4 - 130
GREER RABIEGA - DIRECT

1   A.   That was September 27 and 28 of 2016.

2   Q.   And then this last flight that you just finished

3   describing?

4   A.   That was December 6.  And I can't quite read my notation.

5   It looks like the 6th through the 8th, approximately, of 2016.

6   Q.   So after you made this decision about flying with

7   Mr. Carlson, did you communicate that decision to Mr. Wallace?

8   A.   Absolutely.

9   Q.   What was his response?

10  A.   He agreed.  He said this guy seems shifty, let's not work

11  for him anymore.

12  Q.   Did there come a time where you did a fourth flight for

13  Mr. Carlson?

14  A.   Yes.

15  Q.   How did that come about?

16  A.   So Bob Wallace called me up and said, hey, I've got this

17  trip coming up, it's for the partners, it's out of Van Nuys,

18  going to Atlanta, these are the dates.  Are you available?  And

19  I said yes.

20  Q.   Why did you say yes?

21  A.   Because it was a flight for one of the partners.

22  Q.   Did you know it would be a flight for Robert Carlson?

23  A.   I did not.  I would not have accepted the flight if I

24  knew.

25  Q.   What happened when you -- first of all, what airport did

GREER RABIEGA - DIRECT

1   you fly out of?

2   A.   The plane departed out of Marina, where it's based.   We

3   went down to Van Nuys, LA, to pick up passengers.

4   Q.   What happened when you got to Van Nuys?

5   A.   So we parked the aircraft and we were waiting for the

6   passengers.  And then they drove out to the plane and Rob

7   Carlson was driving the car.

8   Q.   What was your reaction when you saw Rob Carlson?

9   A.   I was furious.

10   Q.   What did you do?

11   A.   I took Bob Wallace aside and yelled at him for a few

12   minutes, said, you know, we agreed we were not flying this guy

13   anymore.  What is happening here?

14   Q.   Did you end up doing the flight anyway?

15   A.   Yeah.  Bob went off and talked to Carlson for awhile.  And

16   then Bob Wallace came back and I told him, look, we're here in

17   Van Nuys already, I will do this one trip with you.  But this

18   ever happens again, I'm just going to go commercial and fly

19   home.

20   Q.   What else happened at Van Nuys?

21   A.   Loaded passengers and bags and departed.

22   Q.   What were the passengers like on this flight?

23   A.   There were two or three.  Carlson himself did not come on

24   the trip.

25   Q.   Did you recognize anybody from previous trips?

GREER RABIEGA - DIRECT

1    A.    I believe the tall blonde was on this flight, but no one

2    else I recognized.

3    Q.    If you saw that tall blonde again, do you think you would

4    recognize her?

5    A.    Probably not.  I only saw her in passing.

6    Q.    Do you recall the dates of this flight?

7    A.    It was -- let's see.  It was -- just went off my screen.

8    It was March 14th and 15th of -- that would be 2017, if the

9    other ones were 2016.

10        MR. SLAVIN:  If we can highlight that, make sure that's

11   correct.

12   A.    Yeah.  The one with the asterisks.

13   Q.    So those are the correct dates, March 14th to 15th, 2017?

14   A.    Yes.

15   Q.    How about, what were the bags like on this flight?

16   A.    Same as the previous trip.  No boxes, but a collection of

17   bags, some of which were notably heavy.

18   Q.    Where did this flight go?

19   A.    This flight went to Peachtree, which is Greater Atlanta.

20   Q.    Do you remember what time it arrived in Atlanta?

21   A.    I don't.

22   Q.    Do you know what happened when you got to Atlanta?

23   A.    Yeah, we let the passengers off the plane, helped them get

24   the bags off.  And then I went -- Bob Wallace and I went to the

25   hotel and the passengers went on their way.

GREER RABIEGA - DIRECT

1    Q.   Where did the bags go?

2    A.   With the passengers, I would assume.

3    Q.   Do you have any idea where the passengers went?

4    A.   No clue.

5    Q.   Any idea how they got there?

6    A.   No.

7    Q.   When were you supposed to leave the Atlanta area?

8    A.   The next day.

9    Q.   Did you end up leaving on time?

10   A.   No.

11   Q.   What happened?

12   A.   We left late.  At this point I was -- you know, with the

13   Carlson flights, I expected to leave late.  They were always

14   kind of a mess.

15   Q.   Do you remember anything about the bags that came back

16   from Atlanta?

17   A.   Similar to the previous trip to Atlanta.  I believe some

18   of them were different.

19   Q.   After you take off from Atlanta, did there come a point

20   where Mr. Wallace left you alone in the cockpit?

21   A.   I can't say -- there were times when Wallace had left me

22   alone in the cockpit to talk to Carlson.  I can't say

23   specifically if it was on this flight or the other flight.

24   Q.   Would he go back and talk to the passengers?

25   A.   Yeah.  That was not atypical for him.

GREER RABIEGA - CROSS

1   Q.   Just one more thing, Mr. Rabiega.  Are any of the pilots

2   who you flew for in this courtroom right now?

3   A.   Yes.

4   Q.   Who?

5   A.   Bob Chipperfield.

6   Q.   And who is he in the courtroom?

7   A.   He's behind you.

8   Q.   What is he wearing?

9        MR. MASON:  Stand up.

10  A.   In the red tie, dark jacket.

11       MR. SLAVIN:  May the record reflect that the witness has

12  identified defendant Robert Chipperfield?

13       THE COURT:  It will.

14       MR. SLAVIN:  Thank you Mr. Rabiega.  No further questions.

15       THE COURT:  Mr. Stephens?

16       MR. STEPHENS:  I do not have cross of this witness.

17       THE COURT:  All right.

18       Mr. Mason?

19       MR. MASON:  I have a few questions, Your Honor.

20       Can you put up 26C back up?

21       THE COURT:  Is that the log?  Okay.  You may.

22       MR. MASON:  It's the one you had up earlier.  Thank you.

23  We were on page 2.

24                          CROSS-EXAMINATION

25  BY MR. MASON:

GREER RABIEGA - CROSS

```
 1   Q.   It looks like somebody has written "Bob Chipperfield" in
 2   here.  Is that your handwriting?
 3   A.   That's my handwriting, yes.
 4   Q.   And it looks like you've made some dashes along the left
 5   side.  Do you see those?
 6   A.   Yes.
 7   Q.   Is that also your handwriting?
 8   A.   Yes.
 9   Q.   Then you have a little asterisk.  Is that your
10   handwriting?
11   A.   Yes.
12   Q.   When did you make those marks?
13   A.   I made them when talking to federal agents.
14   Q.   Federal agents came to talk to you?
15   A.   Yes.
16   Q.   Because of your involvement in Rob Carlson's flights?
17   A.   I assume it's pursuant to this, yes.
18   Q.   And they asked for your logbook?
19   A.   I provided it voluntarily.
20   Q.   Okay.  And they asked about these flights?
21   A.   Yes.
22   Q.   Did they ask about any other flights?
23   A.   Not flights I was on.
24   Q.   They asked you about flights with Carlson, right?
25   A.   Yes.
```

GREER RABIEGA - CROSS

1   Q.   And you told them about your flights with Carlson?

2   A.   Yes.

3   Q.   Okay.  You said Carlson is a slimy guy.

4   A.   I did say that, yes.

5   Q.   And you noticed that on one occasion he did not pay the

6   small airport in Kansas after charging for fuel and food there;

7   is that right?

8   A.   It was Tulsa, Oklahoma.

9   Q.   Okay.  You said that right now you're employed as a -- can

10  you remind me of the job title?

11  A.   Pipeline patrol pilot.

12  Q.   So the job description was you fly a small plane and you

13  fly over the landscape looking at pipeline routes?

14  A.   Yes, sir.

15  Q.   That sounds kind of exciting, you think, or no?

16  A.   I like it.  It's a lot of discretion as a pilot.

17  Q.   And you are in a little small propeller plane?

18  A.   Yes, a Cessna 206 or 208.

19  Q.   You said that a pilot has a career trajectory, where the

20  pilot starts in the small propeller planes and then can work

21  his or her way up to jets at some point?

22  A.   Yes.

23  Q.   You don't fly jets now?

24  A.   No.  There are other career paths available.

25  Q.   You identified for us four times that you flew as a

GREER RABIEGA - CROSS

 1  copilot in a jet carrying passengers; is that correct?

 2  A.   Yes.

 3  Q.   Were those the only four times that you have flown in a

 4  jet carrying passengers?

 5  A.   No.

 6  Q.   How many times have you flown in a jet carrying

 7  passengers?

 8  A.   In total, maybe 30 or 40 trips.

 9  Q.   Okay.  Were all of those with Bob Wallace?

10  A.   With the exception of the one with Bob Chipperfield, yes.

11  Q.   So every time that you've flown in a jet carrying

12  passengers, it's been with Bob Wallace as the pilot or this one

13  occasion that was at Bob Wallace's direction, right?

14  A.   That's correct.

15  Q.   And that was in Bob Wallace's plane?

16  A.   That's correct.

17  Q.   So you've never worked for a charter company, other than

18  working for Bob Wallace, correct?

19  A.   Correct.

20  Q.   You've never flown any kind of aviation involving

21  passengers other than Bob Wallace, right?

22  A.   Correct.

23  Q.   You really don't know what's usual or unusual in the

24  private flight industry, do you?

25  A.   I can only say what seems normal to me.

GREER RABIEGA - CROSS

1   Q.   Right.  And the flight that you're here talking about, the

2   first flight you flew with Bob Wallace, I believe you told us

3   it was August 21, 2016.  That was the very first time that you

4   had ever flown in a jet carrying passengers, wasn't it?

5   A.   No.

6   Q.   How many times had you before that?

7   A.   I would have to look through my complete logbook, but

8   maybe a dozen times before that.

9   Q.   Maybe a dozen.  All with Wallace?

10  A.   Yes.

11  Q.   How many passengers?

12  A.   Depends on the trip.

13  Q.   So these are just people that Wallace would say, hey, we

14  have a trip, do you want to come and fly with me?

15  A.   Yes.  I mean, there was a set group of people he would fly

16  for; usually it was for a car dealership owner in the area.

17  Q.   Okay.  So most of Wallace's trips that you had flown with

18  were with a particular car dealership client?

19  A.   Yes.

20  Q.   All right.  So as of August 21st, 2016, when you took this

21  trip that you identified, you did not have experience in the

22  private flight industry other than those previous approximately

23  12 trips flying with Bob Wallace for a single car dealership;

24  is that right?

25  A.   Yes.

4 - 139

GREER RABIEGA - CROSS

1   Q.   Okay.  So you really don't have any basis to say whether

2   any given aspect of a trip is or is not normal or unusual or

3   odd for the private flight industry as a whole; isn't that

4   correct?

5        MR. SLAVIN:  Objection, Your Honor.

6        THE COURT:  Yes.  Sustained.

7   BY MR. MASON:

8   Q.   Counsel asked you whether or not there was things you

9   found odd.  I'm curious what your basis was for finding

10  anything odd or unusual, given your very limited experience

11  flying passengers.  That's the point of my question.

12       What bases did you have for believing that Rob Carlson was

13  odd the first time you met him?  I'm just trying to elicit some

14  details from you.

15  A.   Like personally, the man himself?

16  Q.   Well, you said you wanted to Google him.

17  A.   Yes.

18  Q.   What caused you to want to Google him?

19  A.   Moving cargo in a passenger plane did not seem normal to

20  me.

21  Q.   Right.  My question is, what basis did you have for

22  believing that passengers on private flights do not bring

23  cargo?  Because you had only flown at that time approximately

24  12 flights, all for the same client.

25  A.   The aviation industry is a small industry and I know

GREER RABIEGA - CROSS

1   people who work in charter, and they have not described that as

2   being a normal thing to me.

3   Q.   But you didn't have any personal experience one way or

4   another to draw on, did you?

5   A.   In the previous flights I had done, we had never had cargo

6   of that type.

7   Q.   Okay.  But that was all for the same client, wasn't it?

8   A.   There was a couple flights for partners as well.  But one

9   or two clients, maybe three.

10  Q.   The car dealership, you said?

11  A.   Yes.

12  Q.   You can't bring a car on a little airplane.

13  A.   It would have to be a very small car.

14  Q.   Right.  So you had never flown for a fancy tech executive,

15  had you?

16  A.   No.

17  Q.   Robert Carlson presented himself to you as a fancy tech

18  executive, right?

19  A.   That's overstating the case.

20  Q.   Well, he seemed like a slimy guy to you who stiffed people

21  on their bills for sure?

22  A.   Yeah.

23  Q.   Right?  But when you Googled him, you saw that he was

24  somebody -- as you put it, he was somebody in the tech industry

25  down in Southern California, right?

GREER RABIEGA - CROSS

1    A.    Yes.

2    Q.    You hadn't hung out with too many tech industry executives

3    from Southern California?

4    A.    No, only Northern California.

5    Q.    Are tech industry executives sometimes a bit odd?

6    A.    Yes, though typically in different ways.

7    Q.    How many of them do you hang out with on a regular basis?

8    A.    I've met five or six.

9    Q.    Anybody famous that we would know?

10   A.    Sergey Brin.

11   Q.    Would you -- Sergey Brin is a genius, right?

12   A.    Yeah.

13   Q.    One of the cofounders of Google?

14   A.    He's a very nice guy, yeah.

15   Q.    You don't think he's a genius?

16   A.    I don't know.

17   Q.    He is one of the cofounders of the company Google, right?

18   A.    Yes.

19   Q.    You're not his private pilot though, are you?

20   A.    I am not.  Google has their own flight department.

21   Q.    Google has their own flight department.  Do you know

22   anything about Google's flight department?

23   A.    Only industry talk, nothing -- I have no personal

24   knowledge.

25   Q.    Would you think that Google, a company as big and

GREER RABIEGA - CROSS

1    influential as Google, would they have a good quality flight

2    department?

3    A.    Yes.

4    Q.    And the people who manage their flight department know the

5    industry really well, don't you think?

6    A.    I would assume so.

7    Q.    That would be your belief based on your interaction with

8    people in the industry as you were describing, right?

9         MR. SLAVIN:  Objection, Your Honor.

10        THE COURT:  Approach.

11        (Bench conference on the record.)

12        MR. SLAVIN:  He's taking guesses about something he

13   doesn't know.

14        THE COURT:  Could you repeat?  I didn't hear anything.

15   Repeat the basis.

16        MR. SLAVIN:  He's taking guesses about something he said

17   he knows nothing about.  He said he doesn't fly for Google, he

18   only knows of it essentially thirdhand.  And he's -- we're

19   asking questions about things that I think literally we're

20   assuming was his views.

21        THE COURT:  Mr. Mason.

22        MR. MASON:  Your Honor, the witness testified he was

23   personally acquainted with Sergey Brin.  I think I'm entitled

24   to ask what he knows about the flight habits.

25        THE COURT:  What does that have do with this case?

4 - 143

GREER RABIEGA - CROSS

1    MR. MASON:  He was saying that he is familiar with tech

2  executives and he had identified Rob Carlson as a tech

3  executive.  That's the purpose of this.  That's all.  What were

4  his impressions.

5    THE COURT:  You can finish this question, but this is far

6  afield to anything that's relevant to what this witness knows

7  about this case.

8    MR. MASON:  I'll move on, Your Honor.  No problem.

9    (Bench conference concluded.)

10  BY MR. MASON:

11  Q.  Your knowledge of how a big company like Google handles

12  its own private flight operations, that's not from your

13  personal experience, right?

14  A.  That's correct.

15  Q.  So your personal experience is limited to what you've told

16  us about?

17  A.  Yes.

18  Q.  All right.  So was Rob Carlson then the first apparent

19  tech executive that you had flown?

20  A.  Yes.

21  Q.  Having done your research and having met the guy, you

22  agreed to fly him, right?

23  A.  Yes.

24  Q.  And you understood that in those boxes were computer

25  servers, right?

GREER RABIEGA - CROSS

1   A.   That was my understanding.

2   Q.   Because that's what you were told?

3   A.   Yeah.

4   Q.   You accepted that explanation, right?

5   A.   I did.

6   Q.   You're not in the tech industry yourself?

7   A.   No.

8   Q.   I mean, you don't work for an internet company or computer

9   company, Microsoft, Google, anything like that; you work for a

10   gas company, light?

11   A.   Yes.

12       THE COURT:  Can you keep your voice up, please?

13       THE WITNESS:  Sorry.

14   BY MR. MASON:

15   Q.   So you said that -- you said that you weren't sure why --

16   you weren't sure why there were going to be boxes on the

17   flight, but having heard the explanation, it seemed plausible,

18   right?  Is that what you said?

19   A.   Yes.

20   Q.   And you said nothing else unusual came to light during the

21   trip?

22   A.   Other than the getting paid in cash; that was unusual.

23   Q.   I don't think you mentioned that in your direct testimony,

24   did you?

25   A.   I don't have a transcript of my testimony.  I don't know.

4 - 145

GREER RABIEGA - CROSS

1   Q.   Did you meet with the prosecution before you came in

2   today?

3   A.   Yes.

4   Q.   How many times?

5   A.   I met with them, before I came in, twice.

6   Q.   Anybody ever say to you, remember to mention something

7   about getting paid in cash?

8   A.   I don't think so.

9   Q.   But the subject did come up in your discussion with the

10  prosecutors, didn't it?

11  A.   Yes.

12  Q.   Bob Wallace paid you in cash?

13  A.   Sometimes in cash, other times he paid me with a check.

14  And for most trips not associated with Carlson, it would be

15  with a check.

16  Q.   But Wallace sometimes did pay you in cash, didn't he?

17  A.   Yes.

18  Q.   You kept working for him?

19  A.   Yes.

20  Q.   You didn't say, Mr. Wallace, I'm not going to accept this

21  cash.  You never said that to him, did you?

22  A.   I said, Mr. Wallace, I would like to be paid with a check.

23  Q.   But when he offered you the cash, you took the cash,

24  didn't you?

25  A.   Yes.

4 - 146

GREER RABIEGA - CROSS

1  Q.   Because there's no law that says you can't take cash as a

2  pilot; isn't that true, Mr. Rabiega?

3  A.   I'm not a lawyer, but I'm not aware of any such law.

4  Q.   And you never received a payment offered to you in cash,

5  did you?  I'm sorry, you never refused a payment that was

6  offered to you in cash, did you?

7  A.   I did not.

8  Q.   So given that your own employer sometimes paid you in

9  cash, there was nothing red flaggy about Mr. Carlson paying you

10 in cash, was there?

11 A.   The trips I got paid with cash for were Carlson trips.  It

12 wasn't a standard procedure with Bob Wallace.

13 Q.   But you kept working for Wallace despite being paid in

14 cash, yes?

15 A.   Yes.

16 Q.   Now, you said on this first trip you went from the

17 Monterey area, you identified that as Marina Airport, right?

18 A.   Correct.

19 Q.   That's Monterey, which is south of San Francisco a little

20 bit?

21 A.   Yes.

22 Q.   You went down to Camarillo, which is near Ventura, right?

23 A.   Yeah, it's Greater Los Angeles.

24 Q.   Then you stopped there, picked up a passenger, right?

25 A.   Yes.

GREER RABIEGA - CROSS

1   Q.   And then you flew east?

2   A.   Correct.

3   Q.   Now, do you have sufficient experience in the private

4   flight industry to tell us whether it is common practice to

5   make multiple stops to pick up passengers in different places?

6   A.   I can only speak to my experience.

7   Q.   So you don't know one way or another whether that's a

8   common practice in the industry, do you?

9   A.   I can only speak to my experience.

10  Q.   Is the answer no to my question, you do not know one way

11  or the other whether that's a common practice in the industry?

12  A.   I don't know.

13  Q.   You mentioned that when you landed at Teterboro, Carlson

14  took you to Sonic?

15  A.   I did.

16  Q.   Now, I kind of like Sonic.  It sounded like you did not;

17  is that accurate?

18  A.   I personally like Sonic.

19  Q.   You said in your testimony that you expected a fancy

20  private flight client to take you somewhere fancier.  I think

21  that's what I wrote down as your exact words, somewhere

22  fancier.  Was that your expectation?

23  A.   It wasn't my expectation.  But it was my experience and

24  what I had heard from other charter pilots in their experience.

25  Q.   You had heard from other charter pilots that rich clients

GREER RABIEGA - CROSS

1   often treat the pilots to rich experiences along the way?

2   A.   Not precisely.  That when clients take pilots to dinner,

3   it tends to be a nice dinner.  But not that it is something

4   that happens frequently.

5   Q.   Got it.  So you had heard that when you have a rich

6   private flight client, that rich private flight client might

7   well take the pilot out to a fancy place?

8   A.   Yes.  And that was my previous experience with the other

9   clients.

10  Q.   The car dealership clients?

11  A.   Yes.

12  Q.   Like what kinds of fancy places did they take you to?

13  A.   Like a Ruth's Chris, that level.

14  Q.   But you can't eat in your car at a Ruth's Chris, can you?

15  You don't need to answer that.  I think it's a great feature of

16  Sonic.

17       THE COURT:  Excuse me.  Let's ask questions, not offer

18  comments.

19       MR. MASON:  Of course, Your Honor:  I will withdraw the

20  question about the comparison between the two restaurants.

21  BY MR. MASON:

22  Q.   You then had two more trips.  Second trip, you said you

23  went again to the Marina Airport near Monterey, correct?

24  A.   Correct.

25  Q.   This is a trip that you identified as being in September

GREER RABIEGA - CROSS

1   of 2016, correct?

2   A.   I believe so.

3   Q.   September 27th?

4   A.   Sounds right.  I don't have my logbook on the screen

5   anymore.

6   Q.   Okay.  And in this second trip, again there were boxes,

7   right?

8   A.   Yes.

9   Q.   You, again, had no problem getting on and flying the

10  plane, right?

11  A.   No.

12  Q.   You again stopped in Kansas and continued on to Teterboro?

13  A.   We didn't go to Teterboro; we went to Stewart, which is

14  also in the New York metro, but different airport.

15  Q.   Stewart's in New Jersey, right?

16  A.   I can't recall if it's in New York or New Jersey, but it's

17  in that general area.

18  Q.   And you had no angst about doing that flight, right?  It

19  was just like the previous flight, correct?

20  A.   I had angst about it, and that was because it was like the

21  previous flight.

22  Q.   Did you tell anybody about your angst?

23  A.   Absolutely.

24  Q.   Who did you tell?  Wallace, right?

25  A.   Yeah, Bob Wallace.

GREER RABIEGA - CROSS

1   Q.   Right.  You had a couple conversations with Wallace about

2   Carlson, didn't you?

3   A.   Yes.

4   Q.   You continued to fly for him?

5   A.   One more trip, yeah -- well, one intended trip.

6   Q.   Two more trips?

7   A.   One intended, but yes, two total.

8   Q.   You had dinner with Isaac; you understood Isaac to be one

9   of Carlson's employees?

10  A.   Lunch, but yes.

11  Q.   You understood that Isaac was one of Carlson's employees?

12  A.   Yes.

13  Q.   All right.  The third trip, the trip you flew with Bob

14  Chipperfield, had you never met Bob Chipperfield before?

15  A.   I had not.

16  Q.   But you had been told that he was an excellent pilot,

17  right?

18  A.   Yes.

19  Q.   That he was long experienced, veteran of the private

20  flight industry?

21  A.   Yes.

22  Q.   Did you find him to be a good pilot when you flew with

23  him?

24  A.   Absolutely.

25  Q.   Was he professional in all respects?

GREER RABIEGA - CROSS

1    A.    I believe so.

2    Q.    Did he act as you would expect an experienced jet pilot to

3    act?

4    A.    He was a bit aloof, but yeah, he seemed like a good pilot.

5    Q.    "Aloof" meaning he wasn't like buddy-buddy, chatting with

6    you?

7    A.    Yeah, we weren't very chatty.  We talked a little aviation

8    safety and operations, but that was about it.

9    Q.    And this was the trip when you went to Van Nuys, right?

10   A.    Yes.

11   Q.    You picked up some passengers at Van Nuys, that was

12   Carlson, and you weren't sure how many other people?

13   A.    Correct.

14   Q.    And they had their luggage?

15   A.    Yes.

16   Q.    And you were asked to help put some of that luggage in the

17   plane?

18   A.    Yes.

19   Q.    And you thought some of the suitcases seemed heavy?

20   A.    Yes.

21   Q.    You said there was seven to eight bags, but you weren't

22   sure quite how many passengers?

23   A.    That's correct, yes, that's what I said.

24   Q.    Was it four passengers, three, five?

25   A.    It was three plus or minus one would be my guess.

GREER RABIEGA - CROSS

1   Q.    Now, at no time did it cross your mind to take a knife and

2   open one of these boxes and look inside, did it?

3   A.    I trusted my PICs, so no.

4   Q.    Well, you understand that as a pilot it's not your job to

5   inspect the passengers' luggage, is it?

6   A.    I don't really know.

7   Q.    Well, Mr. Rabiega, you have a pilot's license, right?

8   A.    I do.

9   Q.    You were doing all this work under the auspices of a

10  license granted to you by the appropriate authorities, correct?

11  A.    Yes.

12  Q.    You weren't flying illegally?

13  A.    No.

14  Q.    So if it was a required part of your job to inspect

15  passengers' luggage, you would know it, wouldn't you?

16  A.    I did not typically do this sort of flying.  I was not

17  intimately familiar with the rules of it and I trusted my PICs.

18  Q.    Sir, you -- I'm not sure I quite heard an answer to my

19  question.

20        If there was a requirement for you to inspect your

21  passengers' bags, you would know about it, wouldn't you?

22  A.    I don't know.

23  Q.    Well, you wouldn't want to go into this business, which is

24  a heavily regulated industry, without being sure that you

25  understood the appropriate rules and regulations, correct?

GREER RABIEGA - CROSS

1    A.   The FARS are a book this thick.  I do my best to maintain

2    a working knowledge of all parts.  I do not at all times recall

3    all parts.

4    Q.   Okay.  Now, at this time you said you aspired to fly

5    passenger jets, right?  You were excited that Wallace had given

6    you an opportunity to do so?

7    A.   Yes.

8    Q.   And you had gotten an opportunity to fly on more than a

9    dozen occasions, you said, in passenger jets carrying

10   passengers, yes?

11   A.   Yes.

12   Q.   On any of those occasions, did you ever inspect

13   passengers' luggage?

14   A.   On multiple occasions, Robert Wallace told me he did.

15   Q.   Did you ever open anybody's luggage and look inside?

16   A.   I did not myself.

17   Q.   Not once?

18   A.   No.

19   Q.   Did you ever pull any passengers aside and say, sir or

20   madam, what's in your bag?

21   A.   I did not.

22   Q.   You understood that your job at Van Nuys was to get on

23   that plane and fly it where you were directed to go, correct?

24   A.   Yes.

25   Q.   On this trip, you went to Charlotte, correct, and you

GREER RABIEGA - CROSS

1   stopped?

2   A.   That's correct.

3   Q.   You said you had a short stop, like a turnaround, both

4   there and back, right?

5   A.   Yes.

6   Q.   And on both of those occasions, you didn't interact with

7   the passengers, right?

8   A.   Correct.

9   Q.   So you don't have any knowledge one way or another of what

10  anybody did, right?

11  A.   I know the door opened and people came on and off.  Beyond

12  that, I don't know much.

13  Q.   Just have no idea?

14  A.   Yeah.

15  Q.   You didn't personally go back into the passenger

16  compartment and hang out with the passengers, correct?

17  A.   No, I never did.

18  Q.   Because that's not your job, is it?

19  A.   It's not.

20  Q.   And you noticed, you told us, that Mr. Wallace would

21  sometimes go and interact with passengers, right?

22  A.   Yes.

23  Q.   But his status is a little different, isn't it, because

24  he's the owner of the plane?

25  A.   I don't know if that's what makes it different.  But he's

GREER RABIEGA - CROSS

1   the PIC.  That's his discretion if he wants to do that.

2   Q.   Isn't he the owner of this plane?

3   A.   He was a part owner, yes.

4   Q.   Right.  He was not simply a pilot hired to fly it; isn't

5   that true?

6   A.   Yes.

7   Q.   Now, when Bob Chipperfield flew this plane, he was a pilot

8   hired to fly it.  He didn't own it, right?

9   A.   That's my understanding, yes.

10  Q.   You said you got hotel stays in Atlanta on these trips,

11  correct?

12  A.   Yes.

13  Q.   Nice hotel?

14  A.   Business hotels.

15  Q.   I think you said the Hilton?

16  A.   Yeah.

17  Q.   Doesn't that count as nice?

18  A.   It's nice.  But it's not like a Four Seasons or something

19  super upmarket.

20  Q.   Did it satisfy you to be put in the Hilton?

21  A.   Yes.

22  Q.   You didn't socialize with the passengers during the trip,

23  right?

24  A.   Really never.

25  Q.   Your understanding is that the pilots -- I think you put

GREER RABIEGA - CROSS

1   it pilots go their separate ways, passengers go their separate

2   ways, correct?

3   A.   That is what I did.

4   Q.   And that's also your observations of what other pilots do

5   in the industry, isn't it?

6   A.   In my limited experience, yes.

7   Q.   All right.  You said that you thought you noticed in

8   Atlanta that some of the bags looked different coming back from

9   the bags that had gone out, right?

10  A.   Yes.

11  Q.   You thought that was something you observed?

12  A.   Yes.

13  Q.   And your reaction at the time was, rich people are weird;

14  is that correct?

15  A.   That's correct.

16  Q.   Just goes with the territory when you are in the business

17  of flying rich people around, that they will do things that may

18  be weird, right?

19  A.   I believe so.

20  Q.   Well, let me ask about what you did.  You never said to

21  these passengers, wait a minute, that bag looks different, get

22  it off of my plane.  You never said anything like that, did

23  you?

24  A.   No.

25  Q.   In fact, you never made any comment to any of the

GREER RABIEGA - CROSS

1    passengers about the bags, did you?

2    A.    No.   I mentioned it to Bob Wallace because he was my PIC.

3    Q.    Right.   On no occasion when you were loading these heavy

4    bags did you ever say to a passenger, that bag is too heavy,

5    did you?

6    A.    No.

7    Q.    On no occasion when you were loading these new bags that

8    you thought looked different, you never said, that bag is

9    different, did you?

10   A.    I mentioned it to Bob Wallace.

11   Q.    Right.   Other than doing that, mentioning it to Wallace,

12   you never said anything to anybody, did you?

13   A.    No.

14   Q.    You said a Hawker is a loud plane?

15   A.    Pretty loud.

16   Q.    So there's a loud sound from the engine that reverberates

17   into the interior of the plane, is that the idea?

18   A.    The engine sound and there's just the sound of the air

19   going by the plane.

20   Q.    Okay.   Can you describe -- I've never ridden in a private

21   plane.   Is it like you hear a jet engine when you're inside the

22   cockpit?

23   A.    You hear the jet engine.   You also hear just sort of loud,

24   like the sound you hear driving a car, just air going by,

25   except louder.

4 - 158

GREER RABIEGA - CROSS

1   Q.   Does that sound come into the cockpit and the passenger
2   area?
3   A.   It's different levels, bull it is in all areas of the
4   aircraft.
5   Q.   So is that why in the pictures everybody has the big
6   earphones on?
7   A.   Part of the reason, yeah.
8   Q.   Because of that noise, are you able to hear conversations
9   going on in the back of the plane?
10  A.   Not at all.
11  Q.   Not at all?
12  A.   Not at all.
13  Q.   So you really have no idea what anybody is doing in the
14  back of the plane while you're flying it, do you?  You can't
15  hear and you said you didn't -- you don't go back and look.
16  A.   No.  I mean, if -- if something really loud happened, I
17  would hear.  If people are moving around a lot, I might notice
18  in the way the plane flies.  So if, you know, I was afraid
19  someone was injured, I could look back and check.  But if it's
20  just people sitting and talking, I would not know.
21  Q.   You have no idea what anybody might be saying because you
22  can't hear?
23  A.   Correct.
24  Q.   At some point you said to Wallace, I don't want to fly
25  with Carlson anymore, correct?

GREER RABIEGA - CROSS

1   A.    Correct.

2   Q.    Do you know as you sit here today, did -- had other pilots

3   ever said, I don't want to fly with you anymore, Carlson?

4   A.    I do not.

5   Q.    You don't know.  But you think your decision was based on

6   the general sliminess that you observed in him?

7   A.    There was that, and also just the nature of the flights.

8   Q.    You said flying at flight?

9   A.    Yes.

10  Q.    Changing of the itineraries?

11  A.    Yes.

12  Q.    And multiple stops, things like that?

13  A.    Yes.

14  Q.    You didn't want to do those things?

15  A.    Yeah.

16  Q.    Indeed, Wallace told you that Carlson was somewhat of a

17  delinquent payer, didn't he?

18  A.    Yes.

19  Q.    After all of this, after this conversation with Wallace

20  and after your decision when you said you didn't want to fly

21  with Carlson anymore, you nonetheless did a fourth flight you

22  told us about; is that correct?

23  A.    That is correct.

24  Q.    Because Wallace asked you to, right?

25  A.    Yeah.

GREER RABIEGA - CROSS

1      MR. MASON:  Trying to keep my eye on the clock, I'll pass

2  the witness to my colleagues.

3      THE COURT:  Mr. Baldani?

4      MR. BALDANI:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6  BY MR. BALDANI:

7  Q.   Good afternoon, Mr. Rabiega.

8  A.   Good afternoon.

9  Q.   You talked at length about the fact that Carlson portrayed

10 himself to be in the computer business and transporting

11 servers, right?

12 A.   Yes.

13 Q.   You also heard at least once that he was in the nightclub

14 business, right?

15 A.   I did.

16 Q.   Okay.  I don't think we mentioned that.  I wanted to bring

17 that out.

18      Let's see.  So originally you thought he was odd but

19 legitimate.  After the Google search and your questions with

20 Wallace, you were okay with flying for him for a period of

21 time, correct?

22 A.   That's correct.

23 Q.   But eventually you became suspicious and wanted nothing

24 more to do with him, right?

25 A.   That's correct.

GREER RABIEGA - CROSS

1   Q.   And let me ask you this.  You mentioned your logbooks.

2   Logbooks are not required, are they?

3   A.   No.  There are some things which you are required to log

4   for currency.  But in general, no.

5   Q.   And so would it be safe to say some pilots, perhaps

6   yourself, are kind of meticulous and keep good, accurate

7   logbooks, and others are kind of sloppy like me and don't keep

8   good records; is that fair to say?

9   A.   You're being kind to me.  But it's fair to say I'm pretty

10  meticulous about my logbook.

11  Q.   I thought so.

12       You also talked about pilot progression and career

13  trajectory, right?

14  A.   Yes.

15  Q.   Usually a person starts out with a single-engine propeller

16  plane, right?

17  A.   Yes.

18  Q.   If somebody's an avid aviation buff, even when you're

19  starting out, if you get a chance to sit second chair in a

20  Hawker or even get a flight on a Hawker, et cetera, very often

21  somebody like yourself might jump at the chance; is that fair

22  to say?

23  A.   That can be a big break in a career.

24  Q.   Now, obviously you made a decision, I don't want to fly

25  for Carlson anymore, right?

GREER RABIEGA - REDIRECT

1   A.   Correct.

2   Q.   And at that point he personally didn't owe you any money,

3   did he?

4   A.   No.

5   Q.   You had been paid through whoever, Wallace, I guess?

6   A.   Correct.

7   Q.   So at the point you decided to walk away from Carlson,

8   there was no financial reason you couldn't do it.  You had been

9   paid for what you had done, right?

10  A.   Yes.

11  Q.   All right.  You don't know my client Torrey Ward at all,

12  do you?

13  A.   Doesn't look familiar to me.

14       MR. BALDANI:  That's all, Your Honor.

15       THE COURT:  Thank you.

16       Ms. Pollock.

17       MS. POLLOCK:  No questions, Your Honor.

18       THE COURT:  Very well.

19       Redirect.

20       MR. SLAVIN:  Yes, Your Honor.

21                      REDIRECT EXAMINATION

22  BY MR. SLAVIN:

23  Q.   Jump right into something that was just said.  You

24  mentioned that flying in a -- second seating a Hawker for

25  someone who hasn't done it could be a big career break?

GREER RABIEGA - REDIRECT

1   A.   Yes.

2   Q.   Am I understanding that correctly?

3   A.   Yeah, that's correct.

4   Q.   Would you say the same thing about riding as a passenger

5   in a Hawker?

6   A.   This wouldn't be a career break, but it could be a fun

7   thing an aviation person might like.

8   Q.   How many trips, total, did you say you did with

9   passengers?

10  A.   Total?

11  Q.   Yes.

12  A.   I think I said 30 to 40.

13  Q.   Of those 30 to 40 trips, how many clients did you have

14  concerns about similar to Robert Carlson?

15  A.   Two, including Carlson.

16  Q.   Who was the other one?

17  A.   I don't recall his name.  It was an Italian guy out of the

18  Sacramento area.

19  Q.   Does Nick Matalone ring a bell?

20  A.   That sounds like it.

21  Q.   Do you know what an FBO is?  I assume you do.

22  A.   Yeah, fixed-based operator.

23  Q.   How much time have you spent in FBOs?

24  A.   More hours than I would like to recall.

25  Q.   What would your ballpark be?  Are we talking tens,

GREER RABIEGA - REDIRECT

1   hundreds, thousands?

2   A.   Thousands.

3   Q.   Thousands of hours?

4   A.   Yes.

5   Q.   What happens in FBOs?

6   A.   Pilots sit around waiting for passengers, passengers come

7   in and out.  You order fuel for aircraft.  FBOs can also

8   arrange catering for aircraft.  And sometimes they have like

9   conference rooms and people have meetings there.

10  Q.   Do you feel like you've gotten to know the charter

11  industry from your time at FBOs?

12  A.   A small slice of it.

13  Q.   Have you had a lot of conversations with pilots who fly

14  passengers at FBOs?

15  A.   Yes.

16       MR. MASON:  Objection, Your Honor.  May we approach?

17       THE COURT:  You may.

18       MR. MASON:  Thank you.

19       (Bench conference on the record.)

20       THE COURT:  Yes, Mr. Mason.

21       MR. MASON:  Thank you.  So the line of questioning here

22  would either go towards directly eliciting hearsay, statements

23  made by others to establish the truth of the propositions

24  asserted by others, or to try and establish this witness as

25  some sort of an expert in the industry, which he has repeatedly

GREER RABIEGA - REDIRECT

1   said he is not.

2        I limited my questions, at the Court's direction, to the

3   witness's own personal experience.  He cannot be asked by the

4   government to testify about general trends in the charter

5   industry based on things that are outside his personal

6   experience.  And the government just asked him to talk about

7   what other pilots that he might have met at some unknown FBOs

8   say about the industry.  That's not proper.

9        THE COURT:  Mr. Slavin.

10       MR. SLAVIN:  That's not at all what I asked.  Actually,

11  the only thing that I'm eliciting from him is how many times

12  he's seen pilots and passengers in the charter industry, which

13  is a direct thing he observed.  I'm not going into any expert

14  area.

15       THE COURT:  As long as you leave it at that.

16       MR. MASON:  I think that question is asked and answered.

17  I do not have a live stream, but I think the last question was,

18  have you gained knowledge about the industry.

19       THE COURT:  It's not significant enough to justify us

20  parsing whether that particular question has been asked and

21  answered.

22       I'm sustaining your objection, but you can ask this

23  question.

24       MR. SLAVIN:  I'm happy to withdraw my previous question.

25       THE COURT:  Okay.  You may.

GREER RABIEGA - REDIRECT

1        (Bench conference concluded.)

2        THE COURT:  Mr. Slavin, you may.

3   BY MR. SLAVIN:

4   Q.   In your thousands of hours at FBOs, how many charter

5   passengers have you seen passing through?

6   A.   Hundreds.  Maybe thousands.

7   Q.   You talked a little bit about being paid in cash.

8   A.   Yes.

9   Q.   First off, counsel raised the question of your meeting

10  with prosecutors.

11       How many times did you say you met with prosecutors?

12  A.   With the prosecutors, I met twice.

13  Q.   When was the first time?

14  A.   The first time was in Paso Robles, about eight or nine

15  months ago.

16  Q.   And what was the second time?

17  A.   Just last night.

18  Q.   And during those conversations, do you remember who

19  brought up being paid in cash?

20  A.   I think I probably did.

21  Q.   How much were you being paid in cash?

22  A.   It was within market rates.  It varied by trip, but it was

23  usually between about 400 and $800 a day.  Sometimes Bob

24  Wallace would throw in a little bit extra, ostensibly for the

25  trips being so unpleasant.

GREER RABIEGA - REDIRECT

1  Q.   Did you ever get over $10,000 in cash?

2  A.   No.

3  Q.   Did you ever see Bob Wallace being paid?

4  A.   No.

5  Q.   You talked about different rules that you follow.  Who

6  were you working for when you did these flights?

7  A.   Bob Wallace.

8  Q.   Other than the FAA rules that you're required to follow,

9  whose rules were you following on these flights?

10 A.   I don't quite understand the question.

11 Q.   Other than the FAA rules you always have to follow when

12 you fly, who set the rules for how the flights were going work?

13 A.   If I'm understanding the question correctly, Rob Carlson

14 would have been the person who was in charge of the itinerary

15 and whatnot.  And Bob Wallace, as the pilot, or in one case Bob

16 Chipperfield, would be in charge of making that happen.

17 Q.   You said you were asked, you know, whether you kept

18 working after accepting cash payments.

19 A.   Yes.

20 Q.   Did you keep working -- did you want to keep working

21 Carlson flights?

22 A.   No.

23 Q.   The flights that you wanted to keep working, were you

24 being paid in cash for those flights?

25 A.   No.

GREER RABIEGA - REDIRECT

1  Q.    You also said that you believed when you were told that

2  the boxes had server parts.   Who told you that?

3  A.    Bob Wallace.

4  Q.    Did you trust Bob Wallace?

5  A.    Absolutely.

6  Q.    Do you still trust Bob Wallace?

7  A.    I am questioning that decision.

8         MR. SLAVIN:   Thank you.   No further questions.

9         THE COURT:   You may step down.   The witness may step down.

10  He is excused.

11         Counsel, approach.

12         (Bench conference on the record.)

13         THE COURT:   Counsel, when you raise an objection, you need

14  to say you're objecting.   When you guys want to object, say

15  you're objecting.   I may be looking somewhere else and I saw

16  you too late, Mr. Mason.

17         MR. MASON:   Object to the last question.

18         MS. POLLOCK:   To the last question.

19         MR. MASON:   That last question comes very close to the

20  line that we're going to be required to ask for a mistrial.

21         MS. POLLOCK:   Yes.

22         MR. MASON:   Very, very close.   Because he is asking this

23  witness to state about -- that Bob Wallace is -- has pled

24  guilty, at least --

25         MS. POLLOCK:   Giving an inference.

GREER RABIEGA - REDIRECT

1       MR. MASON:  -- giving his inference.  When you say to a

2  witness, do you trust him anymore?  And he says, well, no, I

3  don't, what is the only inference to be drawn?

4       Bob Wallace is not in this courtroom.  This jury is not

5  allowed to hear that Bob Wallace pled guilty or anything about

6  that.

7       MS. POLLOCK:  The jury instructions you've given doesn't

8  name names.

9       THE COURT:  Let me hear from the United States.

10      MR. SLAVIN:  Your Honor, we had testimony that Bob Wallace

11 tricked him to doing his last flight.  That's all the jury is

12 going to be thinking of.  The jury is never going to find out

13 that Bob Wallace pled guilty.

14      THE COURT:  I didn't hear anything about Bob Wallace's

15 guilt.  He testified -- I think he even testified to this on

16 cross -- that he didn't want to fly with Wallace.  He told him

17 that he would not fly for Carlson anymore.

18      And when he got to that airport, Wallace had surprised him

19 with Carlson.  And that they -- he had a heated conversation

20 regarding it.  But since he was already there, he would go

21 ahead and fly with him this last time.

22      I didn't hear anything about Bob Wallace's guilt.  I

23 didn't hear anything about him mentioned in this courtroom at

24 any other time, other than as a pilot on the March 17th trip,

25 and others.

GREER RABIEGA - REDIRECT

1        I see no basis for a mistrial or for an objection to the

2   question.  Therefore, the objection is overruled.

3        And I will be mindful, the United States is cautioned not

4   to get near this subject.

5        MR. SLAVIN:  Absolutely, Your Honor.

6        THE COURT:  But Mr. Wallace was on the plane with a

7   defendant in this case.

8        You know, once again, he's entitled to talk about what was

9   going on and he didn't want to fly with Mr. Wallace anymore,

10  because Mr. Wallace lied to him.

11       MR. MASON:  Thank you, Your Honor.  I appreciate the

12  admonition.  And I think I have an obligation to make my record

13  that it is not going to be possible to unring this bell.  If it

14  is -- not this one, but -- and I appreciate the Court's

15  comments -- but the United States has demonstrated that it is

16  going to push close to this line.

17       If it tries it again in a more prejudicial way, we're not

18  going to be able to unring it.

19       THE COURT:  I appreciate your need to make a record.  But

20  I think you have mischaracterized the statement and the Court's

21  ruling.  I didn't hear anything at any time that suggested that

22  Bob Wallace has been convicted or entered a plea of guilty to

23  this trial.

24       I'm sure you'll comb the record once this case is over,

25  and I welcome you to, but I am basing it on my current

4 - 171

JUAN ILLERA - DIRECT

1    understanding of the record and the testimony elicited in this

2    case.

3         So, again, I appreciate your objection.  But it's

4    overruled.

5         MR. MASON:  Thank you, Your Honor.

6         (Bench conference concluded.)

7         THE COURT:  Members of the jury, it seems like a good time

8    for our afternoon break.  I want you to remember all of my

9    prior instructions to you.  Let's take about 15 minutes.  I'll

10   see you back here in the courtroom.

11        (A recess was taken from 3:00 p.m. to 3:18 p.m.)

12        THE COURT:  The record will reflect that all members of

13   the jury are present in the courtroom, along with all parties

14   and counsel.

15        Mr. Moynahan, the United States may call its next witness.

16        MR. MOYNAHAN:  Thank you, Your Honor.  The United States

17   called Juan Illera to the stand.

18        **JUAN ILLERA, GOVERNMENT WITNESS, SWORN**

19        THE COURT:  You may.

20        MR. MOYNAHAN:  Thank you, Your Honor.

21                        JUAN ILLERA

22                     DIRECT EXAMINATION

23   BY MR. MOYNAHAN:

24   Q.  Good morning, sir.  Please state your name for the record

25   and spell your last name.

JUAN ILLERA - DIRECT

1   A.    Juan Illera, I-l-l-e-r-a.

2   Q.    And, sir, where do you work?

3   A.    I work at Signature Flight Support in Teterboro, New

4   Jersey.

5   Q.    Is that a fixed-based operator?

6   A.    Yes, sir.

7   Q.    How long have you worked in the aviation industry?

8   A.    About 16 years, ten at Teterboro.

9   Q.    Prior to the aviation industry, did you spend some time in

10  the military?

11  A.    Yes, sir.

12  Q.    Can you tell us just a second about that.

13  A.    Just served in the U.S. Army in the Second Infantry

14  Division out of Fort Lewis, Washington.  Served about five

15  years there as an 11 Charlie.  I did a couple of deployments

16  overseas.  Standard stuff.

17  Q.    Thank you.

18        In your current role at Signature -- I'm sorry, how long

19  have you worked at Signature?

20  A.    Ten years.

21  Q.    Ten years.  And if you could, just describe what you do in

22  your normal day-to-day work at Signature.

23  A.    Normal day-to-day operations can take from parking

24  aircraft, towing them around, moving them to the different

25  locations, making sure all services are rendered that are

JUAN ILLERA - DIRECT

1   required and asked upon by crew members and/or customers that

2   are showing up.

3   Q.   Are you aware that Signature keeps security video for the

4   ramp and the building itself there at your location?

5   A.   Yes.

6   Q.   Have you had a chance to review video from October 19,

7   2016?

8   A.   Yes, sir.

9        MR. MOYNAHAN:  Your Honor, I would like to play for the

10  witness a portion of the video marked 19S, just for his

11  identification to begin with.

12       THE COURT:  You may.

13       (Video played.)

14  BY MR. MOYNAHAN:

15  Q.   Sir, do you recognize this video?

16  A.   Yes, sir.

17  Q.   What does it depict?

18  A.   Yes, sir.

19  Q.   I'm sorry, what does it show?

20  A.   Depicting right now, right now we can see there's a

21  gentleman standing there about to marshal an aircraft in, bring

22  them in.  So there should be an aircraft about to taxi in,

23  already in the process of taxiing.

24       MR. MOYNAHAN:  We'll go ahead and keep it playing, if you

25  will.

JUAN ILLERA - DIRECT

1      THE COURT:  Counsel and witness, please keep your voices

2  up.

3      MR. MOYNAHAN:  Your Honor, I would like to --

4  Q.  Sir, does this accurately depict the ramp space outside of

5  Signature Aviation in Teterboro, New Jersey?

6  A.  Yes, sir, that's it.  That's half of the ramp.

7      MR. MOYNAHAN:  Your Honor, I would like to move this video

8  into evidence.

9      THE COURT:  It will be admitted.

10      (Government Exhibit 19S was admitted.)

11      (Video played.)

12  BY MR. MOYNAHAN:

13  Q.  If you could just describe what's happening.

14  A.  Apparently the aircraft, he's trying to get the aircraft

15  to come in from -- well, he's facing north.  This guy's a

16  trainee.  He's got the orange vest on.  So we're watching him

17  as he's trying to operate.  He's walking backwards right now.

18      At some point I guess we're yelling on the radio to turn

19  around, we need the aircraft to come from the south side.

20      And here's one of my colleagues running out to take over

21  the operation.  In a moment he's going to take over the wands

22  and have the aircraft come in from the south side pointing

23  north.  I come into the picture there to assist.

24  Q.  That's you as the last person that came into the picture?

25  A.  Yes, sir.

JUAN ILLERA - DIRECT

1   Q.   And do you recognize the type of aircraft that's taxiing

2   in?

3   A.   That's a Hawker.  Right now, like I said, regular

4   operation, standard procedure right now.

5        Another aircraft being towed over there in the corner of

6   the camera.  See the winglet.

7        MR. MOYNAHAN:  Let's jump about three minutes into the

8   video, time 300.

9        (Video played.)

10  Q.   The aircraft comes to a parked position as normal?

11  A.   Yes.

12  Q.   You go to talk to the pilot or the crew?

13  A.   Right now we're just standing outside the aircraft

14  awaiting for crew members to open up the door and passengers to

15  deplane.  And we get instructions usually about what they need,

16  overnight, going back out, fuel, whatever is needed for that.

17  Q.   Do you recall what happens in this case?

18  A.   We stood around for quite a while.  As a matter of fact,

19  we're just right now waiting like for a luggage cart to come

20  there.  You know, took quite some time for a door to open and

21  we're standing around, which is -- you know, usually when the

22  aircraft is empty, that's usually the MO.  Like nothing is

23  needed and we walk away at this point.

24       MR. BALDANI:  Your Honor, could I suggest he put the

25  microphone a little closer.

4 - 176

JUAN ILLERA - DIRECT

1      THE COURT:  Speak up as much as you can, sir.

2  Q.   So eventually you did make contact with the pilot of this

3  aircraft; is that right?

4  A.   Yes, sir.

5  Q.   And do you recall what he asked you?

6  A.   Door opens and we were asked if any vehicles could be --

7  were allowed onto the ramp, onto the tarmac.  At that time we

8  said no vehicles are allowed without permission from Port

9  Authority Police and/or base airport operations.

10  Q.   Did he persist in the request?

11  A.    No.  That was pretty much the end of the request there.

12  And once we said that, you know, what was needed, that was the

13  end of the request.

14  Q.   Okay.  The time, place here for a few minutes.

15      Does anyone get off the jet?

16  A.   No.

17      MR. MOYNAHAN:  We'll skip forward to time 6:35.

18      (Video played.)

19  Q.   Do you recognize what someone's doing right now?

20  A.   Yeah, they are wrapping up the aircraft for overnight

21  parking.  Pitot tubes are being covered up.  One of my

22  colleagues was actually inserting the pins into the landing

23  gear to -- so that we can safely move the aircraft to prevent

24  gear collapsing.

25  Q.   Okay.  If you could, obviously the jury may not be

JUAN ILLERA - DIRECT

1   familiar with what a pitot tube is.  Is that just --

2   A.   That's an instrumentation, I guess, fixture on the outside

3   of the aircraft measuring the wind speeds and various stuff.

4   Q.   You don't want to get it clogged so you put a cover over

5   it?

6   A.   Right.  You don't want anything overnight going in there,

7   insects, whatever.

8   Q.   Did you recognize who was doing that?  Was that one of the

9   members of the crew?

10  A.   Yes.

11  Q.   Okay.  At this point, we're now -- the plane lands at

12  about what time, do you recall?

13  A.   I'm sorry?

14  Q.   Do you recall what time the plane landed?

15  A.   Early morning.  Probably like first aircraft we got that

16  day.

17  Q.   Okay.  We can go back to the beginning when it taxis in.

18  But right now it's time 8:10 on the clock.  Is that clock

19  accurate on the video?

20  A.   Oh, yeah, those cameras are on point there.

21       MR. MOYNAHAN:  Let's skip ahead to time 9:30 on the time.

22       (Video played.)

23  Q.   You see someone walking in from the jet?

24  A.   Yes, sir.

25  Q.   Do you recognize who that might have been?

JUAN ILLERA - DIRECT

1    A.   That was the second crew member on that aircraft.

2         MR. MOYNAHAN:  Let's move ahead to time 13:05.

3         (Video played.)

4    Q.   Do you see another person, sir?

5    A.   Yes, sir, that's the other crew member.

6    Q.   Okay.  Is that the pilot --

7    A.   Yes.

8    Q.   -- as far as you are aware?

9    A.   Yes, sir.

10        MR. MOYNAHAN:  Move ahead to time 14:20.

11        (Video played.)

12   Q.   Do you see someone walk back to the aircraft?

13   A.   That's the second crew member walking back.

14        MR. MOYNAHAN:  Let's move ahead to time 17:55.

15        (Video played.)

16   Q.   Do you see another member walking?

17   A.   Another crew member walking back to the aircraft.

18   Q.   Does that look like the pilot to you?

19   A.   Yes, sir.

20   Q.   Now, the jet's been on the ground for how long at this

21   point, approximately?

22   A.   Approximately 8:04, I would say close to 20 minutes at

23   this point.

24   Q.   Has anyone except the pilot and the copilot gotten off the

25   aircraft?

JUAN ILLERA - DIRECT

1   A.    That's all we've seen so far.

2         MR. MOYNAHAN:  Let's skip to ramp 2 video, time 06.

3         (Video played.)

4   Q.    Is it customary for a passenger, if there was a passenger

5   on this jet, to have come in by this point?

6   A.    Oh, it's customary for them to jump out of the aircraft as

7   soon as it lands.

8   Q.    Okay.  Do you see a person in the video now coming in?

9   A.    Another crew member with their overnight bag.

10  Q.    I know the video is not close in.  Do you recognize who

11  that might be?

12  A.    That's the first crew member, the gentleman.

13        MR. MOYNAHAN:  We'll skip ahead to time 9:30.

14        (Video played.)

15  Q.    Do you recognize that person?

16  A.    Second crew member with the pilot's shirt on.

17  Q.    Walking a bag into the FBO?

18  A.    FBO.

19  Q.    The time 8:30, from your recollection, no other people

20  beyond --

21  A.    Haven't see any movement from inside the aircraft at that

22  point, no.

23        MR. MOYNAHAN:  Let's go to front door, video time 030.

24        (Video played.)

25  Q.    Do you see the back of someone there in that video?

JUAN ILLERA - DIRECT

1    A.    Yes, sir.

2          MR. MOYNAHAN:  Let's stop this for a second.

3    Q.    Can you identify what this is, first of all?

4    A.    This is the front entrance to our building.  Further up

5    ahead past those doors there will be a front gate security

6    guard usually doing check-ins for customers coming through.

7          Once they get up to the front door, they either get on the

8    vehicle and exit or come off and we then escort out to the

9    lobby, where a crew member usually will identify them, walk

10   them out to the aircraft.

11   Q.    So this door takes you right out to where vehicles would

12   be -- normal cars to leave from?

13   A.    Right, your passenger dropoff and pickup area.

14   Q.    Looks maybe like a circle drive or something out there?

15   A.    Yes, sir.

16   Q.    Do you recognize the person whose back is to us here?

17   A.    That is one of the crew members from that Hawker.

18         MR. MOYNAHAN:  Continue to play the video.

19         (Video played.)

20   Q.    We'll note the time here for this.  What time is it now on

21   the clock?

22   A.    That's going to be 9:09.

23   Q.    Is that more than an hour after the plane has landed?

24   A.    Pretty much, yeah.

25   Q.    To your knowledge, has anything except the pilot and

JUAN ILLERA - DIRECT

1    copilot gotten off that plane?

2    A.    Nothing else.

3         MR. MOYNAHAN:   Skip ahead to about 2:30, if we're not

4    already there yet.   Actually, let's go back to 1:21.   Misspoke.

5    Little further back, make it 1:11.

6         (Video played.)

7    Q.    Is that you?

8    A.    Yes, that is me.

9    Q.    Okay.   What are you doing?

10   A.    Meeting up with my colleague out front, he's having a nice

11   little smoke, and just talking about, you know, that there's

12   something going on that we was kind of picking up on at that

13   moment.

14   Q.    Is that the individual that's waiting -- who is that there

15   in the front?

16   A.    That's the crew member.

17   Q.    What happens here outside?

18   A.    This vehicle pulls up, doesn't pull up to the curb as to

19   drop off a passenger, pulls up closer to us.   At this moment he

20   kind of opens the door up and asks us if he can get his vehicle

21   onto the tarmac.

22   Q.    What do you tell him?

23   A.    Told him the same thing we told the crew member, you

24   got -- to get a vehicle on the tarmac, you have to ask for

25   written authorization.   He said to me at that moment, why, if

JUAN ILLERA - DIRECT

1    it's my plane?

2         I said, well, that's just and rules and regulations we

3    have ever since September 11th.

4         He said, who do I have to talk to?

5         I said, Port Authority Police.  And then that was the end

6    of the conversation.

7    Q.   Okay.  So he didn't persist after you mentioned the

8    police?

9    A.   No.  He went ahead and parked it.

10   Q.   Did you watch him come inside here?

11   A.   Sorry?

12   Q.   Did you watch him come inside?

13   A.   Yes.

14        (Video played.)

15        MR. MOYNAHAN:  Pause the video right there.

16   Q.   At the time, did you recognize either of those two

17   individuals?

18   A.   No, sir.

19        MR. MOYNAHAN:  Let's cut to the lobby staircase at the

20   beginning of it.

21        (Video played.)

22   Q.   Sir, if you could, just describe this viewpoint.

23   A.   This viewpoint is just the side view of that main lobby.

24   To your left, that's going to lead out to the tarmac area, to

25   the front desk area, actually.  And to the right, that's the

JUAN ILLERA - DIRECT

1    main entrance.

2    Q.   Is that the same individual we saw the back of before

3    that's standing there next to the cart?

4    A.   Yes.

5         MR. MOYNAHAN:  We can play the video.

6         (Video played.)

7    Q.   I believe you said you obviously interacted with this

8    individual out on the ramp?

9    A.   Yes.

10   Q.   Then you interacted, or at least you were in visual

11   contact with him again here as you kind of walked through the

12   area?

13   A.   Yes, sir.

14   Q.   Did you have an impression of him?  Like how did you --

15   A.   Just, you know, we all started kind of realizing a lot of

16   jitteriness and going back and forth.  That's what kind of made

17   us all start commenting about one another, you know,

18   something's going on around here.

19        MR. MOYNAHAN:  We'll let the video continue to play here

20   for a second, catch up to the point.

21        (Video played.)

22   Q.   While we're waiting, the clock time is what?

23   A.   9:09.

24   Q.   That's how long after the plane's been on deck?

25   A.   One hour after.

4 - 184

JUAN ILLERA - DIRECT

1   Q.   And a passenger, anything else gotten off that plane?

2   A.   Nothing has moved off that aircraft, no, sir.

3   Q.   Except the pilot and copilot?

4   A.   That's it.

5        (Video played.)

6   Q.   So your vantage point, does he appear to be waiting for

7   somebody?

8   A.   That's exactly what it looks like.

9   Q.   Okay.  You can see the individual, does he accompany the

10  other two individuals onto the ramp?

11  A.   Yes, sir.

12       MR. MOYNAHAN:  Let's skip over to ramp number 5 video.

13  Actually, let's start it about two minutes in.

14       (Video played.)

15  Q.   Are things going on with the plane now?

16  A.   Apparently it seems to be someone loading boxes over

17  there.

18  Q.   Do you recall being involved with that or watching some of

19  it happen?

20  A.   Watching some of it, yes.

21  Q.   Okay.  What happened there with -- how is it -- how were

22  the boxes getting off the plane?

23  A.   There was the individuals that had came off the vehicle

24  were out there assisting with the unloading of it, which, you

25  know, that's not very usual for us to see.  We're all standing

JUAN ILLERA - DIRECT

1    around and just kind of sort of minding our business, but just

2    at the same time noticing that, you know, things are a little

3    off here and there.

4    Q.   Okay.  Has Signature provided them with luggage carts at

5    this point?

6    A.   Yes, yes.

7    Q.   What do they eventually do with the luggage carts?

8    A.   Push them out and all the stuff goes on the vehicle.

9         (Video played.)

10   Q.   Okay.  Are they now -- well, describe now what they are

11   doing.

12   A.   Well, right now, again, they are pushing their own luggage

13   out.

14   Q.   Is that luggage, sir?

15   A.   No, that's boxes.

16   Q.   Okay.

17   A.   We call it luggage.  Yeah.

18        MR. MOYNAHAN:  Let's skip to the inside view, front desk,

19   of sub time 7:40.

20        (Video played.)

21   Q.   Describe what you're seeing, sir.

22   A.   The boxes are being pulled through our doors that are

23   leading from the tarmac onto the lobby.  Right now we have one

24   of our air concierge actually holding the doors for them as the

25   boxes are pushed through the facility.

JUAN ILLERA - DIRECT

1      (Video played.)

2  Q.   So two loads of boxes.  Do you recognize the person that

3  was following there and just picked up a magazine, I believe,

4  off the table?

5  A.   That's a crew member.

6  Q.   By "crew member," you mean one of the pilots?

7  A.   Pilots, yes, sir.

8  Q.   Let's talk about these boxes.  What was unusual about this

9  situation?

10  A.   Well, number one, they had the -- the paperwork on the

11  side of it said Dell computers as, you know, regular computers

12  you would buy online.  However, when we were looking at these

13  boxes, any time you've ordered from Dell or anything like this,

14  the packaging just didn't match up.  And what we saw on the

15  side of the boxes were just regular Xerox copied off the

16  internet, you know.

17  Q.   I'm sorry.  You said you saw inside or you mean --

18  A.   Outside.

19  Q.   Outside.

20  A.   Like taped on the outside of the box.  There was Xeroxed

21  paperwork that you would print off, you know, online, Best Buy

22  or something like that, and just post it on the side of the

23  boxes.  That's all they had.

24  Q.   Did you notice any taping on the box?

25  A.   Well, that's the other thing my colleague actually

JUAN ILLERA - DIRECT

1    mentioned was the taping on the box was just way off.

2    Q.    What about the nature of the boxes, in general?  You've

3    worked a long time in aviation.  A lot of jets come and go in

4    your many years.  Have you seen anything like this happen

5    before?

6    A.    That many boxes, no.  One or two boxes, maybe, but never

7    like this.  We'll get three luggage carts full of Louis Vuitton

8    bags before we get boxes.

9    Q.    Did you notice if there was any logo painted on the boxes?

10   A.    Yeah, spray painted or stenciled-on logo, black Dell logo.

11   Q.    Did you have a chance to -- I know you said you didn't

12   load the boxes.  But did you have a chance to feel the box,

13   weight of the box?

14   A.    We were all commenting on the boxes.  There, we all kind

15   of started staring at one another and kind of shifted the

16   weight on the box to see what it was like.

17   Q.    Can you describe how you did that?

18   A.    Just grabbed it from the bottom, just lifted off the cart

19   there a little bit.  And just realized that, you know, as

20   opposed to a computer box or the CPU box -- CPU and everything

21   is loaded up a certain way, you kind of feel that weight

22   distribution and it was just -- it just didn't feel right.

23   Q.    Did it feel heavy?

24   A.    It felt heavy.  It felt -- it just felt odd.

25   Q.    It felt odd.  Okay.

4 - 188

JUAN ILLERA - DIRECT

1      Did the boxes, when they were unloaded from the jet, were

2  they unloaded from the cargo hold of the Hawker?

3  A.   No.

4  Q.   They were all from the interior portion?

5  A.   Interior aisles or on the seat.  I really don't know

6  how -- where they were loaded up.  There's a lot of boxes to

7  fit in that kind of aircraft.

8  Q.   Are you and the colleagues, in fact, joking about this?

9  A.   Oh, of course, yeah.

10  Q.   Because, again, the unfam --

11  A.   Unusual, yeah.

12  Q.   Let's skip ahead to -- let's go back to ramp 5, time 9:30.

13       (Video played.)

14  Q.   So far we've seen two luggage carts coming full of boxes?

15  A.   Here's a third one.

16  Q.   We're seeing that now?

17  A.   Yes.

18       MR. MOYNAHAN:  Let's go back inside to the front desk,

19  time 14:15.

20       (Video played.)

21  Q.   Is that the third load of boxes coming through?

22  A.   Yes, sir.

23  Q.   Where did they take these boxes?

24  A.   These were all taken out to the front curb in the

25  passenger dropoff/pickup area is and they were loaded on that

JUAN ILLERA - DIRECT

1   SUV and off they went.

2        MR. MOYNAHAN:   Let's go to the front door there, time

3   10:10.

4        (Video played.)

5   Q.   A minute ago we saw the SUV pull up.

6   A.   Yes, sir.

7   Q.   And that, of course, was before the boxes are getting

8   loaded.   Are these the boxes going through, out to the car?

9   A.   Those are the exact boxes.

10       (Video played.)

11  Q.   Who is the fellow there in the blue vest?

12  A.   That's one of the air concierges.   Usually their job is to

13  help unload, and they will push those luggage carts to wherever

14  it needs.   And passengers usually don't do much of anything.

15  Q.   Because that's why wealthy people travel in the way they

16  do; they don't want to have to carry their own stuff?

17  A.   They don't touch their own bags.

18  Q.   But in this case --

19  A.   In this case we sat aside, had no interaction whatsoever

20  with that.

21  Q.   Were you there while they loaded this SUV at all?

22  A.   At that moment, no.   We were probably back in the line

23  shack joking about the whole thing right at the moment.

24  Q.   All right.   We'll watch them load for a little bit.

25       (Video played.)

JUAN ILLERA - DIRECT

1   Q.   Do you recall -- it's now time -- what time is it now on

2   the clock there?

3   A.   09:19.

4   Q.   So the jet's been on the ground how long?

5   A.   Hour, hour and 15.

6   Q.   Has the passenger that's on the jet --

7   A.   Nobody's come off the jet at this point, no.  Just the two

8   individuals that came off the SUV is the only thing that's --

9   other than the crew member that has gotten close to that

10  aircraft.

11  Q.   Okay.

12       MR. MOYNAHAN:  Let's go to time -- front desk 1, time

13  15:30.

14       (Video played.)

15  Q.   Eventually they get all these boxes back to the SUV.

16       Do you recall if they all fit in the SUV?

17  A.   No, I didn't recall at that moment.  I wasn't around at

18  that time.

19  Q.   Okay.  So this individual that's backing out through the

20  FBO, do you recognize him?

21       MR. MOYNAHAN:  Stop the frame, if you want.

22  A.   Those two that just came off the ramp area?

23  Q.   Yeah.

24  A.   No.

25  Q.   Okay.  Do you recognize the pilot in this photo?

JUAN ILLERA - DIRECT

1    A.    Yeah.

2          MR. MOYNAHAN:  Maybe back it up, just maybe 5 seconds.

3          (Video played.)

4    Q.    Coming inside from the ramp, is that the passenger who was

5    onboard the plane?

6    A.    Yeah, that's the two people, the individuals that are

7    inside that aircraft at that time.

8    Q.    And now it's time what?  What time is it now on the clock?

9    A.    09:25.

10   Q.    So about an hour and 20 minutes after the plane --

11   A.    Hour and 20 minutes after they arrived, yes, sir.

12         MR. MOYNAHAN:  Let's skip over to lobby staircase video,

13   time 15:08.

14         (Video played.)

15         MR. MOYNAHAN:  This will be a different view.  Pause it.

16   Q.    Is that the same person we just talked about a minute ago?

17   A.    Yes, sir.

18   Q.    The passenger who came on the plane?

19   A.    Yes, that came off the plane, yes, sir.

20   Q.    Is this individual wearing clothing typical of a person

21   who flies on private aircraft, in your experience?

22   A.    Negative.

23         MR. MASON:  Objection.

24         THE COURT:  Approach.

25         (Bench conference on the record.)

JUAN ILLERA - DIRECT

1         THE COURT:  Yes, Mr. Mason.

2         MR. MASON:  Thank you.  I think the most general objection

3    would be that the government is not permitted to have this

4    witness narrate events based on watching the video that he

5    wasn't there for.

6         The witness can authenticate the video, which he did.  He

7    already testified he was not there to observe a lot of this

8    stuff, so I don't think we can properly ask him questions about

9    what he sees on the video.

10        THE COURT:  All right.

11        Mr. Moynahan.

12        MR. MOYNAHAN:  Your Honor, the witness saw this individual

13   get off the airplane.  He obviously didn't necessarily walk

14   inside the FBO and continue to watch him.  But this provides a

15   better chance for him to view the passenger and then describe

16   what his impressions were of that passenger.

17        THE COURT:  It's appropriate for him to use the video to

18   identify individuals that he saw or has seen during the course

19   of his interaction with the defendant, but he doesn't need to

20   narrate the entire video.

21        MR. MOYNAHAN:  We're done narrating.

22        THE COURT:  Particularly the parts he was not there.

23        MR. MOYNAHAN:  Understood.

24        THE COURT:  So --

25        MR. MASON:  Your Honor, may I also add, I think the last

4 - 193
JUAN ILLERA - DIRECT

1    question is also objectionable, is this individual wearing

2    attire that's typical of individuals who fly on private

3    flights.  I think that's an inappropriate question.

4        MR. MOYNAHAN:  Your Honor, I think that one of the biggest

5    questions from this case is what's appropriate and what's not

6    appropriate, and what's common and what's not common in private

7    aviation practice.  And I think that goes to this witness's

8    knowledge about the -- you know, the persons who fly private

9    jets.

10       THE COURT:  I don't know that is particularly relevant,

11   one way or the other.  I think to order the jury to disregard

12   it may draw more attention to it.  But I will make the

13   instruction, if you like.  I'll sustain the objection and

14   direct the jury not to consider the answer to the last

15   question.

16       MR. MASON:  He hasn't answered it yet, Your Honor.

17       THE COURT:  Okay.  I'll direct him not to answer and they

18   can rephrase.

19       MR. MASON:  The government is just moving on.  Thank you.

20       THE COURT:  Counsel, come back just a minute.

21       I thought he answered, and the court reporter tells me he

22   did too, so I just wanted to give you the opportunity to tell

23   the jury to disregard the answer if you want, or we'll just

24   move on and leave it at that.

25       MR. MASON:  Okay.  So it's on the transcript?  What was

JUAN ILLERA - DIRECT

1    the answer?

2          THE COURT:  I don't know.

3          MR. MASON:  I didn't hear one.

4          THE COURT:  Madam Court Reporter, what was the response?

5          MR. MASON:  If the government is moving on, the government

6    is moving on.  Thank you.

7          THE COURT:  I want to give you a chance, since she said he

8    did.

9          (Bench conference concluded.)

10          THE COURT:  Continue, Mr. Moynahan.

11          MR. MOYNAHAN:  Thank you, Your Honor.

12   BY MR. MOYNAHAN:

13   Q.   Mr. Illera, did that pretty much sum up your contact with

14   this aircraft, what we discussed so far?

15   A.   That's it.

16   Q.   You contacted my office a few weeks ago in an email when

17   we were trying to figure out the scheduling of your testimony.

18          Do you recall that?

19   A.   Yes, sir.

20   Q.   At the time, I believe you wrote in your email that you

21   hadn't had a chance -- well, had you had a chance to review the

22   video when you contacted our office?

23   A.   Yes, sir.

24   Q.   And you had a chance to review it again more recently?

25   A.   Yes, sir.

JUAN ILLERA - DIRECT

1    Q.   Okay.  At the time in that email, you said a few things

2    about the day not being all that significant and certainly

3    routine.

4         Now that you're under oath here and testifying in this

5    court, would you like to recharacterize your testimony or would

6    you like to recharacterize your statements?

7    A.   Honestly, I was trying to get out of this whole thing.

8    Q.   Okay.  Was this event in fact a very unusual event?

9    A.   Oh, yes.

10   Q.   Was it so unusual that it stands out in your mind?

11   A.   I mean, it's not every day you see kind of this going on.

12   Q.   Okay.  And were you surprised that one of your colleagues

13   ended up calling the police about it?

14   A.   Yes, we were.

15   Q.   You were surprised about it or were you --

16   A.   We were surprised because we were joking about it, you

17   know, and we -- all of a sudden, we got police showing up.

18   Okay, you know.

19        MR. MOYNAHAN:  No further questions for this witness.

20        THE COURT:  Thank you.

21        Any cross, Mr. Stephens?

22        MR. STEPHENS:  I'm going to decline at this time.

23        THE COURT:  All right.  Mr. Mason.

24        MR. MASON:  Very briefly.

25                         CROSS-EXAMINATION

JUAN ILLERA - CROSS

1   BY MR. MASON:

2   Q.   You've seen a lot of people come and go on private planes

3   over the years?

4   A.   Yes, sir.

5   Q.   Men and women?

6   A.   Everything.

7   Q.   Old and young?

8   A.   Yes, sir.

9   Q.   All races?

10  A.   All races.

11  Q.   People look all sorts of different ways, don't they, in

12  this country?

13  A.   Yes, they do.

14  Q.   You've probably seen some celebrities coming through?

15  A.   All the time.

16  Q.   Probably seen some people in sweatpants before?

17  A.   Yeah.

18  Q.   What you said to prosecutors, when you were first asked

19  about this, was the details of those days and events were very

20  insignificant and routine to me, pretty much just another day

21  at work with airplanes, passengers and pilots.

22       Isn't that true?

23  A.   That's correct.

24       MR. MASON:   I don't have anything else.

25       THE COURT:   Very well.

4 - 197

KATHY KENNEY - DIRECT

1    Mr. Baldani?

2    MR. BALDANI:  No questions, Your Honor.

3    THE COURT:  Ms. Pollock?

4    MS. POLLOCK:  No questions, Your Honor.

5    THE COURT:  All right.  The witness may step down.

6    The United States may call its next witness.

7    MR. SLAVIN:  The United States calls Kathy Kenney.

8    **KATHY KENNEY, GOVERNMENT WITNESS, SWORN**

9    THE COURT:  You may.

10    Mr. Slavin, would counsel and the witness keep your voices

11   up and speak into those microphones.

12                          KATHY KENNEY

13                       DIRECT EXAMINATION

14   BY MR. SLAVIN:

15   Q.   Ms. Kenney, good afternoon.

16   A.   Good afternoon.

17   Q.   Could you introduce yourself to the jury and spell your

18   last name, please?

19   A.   Yes, my name is Kathy Kenney, K-e-n-n-e-y.

20   Q.   What do you do?

21   A.   I work at Signature Flight Support in Teterboro, New

22   Jersey, and I am a customer service representative.

23   Q.   How long have you been doing that?

24   A.   I have been working there, it will be six years

25   March 27th.

KATHY KENNEY - DIRECT

1    Q.    And what does your day-to-day job entail?

2    A.    Well, sometimes it's very busy and hurried, but I work at

3    the customer service desk.  And we service the crew members

4    that come in.  We are an FBO, which means we're a fixed-based

5    operation, so whatever the pilots or flight attendants need, we

6    make sure they get the services for their aircraft; as well as

7    we might help passengers out as well in terms of, you know,

8    confirming that the tail number is there and the pilots will be

9    in shortly to meet them.

10   Q.    Do you interact often with pilots?

11   A.    Yes, all the time.

12   Q.    How about passengers?

13   A.    Yes, we do.  But not as much as the pilots, because really

14   the pilots, they are our clients.

15   Q.    How many days a week do you work?

16   A.    Well, my schedule is five days a week, but I do do a lot

17   of overtime.

18   Q.    Do you often work long days?

19   A.    Sometimes I do, yeah.  If I do a double, it could be 16

20   hours in one day.

21   Q.    In a typical week, how many airplanes do you see going by

22   or coming into your FBO?

23   A.    Teterboro is considered one of the busiest private

24   aviation airports in the world, so it's quite busy.  The

25   economy has been good, so business has been good, slower on the

4 - 199

KATHY KENNEY - DIRECT

1   weekend but busier.  We might see 50 to -- 50 on maybe an

2   average day just at our base, up to a hundred.

3   Q.   Ms. Kenney, do you remember the day of October 19th, 2016?

4   A.   Yes.

5   Q.   Why do you remember that day?

6   A.   Well, it started out to be a normal day, but then it

7   became pretty unusual based on aircraft coming in and what

8   happened and transpired that morning.

9   Q.   What time did you get to work that morning?

10  A.   My shift starts at 6:00 a.m.  So I usually get there about

11  eight to five minutes beforehand and I clock in.

12  Q.   And the aircraft that you mentioned, what time did it

13  arrive?

14  A.   I'm not really sure, but it was probably midmorning.  And

15  when I say "midmorning," 6:00 a.m. is pretty early, so maybe it

16  was 8 or 9.

17  Q.   Did the plane -- did you have advance notice that this

18  plane was arriving?

19  A.   I can't remember if they called in or not.  I'm thinking

20  they didn't, yeah.  Because the other thing is we usually get

21  cars that call in for the planes and I don't think that we

22  heard our front security call in that car.

23  Q.   Is it unusual for planes to arrive without calling

24  beforehand?

25  A.   It's not unusual.  In fact, it does happen quite often and

KATHY KENNEY - DIRECT

1    it puts us in a situation where, you know, if we're busy, we

2    have to figure out how to park the plane and services, if our

3    line guys are busy, so it's really a courtesy that they do call

4    in.

5    Q.   But they don't have to?

6    A.   They don't have to, no.

7    Q.   When this plane arrived, what was the first thing that

8    happened?

9    A.   When the plane arrived, it was parked -- well, the desk

10   would be like this, where I'm now.  And then they were parked

11   back over here pretty much outside the line room window.  And

12   when the plane arrived, usually what happens is the pilots come

13   in, and the pilots did come in.

14   Q.   Before you go on, you mentioned the desk.  Are you talking

15   about your desk?

16   A.   Yes, I'm pretty much in the center of everything there at

17   a desk where I was sitting down.  And there's a counter that

18   goes a little bit higher.

19   Q.   Can you see on to the ramp where the planes are parked

20   from your desk?

21   A.   Yes, I can see to the ramp.  It depends on how I turn my

22   head.  If I'm turning and looking this way or, you know,

23   looking this way, I can see different areas of the ramp.

24   Q.   Did you see anything happening with this plane when it

25   arrived?

KATHY KENNEY - DIRECT

1   A.   Yeah.  It arrived, and then I didn't even know initially

2   that anyone was on that plane.

3   Q.   Why is that?

4   A.   Because no one was getting off it.  And usually we take

5   luggage off the plane or the line guys do.  And I almost forgot

6   that they were there because of everything I had going on at

7   the desk.  And then all of a sudden things started changing and

8   things started moving rapidly.

9   Q.   What happened next?

10  A.   After a while, there were some folks, they were trying to

11  get these, what I thought would be luggage but turned out to be

12  boxes, like a lot of boxes were coming off the plane.

13       And there were people grabbing our carts, which usually

14  doesn't happen, because we usually take care of all that for

15  our customers.  So they were taking our carts and kind of

16  rolling them outside, which I thought was very strange.  It

17  didn't make sense.

18  Q.   You said "people" and "they."  Who are the "people" and

19  the "they" in what you just described?

20  A.   There were people -- usually people come from outside on

21  the ramp into the FBO, into our lobby there.  But there were

22  people that were coming from outside, and I didn't realize it

23  but I realized it later, that they were -- the people that were

24  coming in in the vehicles or vehicle.

25  Q.   By "vehicle," you mean something other than the airplane?

KATHY KENNEY - DIRECT

1   A.   Yeah.  So we call it ground transportation.  So that's

2   usually like a car or an SUV, or it could be a Sprinter if

3   there was a large amount of people getting off.

4         MR. SLAVIN:   If we can show this witness, please, what has

5   been admitted as Exhibit 19S.  Don't play it yet, please.  Show

6   it to the jury as well, please.  Thank you.

7         (Video played.)

8   Q.   What do you see in front of you?

9   A.   This is our small lobby, which is like a living room.  And

10  I am at the desk.  I think I'm kind of standing there, but

11  there is a chair and I usually can sit.  And right now no one

12  else is in the lobby.  And then the door's straight ahead to go

13  out to the ramp.

14  Q.   So the door to the ramp is on which side as we're looking

15  at the video?

16  A.   Yeah, right where your cursor is.

17  Q.   Do you remember what happened next?

18  A.   Well, I believe -- yeah, people were coming in and then --

19  people were coming from both sides, it seemed.  But there were

20  carts coming through and then there were boxes, like tons of

21  boxes, like cargo.  So I was like, we don't do cargo, why are

22  all these boxes coming off, did they make a mistake?  You know,

23  why are they here in Teterboro?

24        It was -- the people that were doing this, they were quite

25  rude.  Usually people come in, we say hi, how are you doing.

KATHY KENNEY - DIRECT

1   And they just didn't want any part of us.

2        (Video played.)

3   Q.   Do you recognize the people who are walking through right

4   now?

5   A.   Yeah.  They were the guys there and the pilot.  And yes, I

6   remember the guy with the light suit because I thought his suit

7   was so out of date, it kind of looked like a leisure suit.  It

8   had these big lapels and it just didn't seem like he would be a

9   person that would be coming through there.

10  Q.   Did you learn -- sorry, go ahead.

11  A.   He just seemed like he was -- got his suit that was from

12  the '80s somewhere.  You know, I don't know.  Just seemed very

13  out of sort for what I see every day.

14  Q.   Did you come to learn the name of the pilot?

15  A.   I did.  We get the pilot's names because there is a

16  frequent fueling program.  So we ask the pilot's last name and

17  first name too.  And then we put their name in the system, and

18  the more fuel they take, the more points they get.  So then

19  eventually they can cash that out for like an American Express

20  card or something else.  So we do ask for their names.

21       And we also print out a landing card.  So when every

22  aircraft comes in, we put the tail number in the system and we

23  have a landing card that -- we call it a landing card, but it's

24  a piece of paper that's generated.  And it has the information

25  about the company, the type of aircraft.  And then there's

KATHY KENNEY - DIRECT

1   places on there where the pilots can fill out information.  You

2   know, if they want fuel.  Usually we hear the stuff over the

3   radio that we answer as well.  And we repeat what the pilot

4   says when they call in.

5        Yeah.  Now that I think about it, I just definitely don't

6   remember that plane calling in.  It just showed up.

7   Q.   Do you remember what that pilot's name was?

8   A.   I don't remember his first name.

9   Q.   Do you remember his last name?

10  A.   I do, but now I forget it.

11  Q.   That's okay, that's fine.

12       Would you recognize the pilot if you saw him again?

13  A.   Yeah.

14  Q.   Is he here in this courtroom?

15  A.   Do you mind if I put my glasses on?

16  Q.   Not at all, please do.

17  A.   He is right behind you.

18  Q.   What is he wearing?

19  A.   A suit and a tie.

20  Q.   What color is the tie?

21  A.   Like a maroon-ish red.

22       MR. SLAVIN:  May the record reflect that the witness has

23  identified the defendant, Robert Chipperfield?

24       THE COURT:  It will so reflect.

25  A.   Chipperfield, right.

KATHY KENNEY - DIRECT

1   Q.    Does that name ring a bell now?

2   A.    Yes.  Yes.

3   Q.    Did you find -- what did you think of how the pilot was

4   acting at this time?  Did you have any thoughts on that?

5   A.    I think he had come in before.

6         THE COURT:  Approach.

7         (Bench conference on the record.)

8         THE COURT:  Yes, Mr. Mason.

9         MR. MASON:  Thank you.  I think the pending question is,

10  what did you think of how the pilot was acting.  That's not a

11  proper question for multiple reasons.  This is a percipient

12  witness.  She's here to testify about what she saw, what she

13  observed.  She can testify to that.  What do you think about

14  how he was acting, it either calls for expert opinion or calls

15  for an improper opinion.

16        MR. SLAVIN:  I just want to interrupt.  It was a poorly

17  worded question.  I'll withdraw it.

18        THE COURT:  It was a poorly worded question.  You may

19  withdraw it.  All right.  Thank you.  Move on.

20        (Bench conference concluded.)

21        THE COURT:  You may proceed, Mr. Slavin.

22        MR. SLAVIN:  Thank you.  Can we actually play the video,

23  please, Ms. Pointer?

24        (Video played.)

25  Q.    Are you at this desk here in this video?

KATHY KENNEY - DIRECT

1   A.   Yes -- oh, no.  I'm walking in at this point.

2   Q.   So is that you in the black or --

3   A.   Wait.  I always have my hair in a bun, so I'm thinking

4   that is me, and I'm wearing a suit.  Yeah, there's me.  Yeah,

5   because I have my flower on.  They used to make us wear these

6   flowers.  So yes, that is me.

7   Q.   At this point, did you know -- had you learned anything

8   else about this plane?

9   A.   I think at this point I was a little bit confused because

10  in the frames before it, it looked like, you know, people were

11  coming from the outside out to our ramp.  And like that

12  doesn't -- they are not supposed to have that happen.

13      We don't have a security person at the door, but the pilot

14  actually is allowed to take passengers out to the plane or

15  people out to the plane because he's identified.

16      So that's why I was like, okay, well, the pilot's taking

17  them out, that's fine.  But men in suits, going out to the

18  plane, I don't know.  It was weird.

19      MR. SLAVIN:  Fast-forward a little.

20      (Video played.)

21  Q.   What's happening now?

22      MR. MASON:  Objection, Your Honor.

23  A.   Well --

24      THE COURT:  Hold on just a second.  Can you say it in a

25  word?  Come on up.

                        KATHY KENNEY - DIRECT

1           MR. MASON:  Thank you.

2           (Bench conference on the record.)

3           THE COURT:  We'll get everybody some Fitbits so we'll get

4    your 10,000 steps.

5           Yes, Mr. Mason.

6           MR. MASON:  Thank you, Your Honor.  This is the same issue

7    as with the previous witness.  Looking at the video screen,

8    this witness is not in the frame.  She's not there.

9           MR. SLAVIN:  She's in the frame.  Just described where she

10   was.  She's standing at the desk.

11          MR. MASON:  She's there right now?

12          MR. SLAVIN:  Yes.

13          MR. MASON:  So she can ask -- what I would ask is --

14          THE COURT:  Why don't you direct the witness to testify

15   only about what she sees when she is in the frame.  Would that

16   be helpful?

17          MR. MASON:  That is exactly my objection.

18          MR. SLAVIN:  Happy to do so.

19          THE COURT:  Let's do that.

20          MR. MASON:  No more narrating, other than what's happening

21   now.

22          (Bench conference concluded.)

23          THE COURT:  Mr. Slavin.

24   BY MR. SLAVIN:

25   Q.   Are you still in this video?

KATHY KENNEY - DIRECT

1  A.   I can't tell if I'm sitting down or not with this video.

2  Q.   Do you remember the next thing that happened?

3  A.   Well, I do remember that there were a lot of boxes that

4  came through, and they were using our carts to put these boxes

5  on there.  And usually we take luggage through.  We don't take

6  cargo-type of items through like that.  And I just thought it

7  was really strange.

8  Q.   Did the boxes go by you?

9  A.   Yes.

10  Q.   Did you see the boxes moving?

11  A.   I saw the boxes moving on the cart.  I don't think there

12  was anything moving in the boxes, but I saw the boxes moving

13  away in the cart, going out to the front.

14  Q.   Were you sitting at your desk as they went by?

15  A.   Yeah.  At one point I was for sure.  And I just thought it

16  was like, what the heck, what's going on here.

17  Q.   Is this the point, if we played the video, where you're

18  sitting at your desk and watching?

19  A.   Yeah.  So I think I'm sitting down there.  It's hard to

20  see me though.

21  Q.   Did you actually see all this happening?

22  A.   Yeah, because it went right in front of me.

23  Q.   What are your thoughts as this is happening?

24  A.   I just was thinking to myself, something's not right here,

25  we don't do cargo.  What are all these boxes?  And I guess the

KATHY KENNEY - DIRECT

```
 1   thing was is that they didn't talk to me about it or talk to us
 2   about moving this stuff.  And they were moving it themselves,
 3   which our people are supposed to move it.
 4         Now, there's an air con, called air con because they are
 5   air concierge, they help bring the luggage off the plane and
 6   bring coffee, iced tea to the plane.
 7         But it's like the drivers were moving this, and that
 8   doesn't happen.
 9   Q.   Did you see the pilot doing anything?
10   A.   Well, he's there in the frame right now.  He's not moving
11   it, but he is allowing the drivers to take those boxes and roll
12   them out.
13   Q.   We can pause it there.
14   A.   Usually the pilot stays with the passengers and the
15   luggage and makes sure, but he's not doing that here.  He's --
16   everything's gone out.  And usually a good pilot would stay,
17   walk out to the car to make sure everything was, you know,
18   loaded.  And he seems just to be like milling a little bit.
19   Q.   Did you observe anything else about the pilot during the
20   entire time they were in Teterboro?
21   A.   Yes, I guess other times I think I've seen him --
22         MR. MASON:  Objection.
23         THE COURT:  What you observed, the witness may testify to
24   what she observed.
25         MR. MASON:  Thank you.
```

4 - 210

KATHY KENNEY - DIRECT

1  A.    Other times I've seen him as a pilot, he would be dressed

2  up more looking like a pilot and --

3         THE COURT:  Approach.

4         MR. MASON:  Thank you.

5         (Bench conference on the record.)

6         THE COURT:  Yes, Mr. Mason.

7         MR. MASON:  Thank you.  I'll wait for my colleagues.

8         Your Honor, it appears that this witness is being put on

9  the stand and asked to simply narrate and spout long,

10 multi-sentence answers to very general questions.

11        The Court specifically directed the government to ask what

12 did you observe this moment, and she immediately launched into

13 other times I have seen him as a pilot, he was more dressed up.

14 I don't know whether that was prepared in advance or whether or

15 not she -- I don't know where that answer comes from, but it is

16 highly prejudicial.

17        Can't put this witness on that's supposed to be a fact

18 witness about what she saw on this date to give generalized

19 testimony about what pilots are supposed to wear.  She's not an

20 expert.  They have laid no foundation for her to give anything

21 like that.

22        She was noticed to us as a percipient witness for the

23 events at this moment.  And she has repeatedly gone in her

24 answers into generalized observations about the propriety or

25 impropriety of pilot conduct, which she is not an expert in.

4 - 211

KATHY KENNEY - DIRECT

1          I think the Court should admonish the government to ask

2   direct questions that she should answer -- this is their

3   witness -- to not allow her to narrate in that fashion.

4          And the Court should also admonish the jury that this

5   witness is not an expert in pilots, charter flights, in

6   anything like that.  She is a receptionist.

7          THE COURT:  Let the United States respond.

8          Mr. Slavin.

9          MR. SLAVIN:  What she just said is that she had not -- she

10  wasn't talking other pilots before.  She had seen specifically

11  this very pilot before and he was dressed differently,

12  previously.  She can testify to her previous experiences with

13  the defendant, and that this was a different experience with

14  the same person.

15         THE COURT:  I will let you lead the witness because that

16  is an appropriate line.

17         I'll tell the witness to listen carefully to the question

18  and confine her answer to the question that is asked.

19         So in part, I'm going to sustain the objection.  She

20  didn't respond to the last question.  She took off and without

21  responding to the direct question Mr. Slavin asked, so I will

22  admonish the witness, and I will let you lead her just a little

23  bit and get through this.

24         MR. SLAVIN:  I'll try to lead her around it.

25         (Bench conference concluded.)

KATHY KENNEY - DIRECT

1       THE COURT:  The Court instructs the witness to listen

2   carefully to the question asked and confine your response to

3   the question asked.

4       Mr. Slavin.

5   BY MR. SLAVIN:

6   Q.   You said that you had seen this pilot before?

7   A.   Yes, they had come in previously, and there was another

8   pilot with him.

9   Q.   Was this interaction on this date different than those --

10  was this visit different than those previous visits?

11  A.   Yes, with the -- yes.

12  Q.   I'll just keep asking questions.

13  A.   Yes.

14  Q.   And ask you to answer the questions.

15  A.   I got it now.

16  Q.   Did you observe anything about the passengers who came in?

17  Was there a passenger on the plane?

18  A.   No, at this point I didn't even see any passengers, so I

19  thought there were no passengers on the plane at this point.

20  Q.   Did you eventually see any passengers?

21  A.   Yeah.  Apparently there was a guy who got off --

22       MR. MASON:  Objection, Your Honor.

23       THE COURT:  Approach.

24       (Bench conference on the record.)

25       THE COURT:  The question was, did you see any passengers.

4 - 213

KATHY KENNEY - DIRECT

1      What's the objection?

2          MR. MASON:   The answer was, apparently there was a guy who

3  got off.  A witness that begins an answer with apparently

4  something happened, is telling us right away this is not her

5  personal observation.  She's narrating what she heard from

6  other people.

7          THE COURT:   That sounds like a cross-examination subject.

8  The question is not objectionable.  I have already instructed

9  the witness and we're going to keep finish until we finish.  So

10 move.

11         (Bench conference concluded.)

12         THE COURT:   I'll remind the witness again to listen

13 carefully to the question and answer.

14 BY MR. SLAVIN:

15 Q.   Did you ever see a passenger get off the plane?

16 A.   I did not see a passenger get off of the plane because I

17 was not outside.

18 Q.   Did you ever see anyone -- in the lobby personally see

19 someone who had been a passenger on that plane?

20 A.   Yes.

21 Q.   Did that person interact with anybody else who was on that

22 plane?

23 A.   Yes.

24 Q.   Who did he interact with?

25 A.   He interacted with the other pilot and -- the pilots.

4 - 214

KATHY KENNEY - DIRECT

1   Q.   Who was the other pilot?

2   A.   It was a lady pilot.

3   Q.   Did you learn her name?

4   A.   I think her name was Ginny.

5   Q.   Did you see the pilots interacting with anybody else?

6   A.   The pilots were interacting with the driver people that

7   came in and used our carts --

8   Q.   What --

9   A.   -- that were taking the boxes.

10  Q.   What, if anything, did you observe about those

11  interactions?

12  A.   I kind of felt that the drivers were taking the lead.

13  Q.   What do you mean by that?  Please tell us what you

14  observed.

15  A.   Okay.  That the drivers came in, they were using our

16  carts.  They were taking over the job that our people do when

17  luggage or people get off a plane.

18  Q.   Who looked like they were in charge of this?

19       MR. MASON:  Asked and answered.  Calls for speculation.

20  Foundation.

21       THE COURT:  Overruled.

22  A.   It looked like in particular the guy with the

23  light-colored leisure suit was in charge.

24  Q.   Do you take payments for fuel as part of your job?

25  A.   Yes, that is part of my job.

KATHY KENNEY - DIRECT

1   Q.   Did you take the payment for this flight?

2   A.   I did not take the payment because they were overnight, so

3   they pay when they leave or before they leave.

4   Q.   Did you take any actions with regard to what was happening

5   with this flight?

6   A.   I -- like I said, I print out what we called a landing

7   card, which is a one-page sheet.  And we are supposed to get --

8   Q.   That's okay.  Did you take any actions that you would not

9   take for a normal flight?

10  A.   With respect to what?

11  Q.   Did you contact anybody about this flight?

12  A.   I eventually did.

13  Q.   Who did you contact?

14  A.   I contacted airport operations.

15  Q.   Why did you do that?

16  A.   Because I had a really bad feeling about what was

17  happening.  It wasn't right, in my mind.

18  Q.   And what gave you that bad feeling?

19  A.   It was just the way this whole situation was handled with

20  the bag -- with the boxes, and that we didn't know anything

21  about this.  And there was such a large quantity of them.  And

22  if we were taking off cargo like that, we would know that.

23       And then, in addition, we don't -- it's not the right

24  place to do this, and to have drivers come in and take this

25  responsibility, and be very, frankly, bossy about the

KATHY KENNEY - CROSS

1  situation, it just didn't seem right to me.

2  Q.   In all the time that you've worked at Signature, how many

3  times have you called operations to report a flight that you

4  had come in?

5  A.   Only this one time.

6       MR. SLAVIN:  Thank you.  No further questions.

7       THE COURT:  Mr. Stephens?

8       MR. STEPHENS:  Nothing of this witness.

9       THE COURT:  Mr. Mason.

10      MR. MASON:  Thank you, Your Honor.

11                          CROSS-EXAMINATION

12  BY MR. MASON:

13  Q.   Good afternoon, ma'am.

14  A.   Good afternoon.

15  Q.   Were you also the Signature employee who called Captain

16  Chipperfield to apologize for the inconvenience of someone

17  having called the police?  Was that you?

18  A.   I don't -- no.

19  Q.   It wasn't you?

20  A.   (Shaking head.)

21      THE COURT:  Can you keep your voice up, please.

22  BY MR. MASON:

23  Q.   Were you present when police ultimately arrived?

24  A.   Yes, I was.

25  Q.   And the police ultimately talked to people and said

KATHY KENNEY - CROSS

1    nothing wrong here, have a nice day, everybody, right?

2    A.   No.

3    Q.   Well, they left, right?

4    A.   They left after a series of questioning went on.

5    Q.   Police talked to people, right?

6    A.   That's correct.

7    Q.   They talked to you?

8    A.   They did.

9    Q.   They talked to others as well, correct?

10   A.   That's correct.

11   Q.   After talking to people, the police left, correct?

12   A.   Yes.  But there was a lot of --

13   Q.   Police never arrested anybody, correct?

14   A.   Not that I'm aware of.

15   Q.   The police concluded there was nothing unusual going on,

16   correct?

17   A.   No.

18   Q.   And you know that because you were present for the police

19   deliberations about their actions that day?

20   A.   No, because I went into the line room and they could see

21   that I was really, like, what's going on?  They came in and

22   they said that they questioned the passengers that came off the

23   plane.

24   Q.   Ma'am, I understand -- I understand that you're telling me

25   how you felt and I appreciate that distinction.  What I'm

KATHY KENNEY - CROSS

1  asking is slightly different, okay?

2      So I'm trying to just ask what you personally observed.

3  You personally observed that the police arrived, correct?

4  A.    Yes.

5  Q.    And you personally have already told us that you had some

6  feelings that things were not right, correct?

7  A.    Absolutely.

8  Q.    Those were your words.  Your words were the drivers came

9  in and were bossy, correct?

10 A.    That's correct.

11 Q.    And you saw a person in a suit that you thought was out of

12 style; you said it looked like it was from the '80s, correct?

13 A.    Yes.

14 Q.    And you said that person didn't look right for what we

15 normally have around here.  That's what I wrote down.  Were

16 those your words?

17 A.    Yes.

18 Q.    It wasn't just the suit about him that made you

19 uncomfortable, was it?

20 A.    May I finish?  Can I finish?  Yes, because he didn't look

21 like he belonged --

22 Q.    Okay.

23 A.    -- there at all.

24 Q.    He didn't look like he belonged.  So you called the police

25 because you saw somebody coming in who didn't look like he

4 - 219

KATHY KENNEY - CROSS

1  belonged?

2  A.   No.  No, not because he didn't belong.  There was a whole

3  series of things that led up to this that were not right.

4  Q.   Okay.

5  A.   Where I live, we've had a lot of situations and we're told

6  and we're trained at work that if we see something that doesn't

7  seem right, then it's okay to follow up on that and make that

8  call.

9  Q.   Where you live, you've had a lot of situations?

10  A.   I live in the New York metropolitan area.  I'm sure you

11  know what happened, 9/11.

12  Q.   You said you had been working at Signature for six years

13  now?

14  A.   It will be six years.

15  Q.   Well, is that as of today?  As of today, is it six, is it

16  five?

17  A.   I mentioned that on March 27th, it will be six years.

18  Q.   Okay.  So we're almost at six years?

19  A.   Uh-huh.

20  Q.   This was three years ago, yes?

21  A.   (Nodding head.)

22  Q.   More or less?

23  A.   Yes.

24  Q.   Three and a half?

25       THE COURT:  Could both of you keep your voices up, please.

KATHY KENNEY - CROSS

1   BY MR. MASON:

2   Q.   We're talking about October of 2016, right?  So that's

3   three and a half years ago?

4   A.   Yes.

5   Q.   So at that point you had only been working at Signature

6   for about two and a half years, right?

7   A.   That's correct.

8   Q.   Are you aware that your colleague, who also spoke about

9   this incident, said that it was no big deal, it was just

10  another day?

11  A.   Just another day in the start of my day at 6:00 a.m.  I am

12  not aware of anything he said.

13  Q.   It was in his email.

14  A.   I wasn't in the room here.

15  Q.   So you haven't seen the email that your colleague sent

16  when he was asked about his impressions of the incidents you

17  just described, and he said it was just another day?

18  A.   No.

19  Q.   Okay.  You saw my client, Mr. Bob Chipperfield, as a

20  captain?  You said you had seen him?

21  A.   Did you say he is a captain?  Yes.

22  Q.   He flies airplanes for a living.  That's how I identify

23  him.  You said you had seen him before, right?

24  A.   Yes.

25  Q.   You said he's flown to Teterboro, you remember multiple

KATHY KENNEY - CROSS

1   times?

2   A.   I remember him before this particular day coming in, yes,

3   and the copilot as well.

4   Q.   That would be Virginia Cloer?

5   A.   Yeah.  I think he called her Ginny.

6   Q.   Ginny.  And you had seen both of them before?

7   A.   Yes.

8   Q.   The thing that stood out in your mind was it was unusual

9   to move that many boxes without having the grounds staff do it?

10  I think -- what I wrote down is that these people came in and

11  they were taking over our job, they were doing what we were

12  supposed to do.

13       So you think normally it would have been your

14  understanding that the staff at the FBO would have moved the

15  luggage?

16  A.   Yes.  It was almost like they didn't want our people to

17  move those boxes.

18  Q.   Okay.  Well, you said -- you didn't talk to anybody,

19  right?  Nobody talked to you?

20  A.   About what?

21  Q.   You said you didn't talk to these people at all, right?

22  A.   I did talk to them at one point, yes.

23  Q.   Did you say, how about we come and help you, or something

24  like that?  Did you offer to help?

25  A.   No.  Do you want me to tell you at the point where I

KATHY KENNEY - CROSS

1   talked to one of them?

2   Q.   Well, normal procedure is we try and ask specific, focused

3   questions and answer those.  That makes a cleaner record for

4   the Court.

5        You said somebody was bossy to you.  Who was bossy to you?

6   A.   The gentleman in the light-colored suit that was one of

7   the drivers.

8   Q.   Okay.  And he said something to you that you thought was

9   rude?

10  A.   Well, he was rude because he said, we need to get on the

11  ramp.  I'm like, you can't get on the ramp.  Sorry, we don't

12  allow that in Teterboro.

13  Q.   And so you told them they could not go onto the ramp with

14  their car, correct?

15  A.   I did.  But he was more insistent.

16  Q.   Okay.

17  A.   So I had to explain the procedure and why -- who could go

18  on the ramp.

19  Q.   Okay.

20  A.   And why.

21  Q.   So, ma'am, you told the gentleman, you may not take your

22  car onto the ramp; is that correct?

23  A.   Yes.

24  Q.   Okay.  And after you told them that, they parked their car

25  in a parking lot and did not drive it onto the ramp, correct?

4 - 223

KATHY KENNEY - CROSS

1   A.   No, they did not park it in the parking lot.

2   Q.   They parked it out in front?

3   A.   Yes.

4   Q.   They didn't drive it onto the ramp where the planes were?

5   A.   They did not drive it on the ramp.

6   Q.   Okay.  You said my client, Mr. Chipperfield, did not

7   participate in the moving of these boxes, correct?

8   A.   That's correct.

9   Q.   And that's confirmed by watching the video too, correct?

10   Yes.?

11   A.   Okay.

12   Q.   That fact is confirmed by the review of the video, which

13   you have done, correct?

14   A.   I believe so.

15   Q.   Okay.  Now, you said a good pilot, in your opinion, would

16   go with the passengers and make sure everything was okay.

17        Did I write down your words more or less accurately in sum

18   and substance?

19   A.   Yes.

20   Q.   Okay.

21   A.   Because the pilots --

22   Q.   So --

23   A.   -- are very service-minded.

24   Q.   Pilots are very service-minded, that's right.

25        A good pilot, in your experience, is supposed to do what

KATHY KENNEY - CROSS

1  he or she can to make sure that the passengers have a

2  successful trip, correct?

3  A.    Yes.

4      MR. MASON:  All right.  Your Honor, I don't have anything

5  else for this witness.

6      THE COURT:  Very well.

7      Mr. Baldani.

8      MR. BALDANI:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10 BY MR. BALDANI:

11 Q.    Good afternoon, Ms. Kenney.

12 A.    Good afternoon.

13 Q.    You've been asked by the attorneys about what you observed

14 on October 19th of 2016, right?

15 A.    Yes.

16 Q.    Okay.  I want to ask you about what you didn't observe.

17 You didn't observe this man -- stand up, please.  You didn't

18 observe this man that day, did you?

19 A.    He may have been there.

20 Q.    Did you say, "He may have been there"?

21 A.    I'm not sure what the question -- where you're going with

22 this.  Was he there or not there?  I don't remember his face,

23 but could have been.  He could have been one of the drivers.  I

24 mean, there was a guy wearing a dark suit and a guy wearing a

25 light suit.

KATHY KENNEY - REDIRECT

1   Q.   Do you remember seeing this guy there that day,

2   Ms. Kenney?

3   A.   I don't remember in particular.

4   Q.   I'm sorry?

5   A.   I don't remember in particular.

6   Q.   He's not the guy in the cheesy '80s leisure suit, right?

7   A.   Well, he could have changed his hair --

8   Q.   Okay.

9   A.   -- in like three years, three and a half years.

10  Q.   So he might be the guy in the leisure suit then?

11  A.   No.  I mean --

12  Q.   Never mind.

13       MR. BALDANI:  No more questions, Your Honor.

14  A.   Oh, no.

15       MR. BALDANI:  No more questions.

16       THE COURT:  All right.

17       Ms. Pollock?

18       MS. POLLOCK:  No questions, Your Honor.

19       THE COURT:  All right.

20       Redirect.

21                    REDIRECT EXAMINATION

22  BY MR. SLAVIN:

23  Q.   You said that the pilot didn't move the boxes.  Was he --

24  did you see him there when the boxes were moved, were being

25  moved through your lobby?

4 - 226

KATHY KENNEY - REDIRECT

1   A.   The pilots were kind of milling around.  So at one point,

2   he was.   At one point, after everything was moved, he was

3   there.

4   Q.   The cars that you mentioned that the boxes were loaded

5   into, did one of those cars belong to Signature?

6        MR. MASON:  Objection, Your Honor.

7        THE COURT:  Overruled.

8        MR. MASON:  Outside the scope, Your Honor.

9        THE COURT:  Overruled.

10  A.   There was an SUV that I believe had different plates, it

11  wasn't New Jersey or New York, but it was an SUV.

12  Q.   My question -- please, my question was, was one of the

13  cars a Signature car?

14  A.   Yes.

15  Q.   Who obtained that car?

16  A.   Well, the guy in the light suit, he asked the pilot to get

17  a crew car, which really sends off a signal to me that

18  something wasn't right, because I wouldn't know how that person

19  would know about crew cars.

20       MR. MASON:  Objection, Your Honor.

21       THE COURT:  Approach.

22       MR. MASON:  Thank you.

23       (Bench conference on the record.)

24       THE COURT:  Yes, Mr. Mason.

25       MR. MASON:  Your Honor, that was outside the scope of the

KATHY KENNEY - REDIRECT

```
 1   direct examination and cross.  Nobody asked on direct or on

 2   cross about a second car, or alleged that my client had got

 3   one.  It is patently unfair on redirect to elicit this.  If the

 4   government forgot it, that's their problem.  I did not ask.

 5        And now I do not get an opportunity to follow up.  This is

 6   unfair.  I think what I would request is the Court instruct

 7   that the answer be stricken and the jury not to consider it or

 8   give me --

 9        THE COURT:  Well, there's an opportunity to ask to

10   recross, upon request.  But you don't want to.

11        MR. MASON:  Of course, I want to.  I'm trying to -- I

12   would love to, if the Court would let me.  I'm trying to adhere

13   to the --

14        THE COURT:  If it's outside the scope, you can make that

15   proffer.  But let me hear a response to your objection before

16   you suggest a remedy.

17        MR. MASON:  Thank you.

18        THE COURT:  Mr. Slavin.

19        MR. SLAVIN:  He asked whether she had interactions with

20   the people there.  One of those interactions was the pilot

21   asking her for a crew car.  That is directly in response to the

22   question of, did she have interactions with them.

23        MR. MASON:  Your Honor.

24        THE COURT:  You did ask that question, Mr. Mason.

25        MR. MASON:  I did not ask that question.  That was the
```

KATHY KENNEY - REDIRECT

1   government's question.  As to the loading -- the loading of the

2   vehicle, getting a second car, I did not ask anything about

3   that.  My one question was, did the pilot participate in the

4   moving of the boxes.  And her answer was no.

5       MR. SLAVIN:  We went through the questions, one of which

6   was, did you interact -- you didn't interact with the people

7   there, did you?

8       MR. MASON:  The driver and the -- the person in the

9   leisure suit and the person in the dark suit, I asked if she

10  spoke to them.  She said they were rude and bossy.  And I said,

11  what was it about them?  Did you speak to them?  What seemed

12  rude and bossy?  And she answered that.

13      It is improper to now try to expand on redirect into this

14  issue of a second car, which never came up anywhere in the

15  direct testimony.

16      THE COURT:  They were multiple questions in the

17  cross-examination of this witness regarding her interactions

18  with all of the people.  And, in fact, the defense carefully

19  crafted and protected its ability to question in that way.  I

20  don't think this is outside the scope.

21      The woman is entitled to describe the interactions that

22  she had which she was asked about on cross-examination.

23      Now, let me say this.  I don't want these details.  I

24  don't think it's important for you to be going off into another

25  subject.  I don't remember this whole rental car thing.

KATHY KENNEY - REDIRECT

1      Can you help me understand why that is relevant?

2      MR. MOYNAHAN:  All the boxes wouldn't fit in the SUV they

3 had, Your Honor.  They had to check out a rental car to get the

4 rest of the boxes in.

5      THE COURT:  That is outside the scope.  I don't think

6 anything was mentioned about that, so I'm not going to permit

7 it.  You'll need to end this up here.  I will sustain the

8 objection.  Move on.

9      (Bench conference concluded.)

10     THE COURT:  Go ahead.

11 BY MR. SLAVIN:

12 Q.   You talked about being from the New York area.  Is that a

13 pretty diverse area?

14 A.   Yes.

15 Q.   Do you see all kinds of people going through Signature?

16 A.   I do see all kinds of people, yes.

17 Q.   Are they people from all kinds of backgrounds?

18 A.   Well, they are mostly people who have a lot of money, with

19 nice clothes, nice luggage.

20 Q.   My question is, are they from different places?

21 A.   Yes.

22 Q.   Different countries?

23 A.   Of course.  Of course they are, yes.

24 Q.   And have you ever reported any of these other people?

25 A.   No.

KATHY KENNEY - REDIRECT

1          MR. SLAVIN:  Thank you, no further questions.

2          THE COURT:  All right.  The witness may step down.

3          Members of the jury, that's all the evidence you're going

4     to hear today.  Put your notebooks in your chairs, leave your

5     badges there and I'll see you in the morning.

6          Please report at 8:45.  Look forward to seeing you.

7          (Jury left courtroom at 4:45 p.m.)

8          THE COURT:  Please be seated.

9          Mr. Mason, have you made any further inquiry of your

10    expert witness?

11         MR. MASON:  I have, Your Honor, and I have some good news

12    to report.  I believe that I can put on my entire case in the

13    early week.  If you let me open my calendar.

14         THE COURT:  In the fourth week?

15         MR. MASON:  I might even be able to do it on the third.

16    Hang on for just a second, Your Honor.  Please indulge me.

17         What I am looking at right now, Your Honor, is that if I

18    could have March 12th and 13th, then I reckon I could be done

19    16th and 17th.

20         I think I probably only have three days, but to err on the

21    side of caution -- and I understand from the government that

22    they feel that they could be done potentially on the 11th.  If

23    I could have the 12th and 13th, I think I can lock my people in

24    for that.

25         THE COURT:  Does Mr. Stephens mind if Mr. Mason proceeds

 1   ahead in his case in the defense?

 2        MR. STEPHENS:  Not one bit.

 3        THE COURT:  All right.

 4        Now, I will not, and I don't think it's appropriate though

 5   for a defendant to put on their witness in the government's

 6   case.  I know of no authority that supports that.

 7        The government has the burden of proof.  It might serve to

 8   confuse the jury and unduly prejudice.  So, you know, I can't

 9   promise that they're going to be finished, Mr. Mason, as you

10   well know.

11        MR. MASON:  So this is my dilemma, which I will apprise

12   the Court of.  I can get my expert here on the 13th.  After

13   that, the next day I can get him here is March 23rd.

14        As to my other witnesses, I can put them on on the 16th

15   and 17th.  And, of course, my main witness is here in court

16   with me.

17        So I guess -- it would be very helpful to me and I think

18   to all of us if we could have a statement from the government

19   as to an update when they are going to finish.

20        THE COURT:  Well, the problem is, is that, you know, you

21   have asked me to go to four days a week so we can stretch this

22   thing out a little bit to accommodate another defendant, and I

23   am willing to do that.

24        But then if we go four and it takes the government longer,

25   that might put you back in a box, Mr. Mason.

1          MR. MASON:  Your Honor, I have -- I will put these

2     witnesses on either in the March 23rd bracket that we had

3     originally scheduled, or in the March 12th and 13th, 16th,

4     17th.

5          THE COURT:  All right.

6          MR. MASON:  I will make that happen.  I would just love to

7     be able to hear from the government when they are going to

8     finish.

9          THE COURT:  Mr. West.

10         MR. WEST:  As the Court has stated, nobody has a crystal

11    ball.  In this matter, we've already briefed this.  The Court

12    has already ruled.  We will do our best and we are progressing

13    quite efficiently through the witness list.  In fact, we have

14    gone farther probably this week than we had anticipated.

15    Mr. Fajardo was actually set for tomorrow.

16         I can't say when the government would finish because a

17    large part of this is going to be the cross-examination of

18    Mr. Carlson which, with the seven boxes aligned behind one of

19    those pillars over there, I would say at least one defendant

20    will spend quite a bit of time going through every document and

21    piece of paper.

22         I can't answer his question.  I agree with the Court,

23    there is no case law that allows them to present their proof in

24    the course of the United States' proof.

25         We have suggested an alternative of a deposition.  If that

1   expert can get here on the 12th and 13th, we're still going,

2   we're happy with a deposition, videotape it with the Court

3   present.

4        THE COURT:  All right.

5        Ms. Pollock.

6        MS. POLLOCK:  If we're on the scenario of the 12th and the

7   13th for Mr. Mason and Mr. Baldani goes before me anyway, I

8   think that my -- the witness -- I would foresee that I could

9   put my client on, but I think I would still -- I would probably

10  be hitting the 23rd.

11       THE COURT:  Before.

12       MS. POLLOCK:  I can't get him before then.  And I think

13  the time -- we talked yesterday, Mr. Slavin and I, about a

14  video depo and the problem that presents.

15       So I think, because I'm last, I may -- and the time things

16  are taking, that it may work out.

17       THE COURT:  All right.

18       Mr. Mason.

19       MR. MASON:  May I add, Your Honor, one thing that would

20  probably be helpful to us, and I think we sort of all feel that

21  we'll be cooperative in this area, but it would be helpful to

22  us if we could hear an explicit order stating it, that the

23  defendants, during the defense side of this case, if we have

24  scheduling issues where we have to move a witness around, if we

25  could have the Court's permission to do that.

1          THE COURT:  Among the parties, as long as you all agree to

2     it, I don't care what order you put it on in.

3          MR. MASON:  Thank you, Your Honor.

4          THE COURT:  That's as explicit as I can make it.  Do I

5     need to clarify that, anybody?

6          Just make clear who you're representing.  And I'll even

7     tell the jury that, to accommodate their schedules, that some

8     of these witnesses may be called out of order.  So absolutely,

9     you can do that.

10         But let me just clarify my thinking of this.  The issue of

11    these witnesses, particularly the expert witness for

12    Mr. Chipperfield, has been discussed over the past few months.

13    All of these lawyers are experienced lawyers and aware of the

14    uncertainties inherent in every single criminal trial, not to

15    mention a six-defendant trial that on the day of trial becomes

16    a four-defendant trial.

17         It is not uncommon in multiple-defendant trials for some

18    defendants to plead guilty before, even during the trial.  As

19    we've discussed, the timing of proof in any case invariably

20    takes more or even less time than anyone can predict, even

21    given their best efforts.  And I think that we've all done the

22    best that we can.  I think the parties have worked well

23    together in that.

24         You know, back from January, Mr. Chipperfield's counsel

25    asked for permission to have his expert testify live and I've

 1    already ruled on that.  I don't think that's appropriate during

 2    the government's case.

 3        But the Court has opted to present various options to

 4    accommodate the dilemma.  I think we have all agreed that the

 5    proposal that we go dark for an entire week is not good.  It

 6    prejudices both sides and really inconveniences the jury.  So

 7    the Court is rejecting that as an alternative.

 8        Now, the prospect of proceeding four days a week so that

 9    we can stretch the trial into a fourth or fifth week, I've

10    entertained and I am willing to do that, but the problem is,

11    then, it may cause the government's case to go later.  So I'm

12    willing to do that, but I want you to think about that tonight

13    to see how it affects your thinking.

14        I have pressed both parties to produce the witnesses by

15    deposition if they can't have them here.

16        You know, the Court has an obligation, and that's to be

17    sure that the defendants' constitutional rights to mount a

18    defense are protected, and I want to do that.  But I am also

19    obligated to be sure that this trial proceeds in an efficient

20    manner, particularly considering the jury's ability to retain

21    information.

22        And I have accepted completely that the Counsel are

23    working in good faith and making every effort that they can to

24    produce their witnesses.

25        But you know, if these witnesses won't be here, I will

1    compel them if you ask me.  And I will compel their testimony.

2    I don't want to do that for reasons that I said yesterday.  But

3    if you can't get them here when you need them, I will compel

4    their appearance.  As an alternative, then you could offer

5    their testimony by deposition.

6        The thing is, is that I do think that the United States

7    will be through on the third week based on how we're

8    proceeding.  I think you all think that, but I can't make you

9    any promises with respect to that.  So I just leave you with

10   these options.

11       But, you know, I think that it's up to the defendant to

12   bring these witnesses here and within the parameters I've

13   described.  I'm willing to work with you.  But you've got to

14   get them here or get them by deposition, one way or the other.

15   Or if you ask me, I will compel them to appear to protect the

16   defendants' rights to have their defense presented to the

17   Court.

18       So I'll leave you all to think about it more, and I'll

19   allow the defense to place its proof on out of order.  And,

20   again, the issue of not proceeding on Fridays, does that make

21   this situation better or worse, I don't know.

22       MR. BALDANI:  Can we start tomorrow?

23       THE COURT:  What?

24       MR. BALDANI:  Can we start tomorrow?

25       THE COURT:  No.  I want to get at least four days of

```
 1   evidence in every week, at least four.

 2        That was a good try, though, Mr. Baldani.  You thought I

 3   was tired and you had worn me down.  All right.  Thank you all

 4   very much.

 5        Mr. West, yes.

 6        MR. WEST:  Yes, Your Honor.

 7        MR. SLAVIN:  Just, again, for everyone's planing, the

 8   witnesses tomorrow will be essentially the witnesses I listed

 9   yesterday that we didn't get to today.  So Matthew Meader,

10   McCarty, Don King -- not that Don King -- and Virginia Cloer,

11   and possibly Isaac Basilio Rosas.  There's been some transit

12   issues with him and we're doing our best to figure that one

13   out.

14        THE COURT:  If you'll give me one minute, I'll be back.

15   You are all excused.  If you give me just one minute, I'll let

16   the lawyers clear out and I'll hear the next two matters.

17        (Proceedings adjourned at 4:56 p.m.)

18

19                    C E R T I F I C A T E

20        I, Linda S. Mullen, RDR, CRR, do hereby certify that

21   the foregoing is a correct transcript from the record of

22   proceedings in this above-entitled matter.

23

24   /s/Linda S. Mullen            March 4, 2020
     Linda S. Mullen, RDR, CRR     Date of Certification
25   Official Court Reporter
```

1                            I N D E X

2     WITNESS                                    PAGE

3

      CEDRIC FAJARDO
4     Cross-Examination By Mr. Mason               3
      Cross-Examination By Mr. Baldani            26
5     Redirect Examination By Mr. West            52

6     MICHAEL VIERGUTZ
      Direct Examination By Mr. Slavin            65
7     Cross-Examination By Mr. Stephens           84
      Cross-Examination By Mr. Mason              87
8     Cross-Examination By Mr. Baldani            92
      Cross-Examination By Ms. Pollock           101
9     Redirect Examination By Mr. Slavin         102

10    GREER RABIEGA
      Direct Examination By Mr. Slavin           105
11    Cross-Examination By Mr. Mason             134
      Cross-Examination By Mr. Baldani           160
12    Redirect Examination By Mr. Slavin         162

13    JUAN ILLERA
      Direct Examination By Mr. Moynahan         171
14    Cross-Examination By Mr. Mason             196

15    KATHY KENNEY
      Direct Examination By Mr. Slavin           197
16    Cross-Examination By Mr. Mason             216
      Cross-Examination By Mr. Baldani           224
17    Redirect Examination By Mr. Slavin         225

18    EXHIBITS                                ADMITTED

19     Government Exhibit 19S                    174
       Government Exhibit 26L                     77
20     Government Exhibit 26C                    112

21

22

23

24

25